2014-1218

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MEDIA RIGHTS TECHNOLOGIES,

**Appellant**

v.

CAPITAL ONE FINANCIAL CORPORATION, et al.

**Appellees**

**Appeal from the United States District Court for the Eastern District of Virginia in *Media Rights Technologies v. Capital One Financial Corp., et al.*, 1-13-cv-00476-AJT-TRJ**

BRIEF FOR APPELLANT MEDIA RIGHTS TECHNOLOGIES
**[CORRECTED]**

Robert Greene Sterne
Byron L. Pickard
Jon E. Wright
Jonathan M. Strang
STERNE KESSLER GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, DC 20005
202.371.2600

*Counsel for Appellant,*
*Media Rights Technologies*

Dated: September 12, 2014

**Form 9**

FORM 9.   Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____ v. _____

No. _____

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

_____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

_____

_____

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

_____

_____

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

_____

_____

_____

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

_____

_____

_____          _____
          Date                                          Signature of counsel

                                        _____
                                          Printed name of counsel

Please Note: All questions must be answered

cc: _____

# TABLE OF CONTENTS

RULE 47.5 STATEMENT OF RELATED CASES ..................................................1

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF THE ISSUES............................................................................2

STATEMENT OF THE CASE...............................................................................3

STATEMENT OF FACTS .....................................................................................4

I.    Media Rights Technologies —A leader in protecting digital content.............4

II.   The '033 Patent—An elegant solution to prevent unauthorized output of
      electronic media content such as recording, copying or unrestricted
      playback .................................................................................................4

A.    The protected media content may be associated with indicators that the
      compliance mechanism can monitor for usage restrictions...........................11

B.    The "compliance mechanism" diverts protected media to a controlled
      pathway and monitors the incoming media stream and the client
      computing system. ........................................................................................12

C.    The "custom media device" is customized by having embedded within it
      one or more software switches or gates in the controlled pathway which,
      when opened by the compliance mechanism, block or "selectively
      restrict" content from reaching a particular prohibited device......................14

D.    Figure 5B shows an example of a controlled data pathway. .........................15

III.  The District Court's Claim Construction .....................................................18

A.    The district court concludes "compliance mechanism" is indefinite. ...........18

1.    The district court concludes compliance mechanism is a means-plus-
      function limitation. .......................................................................................19

2.    The district court concluded the patent did not disclose sufficient
      structure corresponding to the "compliance mechanism" under Section
      112 (f), and ruled all claims in the patent were invalid as indefinite under
      Section 112 (b)..............................................................................................21

B.    The district court concluded "custom media device" was indefinite and ruled all claims in the patent were therefore invalid under Section 112(b)..................................................................................................25

SUMMARY OF ARGUMENT ..............................................................28

STANDARDS OF REVIEW ..................................................................29

ARGUMENT ...........................................................................................30

I.    The district court reversibly erred in concluding that the "compliance mechanism" is a means-plus-function limitation because it did not consider the patent's specification................................................30

A.    This Court should reverse and remand because the district court did not analyze the patent's specification in finding Capital One overcame the strong presumption that "compliance mechanism" is a not means-plus-function limitation. ......................................................................32

B.    The district court's failure to consult the specification was not harmless error because "compliance mechanism," read in light of the specification, recites structure. ................................................34

1.    The '033 Patent claims and describes what the "compliance mechanism" is connected to. ..........................................................35

2.    The '033 Patent describes how the "compliance mechanism" interacts with the components to which it connects................................38

3.    The '033 Patent describes the processes that the "compliance mechanism" performs...................................................................40

4.    The '033 Patent discloses subcomponents that the "compliance mechanism" can include. ..............................................................42

II.    The district court erred in finding the '033 Patent failed to disclose sufficient structure corresponding to the "compliance mechanism's" functionality because it lacked relevant expert evidence as to the perspective of a skilled artisan; this Court should vacate, if not reverse, the district court's finding..........................................................43

III.   The district court's error in concluding the patent lacked adequate structure was not harmless because the '033 Patent discloses algorithms corresponding to the four claimed functions. .................................................45

A.   Source-code algorithms correspond to the controlling/managing-a-data-output-pathway-by-diverting function..........................................................46

B.   Textual algorithms correspond to the monitoring-the-controlled-data-pathway function. ...............................................................................46

C.   Source-code and textual algorithms correspond to the stopping-or-disrupting-the-playing-of-said-media-content function. ...............................47

IV.   The Court should overturn the district court's finding that "custom media device" is indefinite. .......................................................................49

A.   This issue should be vacated and remanded, at least, so the district court can comply with the Nautilus legal and evidentiary requirement........................49

B.   Even if this Court does not remand in view of Nautilus, the district court's indefiniteness reasoning was flawed, and should be reversed for that reason. ....................................................................................50

1.   The patent states that "custom media device" is software, not hardware. ....50

2.   The separate embodiments wherein the "custom media device driver" emulates the "custom media device", and vice versa, introduce breadth but not uncertainty. ......................................................................51

3.   Contrary to the district court's finding, the '033 Patent describes what is "custom" about the "custom media device."..................................................53

C.   Properly construed, Custom Media Device means "an application or driver specific to the particular media being played, viewed, or otherwise presented." ....................................................................................55

CONCLUSION AND RELIEF SOUGHT ............................................................58

# TABLE OF AUTHORITIES

## Cases

*Augme Technologies v. Yahoo, Inc.*,
   2014 WL 2782019 (Fed. Cir. 2014) .................................................................44

*Creo Products, Inc. v. Presstek, Inc.*,
   305 F. 3d 1337 (Fed. Cir. 2002) ......................................................................45

*Elcommerce.com v. SAP AG*,
   745 F.3d 490 (Fed. Cir. 2014) ...................................................................43, 46

*Finisar v. DirectTV*,
   523 F.3d 1323 (Fed. Cir. 2008) ......................................................................45

*Flo Healthcare Solutions, LLC v. Kappos*,
   697 F. 3d 1367 (Fed. Cir. 2012) ......................................................................33

*Greenberg v. Ethicon Endo-Surgery, Inc.*,
   91 F. 3d 1580 (Fed. Cir. 1996) .......................................................................32

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*,
   732 F.3d 1376 (Fed. Circ. 2013).................................................................23, 24

*Inventio AG v. Thyssen-Krupp Elevator Ams. Corp.*,
   649 F. 3d 1350 (Fed. Cir. 2011) ......................................................30, 31, 33, 34

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
   382 F.3d 1354 (Fed. Cir. 2004) ......................................................................30

*MIT v. Abacus Software*,
   462 F.3d 1344 (Fed. Cir. 2006) ......................................................................33

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S.Ct. 2120 (2014)..............................................................................44, 49

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*
   161 F.3d 697 (Fed. Cir 1998) ........................................................................31

*Phillips v. AWH*,
   415 F. 3d 1303 (Fed. Cir. 2005) ......................................................................31

*Sage Products v. Devon Indus.*,
   126 F.3d 1420 (Fed Cir. 1997) ............................................................30

*TI Group Automotive Systems (N. Am.), Inc. v. VDO N. Am., L.L.C.*,
   375 F.3d 1126 (Fed. Cir. 2004) ...........................................................31

*Triton Tech of Texas, LLC v. Nintendo of Am.*,
   2014 WL 2619546 (Fed. Cir. 2014) ...............................................30, 44

*Typhoon Touch Technologies v. Dell Inc.*,
   659 F. 3d 1376 (Fed. Cir. 2011) ..........................................................43

*Ultimax Cement Mfg. v. CTS Cement Mfg.*,
   587 F.3d 1339 (Fed. Cir. 2009) ...........................................................52

*Welker Bearing Co. v. PHD, Inc.*,
   550 F.3d 1090 (Fed. Cir. 2008) ...........................................................34

## RULE 47.5 STATEMENT OF RELATED CASES

No other appeal in or from the same civil action in the lower court was previously before this or any other appellate court. This appeal may directly affect co-pending litigation captioned *Media Rights Technologies, Inc. v. Microsoft Corp.*, Civil Action No. 5:13-cv-01916-PSG, before the United States District Court for the Northern District of California. That co-pending suit involves the patent at the center of this appeal, U.S. Patent No. 7,316,033 ("'033 Patent").

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a). On December 11, 2013, the district court entered final judgment that all claims in the '033 patent were invalid as indefinite. (A1.)[1] Media Rights Technologies timely filed a notice of appeal on January 8, 2013. (A986-88.) This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

---

[1] Citations to the Judgment, the district court's Memorandum and Opinion, and the patent-in-suit may be found at identical pages in the attached Addendum. For example, a citation to A1 will also be present at Add1. As such, parallel citations to the Addendum are not provided.

## STATEMENT OF THE ISSUES

The district erred in finding all claims of the '033 Patent invalid as indefinite. This appeal presents four issues:

1.      Did the district court err in concluding the term "compliance mechanism" is a means-plus-function limitation, even though it does not recite "means" and the district court did not consult the specification?

2.      Assuming "compliance mechanism" is means-plus-function limitation, did the district court err in concluding the '033 Patent does not disclose sufficient corresponding structure, when the district court lacked any evidence as to how a skilled artisan would have understood the patent's disclosure of algorithms corresponding to the "compliance mechanism's" computer-implemented functions?

3.      Should this Court vacate and remand the district court's ruling that the claimed "custom media device" was indefinite under Section 112 (b) so it may receive and consider evidence relevant to the Supreme Court's subsequent decision in *Nautilus*?

4.      Did the district court err in concluding that the claimed "custom media device" is indefinite?

## STATEMENT OF THE CASE

Media Rights Technologies brought this suit against three Capital One entities (collectively "Capital One") in April 2013, in the United States District Court for the Eastern District of Virginia, Civil Action No. 1:13-cv-476-AJT-TRJ. (A50-57.) Media Rights Technologies alleged that Capital One infringed Media Rights Technologies' '033 Patent, which claims and discloses systems, methods, and computer-readable media for preventing the unauthorized output of media content protected by law or agreement.

The case below was decided at the claim-construction phase, when the district court held that the terms "compliance mechanism" and "custom media device," which appear in all claims of the patent, were indefinite, thereby making all claims invalid under Section 112 (b). The district court found that the term "compliance mechanism" was a means-plus-function term and was indefinite because the patent did not disclose sufficient structure. The court further found that the term "custom media device" was indefinite because the claim and specification did not give the public the requisite notice as to the scope of the claims. The district court entered final judgment on December 13, 2013, and Media Rights Technologies timely appealed this decision in compliance with Federal Rule of Appellate Procedure 4(a). (A986-88.)

# STATEMENT OF FACTS

## I.    Media Rights Technologies —A leader in protecting digital content

Hank Risan, an inventor of the '033 Patent, founded Media Rights

Technologies, a leader in developing innovative technology for the effective

transmission, protection, and monetization of digital content (A80.) The '033

Patent is part of Media Rights Technologies' extensive portfolio.

## II.    The '033 Patent—An elegant solution to prevent unauthorized output of electronic media content such as recording, copying or unrestricted playback

The '033 Patent claims and discloses methods and implementing software

architecture for preventing a computer user who receives protected media content

on a client computer system from executing actions on that content that are

prohibited by agreement or law (such as copyright law), such as unrestricted

recording, copying, or playback.[2] (A18, A80.) The "compliance mechanism" is the

heart of the patent's invention; it diverts incoming media content protected by law

or agreement from being output on a commonly used data pathway, which would

---

[2] The '033 Patent is a continuation-in-part of then co-pending U.S. Patent

Application Ser. No. 10/304,390, now U.S. Patent No. 7,757,002 (the '390

Application). The '033 Patent incorporated the '390 Application by reference.

(A31, 1:7-12).

allow little or no control over unauthorized output of that content, to a data output pathway controlled by the "compliance mechanism." Unlike the commonly used (i.e., conventional) pathway, the controlled pathway is configured to prevent such unauthorized actions. The patent discloses several embodiments of the controlled pathway (*e.g.* Figs. 5A, 5B, & 5C) that differ primarily in the components that are configured on the controlled output data pathway. All the claims include a "custom media device" on the pathway that contains what are essentially software switches or gates that the "compliance mechanism" can open and close to enable and disable certain functions, such as recording, in response to the usage restrictions on the incoming media or in response to a user's attempt to circumvent the usage restrictions. The controlled pathway can include other components with switches that can be activated to prevent unauthorized playback or recording. Specifically, these software switches can be implemented as part of a wave shim driver (as in Figure 5A), a wave shim driver plus a custom media device (as in Figure 5B), or a wave shim driver plus a custom media device plus an output device (as in Figure 5C).



FIGURE 5A



FIGURE 5B



FIGURE 5C

In operation, once the client system receives the incoming media content data stream, the "compliance mechanism" is activated and monitors it for embedded usage restrictions associated with particular content. The compliance mechanism also monitors user requests for output operations on the incoming data stream, such as a request to record audio. When the compliance mechanism detects a requested output operation that violates a usage restriction, it opens one or more switches on the controlled data output pathway, which interrupts or blocks the relevant data output path, thereby selectively restricting the requested output function.

Exemplary claim 1 recites:

>    A method of preventing unauthorized recording of electronic media comprising:
>
>    activating a **compliance mechanism** in response to receiving media content by a client system, said **compliance mechanism** coupled to said client system, said client system having a media content presentation application operable thereon and coupled to said compliance mechanism;
>
>    controlling a data output pathway of said client system with said **compliance mechanism** by diverting a commonly used data pathway of said media player application to a controlled data pathway monitored by said compliance mechanism; and
>
>    directing said media content to a **custom media device** coupled to said compliance mechanism via said data output path, for selectively restricting output of said media content.

(A48, Claim 1, emphasis added.)

To understand how the claims work, it is helpful to consider in detail three components of the invention: the compliance mechanism, media usage restriction indicators, and the custom media device. The following description: (i) explains what these components are, (ii) explains how they function and (iii) shows how they work together through the example of the embodiment shown in Figure 5B of the patent. Annotated Figure 5B (below) will orient the reader for the following discussion of these components and Figure 5B's embodiment. Highlighted in green is CCM 300 (a specific kind of compliance mechanism) and its connections; in yellow is the custom media device; in red is the usage restriction indicator:

9



FIGURE 5B

10

**A.    The protected media content may be associated with indicators that the compliance mechanism can monitor for usage restrictions.**

The '033 Patent describes indicators that may accompany the protected media as a way to communicate to the "compliance mechanism" usage rules applicable to the media. Figure 6A shows a media file adapted with indicator 605 that enables compliance with usage rules (A42, 24:29-34):



FIGURE 6A

(A26, Fig. 6A, annotated.)

In this figure, the incoming media is input to Playback Application 501. For ease of understanding, this playback application can be a commonly used application such as Windows Media Player, which is provided with the Windows operating system. (A40, 19:27-33.) Playback application 501 is coupled to the compliance mechanism (shown as copyright compliance mechanism CCM 300) with a connection (520) that allows CCM 300 to monitor the incoming media content 499 and determine whether it is protected with usage restrictions, denoted

by indicator 605. (A41, 21:65 to 22:1.) The patent describes a number of usage

restrictions that an indicator might include:

- A level 0 indicator would indicate to CCM 300 that copying is permitted without restriction. (A43, 25:2-4.)

- A level 1 indicator would indicate to CCM 300 that single copy (but no more than one copy) of the media could be made. (A43, 25:5-9.)

- A level 2 indicator would indicate to CCM 300 that copying would be prohibited. (A43, 25:10-12.)

(A42, 24:29-34.)

**B.  The "compliance mechanism" diverts protected media to a controlled pathway and monitors the incoming media stream and the client computing system.**

The '033 Patent describes the "compliance mechanism" primarily through

several embodiments of copyright compliance mechanism CCM 300 and

associated components that include software-implemented switches or gates that

when activated (*i.e.*, opened) block the pathway to a particular output device. The

claim term "compliance mechanism," however, is broader than the disclosed CCM

300 as described in the specification. A compliance mechanism can be used to

prevent the unauthorized output of any kind of media, not just copyrighted media.

(A31, 2:45-62, describing the use of a "compliance mechanism.") The figures and

the related written description in the specification disclose various structures for

the "compliance mechanism" that accomplish the goals of the invention. For

example, Figure 3 shows that the CCM can include the following subcomponents:



FIGURE 3

The '033 Patent describes how each subcomponent depicted in Figure 3 may be

included in different embodiments of the invention. (A34, 8:18 to A37, 14:20.) For

example, it can include a user ID generator to prevent unauthorized *access* to

media content; (A34, 8:38-52; A35, 19:4-9.) The '033 Patent discloses the

coder/decoder 303 (codec) and custom-media-device-driver source code to be used

to divert media from the commonly used output pathway to the controlled output

pathway. (A36, 11:36 to 12:20.) The patent describes how the compliance

mechanism can use the codec 303 program to monitor incoming media content and ensure that usage rules are enforced. (A35, 9:24-29.) The patent continues, describing how agent programs 304 can monitor actions taken by the user of the client computer system, such as an attempt to circumvent the usage restrictions, and detect whether the components of the compliance mechanism are properly implemented. (A35, 9:43-54.)

> **C.    The "custom media device" is customized by having embedded within it one or more software switches or gates in the controlled pathway which, when opened by the compliance mechanism, block or "selectively restrict" content from reaching a particular prohibited device.**

The "custom media device" is a software application or driver that is configured for use with the "compliance mechanism." Its role in the invention is to selectively restrict media output. (A 48-49,  claims 1, 10, 19, reciting that the "custom media device" interacts with the "compliance mechanism"; A48-49; A37, 13:24-28.)

The patent discloses several ways that the "custom media device" is customized to selectively control against the unauthorized recording and playing of media content. First, the "custom media device" is communicatively coupled to the "compliance mechanism," ensuring control of media output. (A48-49, claims 1, 9, 10.) Second, the "custom media device" can include a switch that the "compliance mechanism" can control, depending on whether the media content's usage

14

restrictions prohibit or allow certain functions (such as recording). (A31, 2:45-52.)

Third, a standard media device can be converted (i.e. customized) to a custom

media device using a skin 306. (A46, 32:26-33.) A skin can be thought of as a

software program that covers another program to change its function or

appearance. The patent explains that skin 306 can be configured to omit certain

functions of a standard media device, such as a save function. (A36, 12:63-64.)

Fourth, the custom media device is specifically tailored to the protected media on

the controlled pathway. (A37, 13:56–63, describing how secured media from the

server will play on a custom media device but not on an "alternative media player

application.")

### D.     Figure 5B shows an example of a controlled data pathway.

Figure 5B illustrates the architecture of a controlled data output path to

which the "compliance mechanism" diverts incoming media content that may

contain associated usage restrictions. Figure 5B has been modified to include

indicator 605, which the patent explains is adapted for used with the embodiments

of Figures 5A, 5B, and 5C. (A42, 24:29-34.)



FIGURE 5B

16

Annotated Figure 5B[3] depicts a preferred embodiment of the claimed

invention showing the controlled data output pathway, governed or managed by

CCM 300, which is communicatively coupled to the playback application, custom

media device, and wave shim driver. (A34, 7:29-34.) The controlled output

pathway is shown in the green and red paths, where the green parts allow media to

output and the red parts block media output .This embodiment includes custom

media device 310, which can selectively restrict media output by virtue of its

switch 312. In this embodiment, CCM 300 is communicatively coupled  to

Playback Application 501, which, among other things, allows the CCM 300 to

detect usage restrictions such as contained in indicator 605. As stated above, CCM

300 is also coupled to Custom Media Device 310, and it controls switch 312, that,

when open, prevents (i.e., blocks as shown on the red paths) the recording of

incoming media by recording application 502 via the pathways 546, 548 and 566-

568. (A24, 21:39-62.) CCM is also coupled to Wave Shim Driver 309 and it

controls switch 311 that when open similarly blocks the pathways 548 and 568 to

---

[3] Figures 5A and 5C show similar embodiments. Figure 5A does not

explicitly include a custom media device since it is part of the player. Figure 5C

has an additional switch that allows the CCM 300 to interrupt the output at Digital

Out 575.

prevent recording. (A24, 22:3-9.) If applicable media restrictions did not preclude copying or recording, switches 311 and 312 would be closed.

## III.    The District Court's Claim Construction

Following briefing and oral argument, the district court issued its Opinion and Order Construing Claims, concluding that two claim terms, "compliance mechanism" and "custom media device," which appear in all claims of the patent, were indefinite and ruling the entire patent invalid under Section 112 (b). (A16-17.) Media Rights Technologies sets forth the factual findings of the Court and specifies the parts of the patent the district court ignored.

## A.    The district court concludes "compliance mechanism" is indefinite.

The district court ruled that "compliance mechanism" was indefinite based on, broadly speaking, a two-step process: first, the court determined that "compliance mechanism" was a means-plus-function term; and second, it determined that the '033 Patent disclosed insufficient structure corresponding to the claimed functions of the "compliance mechanism." In the first step, the district court looked only to the claims, but not to the patent specification. In the second step, the district court consulted the specification, but lacked any expert testimony on how a skilled artisan would understand the specification.

1.    **The district court concludes compliance mechanism is a means-plus-function limitation.**

In addressing whether "compliance mechanism" fell under Section 112 (f), the district court correctly applied the legal presumption that when a term omits any explicit recitation of "means," the term is presumed not to be a means-plus-function limitation. (A6.) To rebut this presumption, Capital One presented a four-paragraph written opinion from its expert witness, Chaterjee, who merely stated that "compliance mechanism" has no known meaning or structure in the art:

- "'Compliance mechanism' does not have an ordinary or customary meaning in the field of computer science, nor does it have an ordinary or customary meaning to one of skill in the art of the '033 Patent." (A626, para. 17.);

- "In my opinion, there is no structure known to one of skill in the art that is associated with a 'compliance mechanism' generally, or 'compliance' specifically." (A626, para. 19.)[4]

---

[4] The paragraphs of Chatarjee's declaration not quoted above state (i) that the term "compliance mechanism" appears in all claims, and (ii) that the patent's detailed description discusses "copyright compliance mechanism" not a "compliance mechanism." (A626, paras. 16 & 19.)

Capital One, which had the burden of proof, presented no other evidence to the district court on this issue.

Nevertheless, the district court found that Capital One had overcome the presumption against construing "compliance mechanism" as a means-plus-function limitation. The district court first observed that "compliance mechanism" has no known meaning in the art. (A6.) The court then examined the claims and concluded: "…this language merely explains how the components of the invention fit together and the functions performed by the compliance mechanism; it says nothing about the structure of the compliance mechanism." (A7, emphasis added. )

The district court's opinion on this issue omitted any mention of the '033 Patent's detailed specification, including its drawings, an omission made explicit in the concluding sentence of the court's ruling on this issue: "*the claims themselves* do not recite a sufficient structure, and 'compliance mechanism' must be construed as a means-plus-function term." (A7, emphasis added.)

**2.    The district court concluded the patent did not disclose sufficient structure corresponding to the "compliance mechanism" under Section 112 (f), and ruled all claims in the patent were invalid as indefinite under Section 112 (b).**

Having concluded the term was a means-plus-function limitation, the district court identified four[5] claimed functions that the "compliance mechanism" performs:

> i. "controlling a data output path [of] the client system…by diverting a commonly used data pathway of said media player application to a controlled data pathway" (claim 1);

> ii. "managing an output path of [the] client system…by diverting a commonly used pathway of [the] media player application to a controlled data pathway" (claim 10);

> iii. "monitoring the controlled data pathway" (Claims 1, 10, and 19); and

> iv. "stop[ping] or disrupt[ing] the playing of said media content file at said controlled data pathway when said playing of said media file content is outside of said usage restriction applicable to said media file."

(A7-8.)

---

[5] The first two functions are nearly identical, differing only in whether the function is characterized as "managing" versus "controlling." However, the essence of the function is precisely identical—diverting a commonly used pathway to a controlled pathway. Therefore, there are really just three, not four, separate claimed functions.

After identifying these functions, the district court then reviewed the specification to identify structure corresponding to these functions. Capital One, however, did not provide the court with any evidence on how a skilled artisan would understand the '033 Patent's disclosure, including what corresponding structures were disclosed. Deprived of this evidence, the district court, nevertheless, concluded that sufficient structure was lacking. To reach this conclusion, the district court ignored the structures disclosed in the detailed specification.

Because many of the functions disclosed and claimed in the '033 Patent are software-implemented, the district court stated that in deciding whether structure had been disclosed, its task was to determine whether the patent described algorithms for the claimed functions. (A10.) The district court's opinion on this issue then focused on Figure 3's depiction of copyright compliance mechanism (CCM 300) and the associated written description of CCM 300's components:



FIGURE 3

The court's inquiry primarily dealt with whether the particular components of CCM 300 were all mandatory or were optional: "Media Rights contends that, under a means-plus-function construction, the compliance mechanism does not necessarily include all of the identified components [of CCM 300.]…. If, however, the disclosed structure need not include any particular components…the specification in effect discloses no structure at all." (A8.) The district court then analogized the '033 Patent's disclosure of Figure 3 to the disclosure of the patent in this Court's recent *Ibormeith* decision—a case involving a patent directed to monitoring conditions indicating a driver's drowsiness. (A11, citing *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379 (Fed. Circ. 2013).) According to the district court in *Ibormeith*: "The [CAFC] concluded that the

[*Ibormeith*] patent specification did not provide a sufficient algorithm for the term 'computational means' because, even though it identified factors related to drowsiness, it did not disclose any concrete relationship between the various factors." (A11.) The district court then concluded: "The algorithm disclosed in this case, which, according to Media Rights, consists of some combination of the identified components, suffers from the same deficiency as in *Ibormeith*." (A11.)

The district court's review of the '033 Patent for structure (unaided by evidence on the perspective of a skilled artisan) omits any mention of algorithms that the '033 Patent specifically links to the claimed functions. For example:

- the patent discloses a source-code algorithm for the *managing-an-output-pathway-by-diverting* function (A36, 11:37 to 12:20);

- the patent discloses a source-code algorithm for the *controlling-an-output-pathway-by-diverting* function in the source code (A36, 11:37 to 12:20);

- the patent discloses an algorithm in textual and diagrammatic form for the *monitoring-the-controlled-pathway* function, involving iteratively checking for rules compliance (A35, 9:23-35; A29, Fig. 7C); and

- the *stopping-or-disrupting* function is linked to the source-code algorithm for Codec 303 (A35, 10: 22-25).

**B.    The district court concluded "custom media device" was indefinite and ruled all claims in the patent were therefore invalid under Section 112(b).**

The district court also held the term "custom media device" was indefinite stating that the "claims and the specification fail to define the bounds of the term 'custom media device,'" "[and] they do not 'give notice to the public of the extent of the legal protection afforded by the patent.'" (A16.) The district court's opinion provided three reasons supporting its conclusion.

First, the district court found that it was unclear whether the "custom media device" was hardware or software. (A13.) But the '033 Patent states: "Within the context of the present invention, certain discussed processes, procedures, and steps are realized as a series of instructions (*e.g., a software program*) that reside within computer system memory units of computer system 100 and which are executed by a processor(s) of computer system 100." (A33, 5:18-23, emphasis added.) The patent also describes "custom media device" as an example of a software application: "A client computer system, e.g., 210, can be configured to utilize a custom media device application, e.g., custom media device 310…" (A37, 13:24-37.)

Second, the district court found that the patent's disclosure of alternative custom-media-device embodiments where the custom media device emulates a custom media device driver, and vice versa, was confusing: "Further uncertainty

25

arises when one considers that the custom media device is, in one embodiment, 'an emulation' of a custom media device driver, '033 patent at 13:32-34, while in another embodiment, the custom media device driver emulates the custom media device, '033 patent at 14:23-24, and that the specification at other points equates the custom media device to a driver, '033 patent at 14:21-24." (A13-14.) Two things stand out about the district court's quote. First, the court's professed confusion immediately followed the district court's quote about the generally understood definition of emulation, which raises the question why the district court believed that the emulation embodiments introduced uncertainty. (A13.) Second, the quote shows that the court misread the patent, because the court reached two incompatible conclusions—the custom media device driver emulates the custom media device, while also equating the two—but cited the same part of the patent specification:

> '033 patent at 13:32-34, while in another embodiment, <u>the custom media device driver emulates</u> <u>the custom media device, '033 patent at 14:23-24</u>, and that the specification <u>at other points</u> <u>equates the custom media device to a driver, '033 patent at 14:21-24.</u> Accord
>
> One's expert on this point, an "emulator" is "generally understood by one of

cites the same part of the specification to reach different conclusions

(A13, annotated.) However, the '033 Patent, at Column 14 lines 21 to 24, discloses that the custom media device driver in one embodiment can emulate the custom

media device; it does not disclose that the two terms are synonymous. (A37, 14:21-24.)

Third, the district court found that the patent "fails to satisfactorily convey what makes the custom media device 'custom.'" (A14.) This final conclusion was premised on the district court's disregard for a relevant part of the patent specification. The district court first quoted a part of the specification describing how a media device can be customized:

> In one embodiment of the present invention, a specialized or custom media player may be involved in order to experience the media content, e.g., skin 306 of FIG. 3. Skin 306 may be implemented when CCM 300 cannot modify an industry standard media player application to comply with copyright restrictions and/or licensing agreements in accordance with the DMCA.

(A15, quoting A46, 32:26-36.) But the district court failed to appreciate the relevance of that quoted portion of the specification, reasoning that this description was not relevant: "it does not appear from specification that 'custom media player' and 'custom media device' are in fact synonyms." (A15.) The district court then noted that the "custom media player" was needed in some embodiments, but not others, while the "custom media device" "is necessarily present in every embodiment of the invention." (A15.) That statement however confused the issue of what is claimed by the '033 Patent with what the patent discloses. The claims of the '033 Patent all recited a "custom media device," but the patent discloses

27

unclaimed embodiments. For example, the disclosed-unclaimed embodiment of Figure 5A does not include a custom media device.

## SUMMARY OF ARGUMENT

The '033 Patent is an invention that solved a significant problem. It prevents improper copying of media content prohibited by law, such as copyright, or by contract. The district court erred when it found the '033 Patent invalid as indefinite. First, the district court committed reversible error by concluding that the presumption against construing the term "compliance mechanism" as a means-plus-function limitation was overcome, when it failed to read the term in light of the intrinsic record. This error was not harmless because the specification describes that "compliance mechanism" recites structure by (i) disclosing subcomponents of the "compliance mechanism," (ii) describing what the "compliance mechanism" connects to, (iii) explaining the intersection between the compliance mechanism and the components it connects to, and (iv) discussing the processes performed by the compliance mechanism.

Second, Media Rights Technologies will show that the district court erred, warranting vacatur, if not reversal, when it concluded that the '033 Patent does not disclose sufficient corresponding structures for the "compliance mechanism's" claimed functions. Although the court states it attempted to find the corresponding structure, the court lacked any evidence from one skilled in the art on whether the

patent disclosed corresponding structure. The court's error on this point was not harmless because the patent discloses algorithms that correspond to the claimed computer-implemented functions more specifically: (i) source-code algorithms correspond to the controlling/managing-a-data-output-pathway-by-diverting function, (ii) textual algorithms correspond to the monitoring-the-controlled-data-pathway function, and (iii) source-code and textual algorithms correspond to the stopping-or-disrupting-the-playing-of-said-media-content function.

Finally, the district court erred when it found that the term "custom media device" is indefinite. First, the Court should vacate and remand so that the district court can comply with the *Nautilus* decision, which issued after the court's indefiniteness ruling here. Second, Media Rights Technologies will show the court's decision was flawed because: (i) the district court ignored the patent language that the "custom media device" is software; (ii) the separate embodiments of the "custom media device driver" emulating the "custom media device," and vice versa, demonstrate the breadth of the patent, not uncertainty; and (iii) the patent describes what is "custom" about a "custom media device." Third, Media Rights Technologies will show the proper construction for Custom Media Device.

## STANDARDS OF REVIEW

This Court also reviews *de novo* a district court's decision regarding indefiniteness, including whether a means-plus-function term is indefinite for

lacking a disclosure of sufficient structure in the specification. *Triton Tech of Texas, LLC v. Nintendo of Am.*, 2014 WL 2619546 (Fed. Cir. 2014). Whether a claim term is a means-plus-function limitation is also a question of law that is reviewed *de novo*. *Id*.

## ARGUMENT

**I.   The district court reversibly erred in concluding that the "compliance mechanism" is a means-plus-function limitation because it did not consider the patent's specification.**

The claim term "compliance mechanism" does not recite "means." The recitation of "means" in a claim is central to the analysis whether a claim term is a means-plus-function limitation. *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) The term "means," especially when phrased as "means for", is "part of the classic template for a functional claim element." *Id*. (quoting *Sage Products v. Devon Indus.*, 126 F.3d 1420, 1427 (Fed Cir. 1997). A claim term that does not recite "means" triggers a presumption that the term is not a means-plus-function limitation. *Id*. And this presumption is strong: "…the presumption flowing from the absence of the term "means" is a strong one." *Inventio AG v. Thyssen-Krupp Elevator Ams. Corp.*, 649 F. 3d 1350, 1356 (Fed. Cir. 2011).

This presumption applies here, because "compliance mechanism" does not recite "means."

To overcome this strong presumption, Capital One had to show "the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Inventio*, 649 F. 3d at 1356. In addition, the test Capital One had to meet also includes a consideration of the intrinsic record, including the specification. *Id.* at 1356; *See e.g., TI Group Automotive Systems (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1135 (Fed. Cir. 2004) (§ 112 (f) did not apply to recited "pumping means" because "[t]he written description informs and fully supports the structure recited in the claims"); *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n* 161 F.3d 697, 704 (Fed. Cir 1998)(declining to construe "digital detector" as a means-plus-function limitation where "neither intrinsic nor extrinsic evidence" rebutted the presumption that a "detector" connoted structure to those of skill in the art); *Lighting World*, *Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360–63 (Fed. Cir. 2004) (reviewing the written description, technical dictionaries, and expert testimony to conclude that the defendant failed to rebut the presumption that the claimed "connector assembly" connoted sufficiently definite structure).

This need to analyze the specification makes sense, given this Court's mandate to read claim terms in the light of the specification from the perspective of a skilled artisan at the time of the invention. *See Phillips v. AWH*, 415 F. 3d 1303, 1313-14 (Fed. Cir. 2005). Importantly, the *Phillips* Court considered the written

description in deciding that the recited "steel baffles" was not a means-plus-function term. *Id*. at 1311.

**A.    This Court should reverse and remand because the district court did not analyze the patent's specification in finding Capital One overcame the strong presumption that "compliance mechanism" is a not means-plus-function limitation.**

The district court did not analyze the '033 Patent's written description in deciding that the presumption against construing "compliance mechanism" as a means-plus-function term had been overcome; instead, the district court only considered the claims: "Thus, the Court concludes that *the claims themselves* do not recite a sufficient structure, and 'compliance mechanism' must be construed as a means-plus-function term." (A7, emphasis added.)

The district court's oversight was confounded by, if not caused by, Capital One's failure to present any evidence on whether "compliance mechanism," read in light of the specification, recited structure. Instead Capital One's evidence merely showed that its expert believed the term "compliance mechanism," standing alone, did not have a generally known meaning or structure in the art. (A626, para. 17, 19.) But that meager evidence is not sufficient to overcome the presumption.

If a particular claimed "device" or "mechanism" has an understood meaning in the art or is defined in dictionaries, that may be sufficient to find that the recitation of a "device" or "mechanism" is *not* a means-plus-function term. *See e.g. Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F. 3d 1580, 1583-84 (Fed. Cir. 1996)

(involving "detent mechanism"); *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.

3d 1367, 1375 (Fed. Cir. 2012) (involving "height-adjustment mechanism"). But

this Court has never held that reciting a type of "mechanism" that lacks a known

meaning in the art or is not defined in dictionaries is sufficient to overcome the

presumption against construing a term as a means-plus-limitation. *See e.g.*

*Inventio*, 649 F.3d at 1353 (finding presumption against means-plus-function

construction was not overcome even though "modernizing device" had no well-

understood meaning in the art and was not found in technical dictionaries).

And, the instant case is not like cases where this Court held that

"mechanism" fell under Section 112 (f). For example, in *MIT v. Abacus Software*,

462 F.3d 1344, 1349 (Fed. Cir. 2006), this Court held that "colorant selection

mechanism" was a means-plus-function limitation. But the patent at issue there

used the terms "colorant selection means" and "colorant selection mechanism,"[6]

interchangeably. Further, the adjectival modifier "colorant selection" was not

defined in the specification. *Id*. Similarly, in *Welker*, the claims simply recited a

---

[6] Further, the patent involved in *Abacus Software*, 462 F.3d 1344, U.S.

Patent 4,500,919, contains no description, or even a mention, of a "colorant

selection mechanism" in the specification. In contrast, the '033 Patent's

specification contains numerous references to "mechanism" but none to "means."

"mechanism for" followed by a function, without any adjectival modifier to delineate the particular "mechanism" claimed. *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1092 (Fed. Cir. 2008).

**B.      The district court's failure to consult the specification was not harmless error because "compliance mechanism," read in light of the specification, recites structure.**

The '033 specification shows that "compliance mechanism" is not a means-plus-function limitation. In *Inventio v. Thyssen-Krupp Elevator Ams. Corp.*, 649 F. 3d 1350, 1356 (Fed. Cir. 2011) this Court reversed a finding that the claimed "modernizing device" was a means-plus-function limitation, and the Court's analysis there is instructive in light of the facts here. *Inventio*, 649 F.3d at 1356. The *Inventio* Court first accorded patentee the presumption that its claims were not subject to Section 112 (f) because the claims omitted any recitation of "means." *Id*. at 1356. The Court reversed the trial court's finding that the term was effectively means-plus-function, holding that the claimed "modernizing mechanism" recited sufficient structures, relying on the specification's descriptions showing how the mechanism connected to other components, how the mechanism interacted with those components, and the processing that the claim element performed. The Court also accorded no weight to the fact that (i) the claimed "modernizing device" had no understood meaning in the art and was not defined in any technical dictionaries,

(ii) "device" was a generic substitute for "means," and (iii) the modifier "modernizing" added no structure. *Id*.

These are precisely the facts presented in the '033 Patent: claims *and its detailed specification*, similar to the patent in *Inventio*, describe (i) what the "compliance mechanism" is connected to, (ii) describes how the "compliance mechanism" interacts with the components it is connected to, and (iii) describes the processes that the "compliance mechanism" performs." *See Iventio*, 649 F. 3d att 1358. The district court did not consider these disclosures in reaching its conclusions, resulting in its reaching the wrong results.

1.    **The '033 Patent claims and describes what the "compliance mechanism" is connected to.**

All claims of the '033 Patent recite that the "compliance mechanism" is "coupled to said client system," and claims 1-9 further recite that the "compliance mechanism" is also coupled to a "custom media device." The written description further describes that the "compliance mechanism" may be communicatively coupled to the playback application. (A34, 7:29-34.) And the patent describes embodiments showing what other elements the compliance mechanism can be connected to. For example 5B and 5C depict the copyright compliance mechanism, CCM 300, as coupled to a "Playback Application 501," "Wave Shim Driver 309," "Custom Media Device 310" and "Output Device 570":



FIGURE 5B



FIGURE 5C

**2.    The '033 Patent describes how the "compliance mechanism" interacts with the components to which it connects.**

The embodiments of Figure 5A (as well as 5B and 5C), for example, show how the compliance mechanism interacts with other components:



FIGURE 5A

CCM 300 uses the component Wave Shim Driver 309 to selectively control the recording of copyrighted media. (A39, 18: 48-53.) Without CCM 300 and switches 311 and 511, a commonly used data pathway would enable "direct sound 504 to capture incoming media 499 via wave-in line 551 and *unlawfully* output media 499 to a recording application 502 via wave-out line 568, as well as media 499 eventually going to media device driver 505, the standard default

driver." (A40, 20:5-17.) However, the '033 Patent provides a structure that solves the problem by using CCM 300 to establish a controlled data pathway implementation that can prevent unlawful recording of protected content by controlling " whether switches 311 and 511 are open (shown), thus preventing incoming media 499 from reaching a media recording application, or closed (not shown) to allow recording of incoming media 499." When switch 511 is open "incoming media 499 cannot flow to recording application 502, thus preventing unauthorized recording of it." (A40, 20:28-31.)

Figures 5B and 5C depict similar embodiments that include the "custom media device 310" and that show how CCM 300 interacts with the other system components. In the embodiment of Figure 5B:

- "CCM 300 is coupled to and controls a selectable switch 311 in waveform driver shim 309 via connection 522. CCM 300 is also coupled to and controls a selectable switch 312 in custom audio device 310 via connection 521." (A41, 21:42-46.)

- "CCM 300 controls whether switches 311 and 312 are open (shown), thus preventing the incoming media 499 from reaching a recording application, or closed (not shown) so as to allow recording of the incoming media 499." (A41, 21:46-52.)

And in the embodiment of Figure 5C:

- "CCM 300 is coupled to and controls a selectable switch 311 in waveform driver shim 309 via connection 522." (A41, 22:65-67.)

- "CCM 300 is further coupled to and controls a selectable switch 571 in media hardware output device 570 via connection 523." (A42, 23:2-4.)

- "CCM 300 controls whether switches 311 and 312 are open (shown), thus preventing the incoming media 499 from reaching a recording application, or closed (not shown) so as to allow recording of the incoming media 499." (A42, 23:6-10.)

- "Additionally, CCM 300 controls whether switch 571 is open (shown), thus preventing incoming media 499 from being output from digital output 575 of media hardware output device 570, or closed (not shown) to allow incoming media 499 to be output from media hardware output device 570." (A42,  23:10-15.)

- "Playback application 501 communicates to CCM 300, via connection 520, to determine whether incoming media 499 is protected by any copyright restrictions and/or licensing agreements." (A42, 23:43-47.)

Thus, the detailed patent specification and corresponding figures show how the compliance mechanism is connected to and interacts with the components.

### 3.    The '033 Patent describes the processes that the "compliance mechanism" performs.

The '033 Patent describes the processes that the "compliance mechanism" performs, including in some instances exemplary source code that may be used to implement them. The patent describes how the CCM 300 receives information about usage restrictions associated with the media delivered to the client system (A42, 24:29 to A43, 25:11), and uses software-implemented switches or gates to either "selectively restrict" recording, copying and/or playback or to allow recording, copying, and playback. (A41, 21:46-52; A42, 24:22-28.) As one

40

example, Figure 6A and the corresponding written description explain that incoming media 499 can include an indicator 605. (A42, 24:29-34.) Indicator 605 is received (along with media 499) by the playback application, which detects the indicator and places it in the media content stream received by CCM 300, thus communicating to CCM 300 the use restrictions (if any) for media 499. (A43, 25:1-27.) Depending on the restrictions indicated by 605, CCM 300 will then open or close switches that control recording, copying, presentation, or playback. For example, if CCM 300 of Fig 5A receives a level 2 indicator (denoting that recording is prohibited), CCM 300 "activates switches 311 and 511 to prevent any recording of incoming media 499." (A43, 25:13-17; A43, 25:21-22; A44, 28-33.)

The patent also discloses code that can divert the commonly used data pathway to a pathway controlled by the compliance mechanism, including control of the switches inserted in the controlled pathway. (A36, 11:36-42.) And, the patent, plainly describes a process that the compliance mechanism can use to monitor the controlled pathway. (A39, 18:33-47; A43, 26:8-15, A47, 33:19-32.)

In sum, the specification plainly describes structure, which the district court plainly ignored in deciding that "compliance mechanism" does not recite structure. And Capital One failed to address the structure identified in the specification, even though it bore the burden to present evidence overcoming the presumption against construing the terms as a means-plus-function limitation.

41

**4.    The '033 Patent discloses subcomponents that the "compliance mechanism" can include.**

Finally, the '033 Patent's Figure 3 discloses several structural components that together or in various sub-combinations can comprise the compliance mechanism as shown in the various disclosed embodiments. (A21, Fig. 3.) Indeed, Capital One concedes this fact, stating in its claim-construction brief, that identified Figure 3's copyright compliance mechanism, or CCM, as the structure disclosed in the specification." (A537.)



Capital One also recognized that the "the structure of these subcomponents is disclosed in Columns 8-13 of the specification." (A537.)

## II.    The district court erred in finding the '033 Patent failed to disclose sufficient structure corresponding to the "compliance mechanism's" functionality because it lacked relevant expert evidence as to the perspective of a skilled artisan; this Court should vacate, if not reverse, the district court's finding.

Assuming *arguendo* that "compliance mechanism" is a means-plus-function limitation, the district court erred in finding the specification failed to disclose sufficient associated structure. The reason for this is straight forward: the district court lacked the required evidence—because Capital One did not provide any—whether a skilled artisan reading the patent at the time of the invention would have understood it lacked structure corresponding to the claimed functions of the "compliance mechanism." *See Typhoon Touch Technologies v. Dell Inc.*, 659 F. 3d 1376, 1385 (Fed. Cir. 2011) ("The defendants have directed us to no evidence that a Programmer of ordinary skill in the field would not understand how to implement this function."). *Elcommerce.com v. SAP AG*, 745 F.3d 490, 506 (Fed. Cir. 2014) ("Without evidence, ordinarily neither the district court nor this court can decide whether, for a specific function, the description in the specification is adequate from the viewpoint of a person of ordinary skill in the field of the invention.")

"[A] means-plus-function clause is indefinite if a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim." *Elcommerce.com*, 745 F.3d at

501.[7] The patent need only disclose sufficient structure for a person of skill in the field to provide an operative software program for the specified function. *Id*. Therefore, the detail that must be provided "depends on the subject matter that is described and its role in the invention as a whole, in view of the existing knowledge in the field of the invention." *Id*.

Capital One simply did not provide evidence on this issue. Its expert merely opined that, standing alone, "compliance mechanism" has no generally understood meaning: "In my opinion, there is no structure known to one of skill in the art associated with a 'compliance mechanism' generally, or 'compliance'

---

[7] The Supreme Court's recent decision in *Nautilus v. Biosig* should not affect the analysis of whether a means-plus-function limitation is supported by sufficient corresponding structure. *Nautilus, Inc. v. Biosig Instruments, Inc.,* 134 S.Ct. 2120 (2014). The *Nautilus* decision altered the prior insolubly-ambiguous standard for indefiniteness under Section 112 (b), substituting a new reasonably-certain test. The issue here concerns the proper test under Section 112 (f). This Court recently addressed the proper test for 112(f) in two recent post-*Nautilus* cases, neither of which cite *Nautilus* on this issue. *Augme Technologies v. Yahoo, Inc*., 2014 WL 2782019 (Fed. Cir. 2014); *Triton Tech of Texas, LLC v. Nintendo of Am.*, 2014 WL 2619546 (Fed. Cir. 2014).

specifically." (A626 , para. 19.) But the district court received no evidence on the specific question whether a skilled artisan would have understood the specification as disclosing adequate structure. In the absence of any evidence of how a skilled artisan would have read the specification, the court erroneously ruled that the '033 Patent failed to disclose sufficient structure. That error is reversible because the '033 Patent discloses ample structures for the claimed functions.

**III.   The district court's error in concluding the patent lacked adequate structure was not harmless because the '033 Patent discloses algorithms corresponding to the four claimed functions.**

The '033 Patent contains ample disclosure of algorithms for all four functions corresponding to the claimed functions of the "compliance mechanism," even if this Court concludes the district court did not lack relevant expert evidence. Algorithm has a broad meaning in this context; "this Court permits a patentee to express that algorithm in any understandable terms including as a mathematical formula, in prose…, or as a flow chart, or in any other manner that provides sufficient structure." *Finisar v. DirectTV*, 523 F.3d 1323, 1340 (Fed. Cir. 2008). And, the disclosure of structure can be implicit and rely on the knowledge of a skilled artisan to "flesh out a particular structural reference in the specification for the purpose of satisfying the statutory requirement of definiteness." *Creo Products, Inc. v. Presstek, Inc*., 305 F. 3d 1337, 1347 (Fed. Cir. 2002). For computer-implemented inventions, it is standard to describe algorithms in prose, block

diagrams, and flow charts. *Elcommerce*, 745 F.3d at 503. And, a patent may omit

information and knowledge possessed by persons of ordinary skill in the field of

the invention. *Id*. "When the structure or acts that perform the function "would be

'well within the skill of persons of ordinary skill in the art,' such functional-type

block diagrams may be acceptable and, in fact, preferable if they serve in

conjunction with the rest of the specification to enable a person skilled in the art to

make such a selection and practice the claimed invention with only a reasonable

degree of routine experimentation."

**A.    Source-code algorithms correspond to the *controlling/managing-a-data-output-pathway-by-diverting* function.**

The '033 Patent discloses several algorithms for performing the claimed

*controlling/managing-a-data-output-pathway-by-diverting* function. The patent

sets forth two source-code algorithms for this function—the first in the '033 Patent

(A36, 11:36-12:20) using the CCM's codec or custom media device driver, and the

second in the incorporated '390 Application using the CCM's system hooks. ('390

App, pp 19-20.)

**B.    Textual algorithms correspond to the *monitoring-the-controlled-data-pathway* function.**

For the *monitoring-the-controlled-pathway* function, the patent textually

discloses a monitoring algorithm with the iterative steps of (i) checking for

enforcement of usage rules, (ii) if rules are enforced, retrieving a portion of media

46

content, (iii) re-checking rule enforcement, and (iv) retrieving additional portions

of media content, and (v) if rules are not enforced suspending media retrieval:

> If the rules, in accordance with CCM 300, are enforced, the codec/decoder 303 retrieves a subsequent portion of the media content that is stored locally in client computer system 210…While the newly retrieved portion is presented, CCM 300 then again checks that the rules are enforced, and retrieves an additional portion of the media file or suspends presentation of the media file is the rules are not being enforced, and these steps are performed repeatedly throughout the playback of the media file, in a loop environment, until the media file's contents have been presented in their entirety. *Advantageously, by constant monitoring during playing of media files, CCM 300 can detect undesired activities and enforces those rules as defined by CCM 300.*

(A39, 18:33-48.) The patent also describes that codec 303 of the copyright

compliance mechanism can check (i.e. monitor) the media as it passes along the

controlled output pathway to the media player application using frame-by-frame or

buffer-by-buffer algorithm. (A35, 9:26-29.)

## C.    Source-code and textual algorithms correspond to the *stopping-or-disrupting-the-playing-of-said-media-content* function.

Here again, the '033 Patent explains that its disclosed codec 303 source code

can be used to disrupt or stop media. The '033 Patent introduces the exemplary

source code for codec 303 and custom media device driver 307's function of

redirecting or diverting data pathways (A35, 10:22-25) and then states that this

same source code can stop or disrupt playback:

> For example, *codec 303… can stop or disrupt the playing of a media content file. This can be accomplished, in one embodiment, by*

*redirecting and/or diverting certain data pathways that are commonly used for recording,* such that the utilized data pathway is governed by the copyright compliance mechanism 300.

(A36, 11:2-9, emphasis added.)

Figure 6A and its accompanying text explain other ways CCM 300 can use indicator 605 to determine whether particular switches should be open or closed, thereby stopping playback. Specifically, the patent discloses the steps of (i) attaching an indicator of usage restriction to media content, (ii) detecting the indicator, and (iii) opening switches when usage is restricted:

> (i) "In one embodiment, an indicator 605 is attached to incoming media 499 for preventing unauthorized copying or recording in accordance with the SCMS" (A42, 24:51-53.)

> (ii) "Application 501 detects an indicator 605 attached therewith, in this example, a level 2 bit is placed in the bit stream for indicating to CCM 300 that copying is not permitted." (A43, 25:14-17.)

> (iii) "…when CCM 300 is configured in system 210 such as that shown in FIG. 5A, in response to a level 2 indicator bit, CCM 300, while controlling the audio path, then activates switches 311 and 511 to prevent any recording of incoming media 499." (A43, 25:18-22.)

Elsewhere, the patent describes "presentation stoppages" (i.e. stopping or disrupting playback) can be achieved with several algorithms. (A39, 18:20-32.) Codec 303 repeatedly determines rule enforcement for the media and if the rules are not enforced, media presentation is stopped by (i) outputting media without audio, (ii) or output audibly but with recording functionality disabled. (A39, 18:26-

32.) Taken together, these algorithms provide the requisite structure in the event the term is found to be a means-plus function or term.

## IV.    The Court should overturn the district court's finding that "custom media device" is indefinite.

In *Nautilus*, the Supreme Court recently changed the legal standard for determining whether the claimed "custom media device" is indefinite, replacing the insolubly-ambiguous standard with a new indefiniteness standard that requires "that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.,* 134 S.Ct. 2120 (2014) The Court imposed an evidence requirement, stating that the perspective of a skilled artisan is essential to resolve this question: "It cannot be sufficient that a court can ascribe some meaning to a patent's claims; the definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters post hoc." *Id*. at 2130.

## A.    This issue should be vacated and remanded, at least, so the district court can comply with the *Nautilus* legal and evidentiary requirement.

The Court should reverse and remand the district court's indefiniteness ruling on "custom media device" because the district did not apply the new legal standard for a finding of indefiniteness and Capital One did not submit evidence tailored to this new standard to meet its burden in proving invalidity for

indefiniteness. The district court did not apply the now-governing *Nautilus* standard because that opinion was handed down after this decision.

Aside from adjusting the legal standard for determining indefiniteness, the Supreme Court's *Nautilus* opinion also requires the court to consider evidence of the perspective of a skilled artisan under that standard, which is also lacking in the record of this case. Capital One's expert never considered the question whether a skilled artisan reading the claims, in the light of the specification, would have been "reasonably certain" of the claim scope.

**B.    Even if this Court does not remand in view of *Nautilus*, the district court's indefiniteness reasoning was flawed, and should be reversed for that reason.**

The district court's indefiniteness reasoning rested on three conclusions that show a fundamentally flawed misreading of the specification:

(i) that "custom media device" was hardware, not software, (A12-13);

(ii) that the "custom media device driver," which emulated the "custom media device", and vice versa, introduced uncertainty, (A14-15); and

(iii) that nothing in the patent described what was custom about this element. (A15.)

None of these reasons hold up to the specification's detailed disclosures.

**1.    The patent states that "custom media device" is software, not hardware.**

The patent clearly calls out "custom media device" as an example of a type of an application, making it by definition software: "A client computer system,

e.g., 210, can be configured to utilize a custom media device application, e.g., custom media device 310…." (A37, 13:24-37.) The '003 Patent states: "Within the context of the present invention, certain discussed processes, procedures, and steps are realized as a series of instructions (*e.g., a software program*) that reside within computer system memory units of computer system 100 and which are executed by a processor(s) of computer system 100." (A33, 5:18-23, emphasis added)

**2.    The separate embodiments wherein the "custom media device driver" emulates the "custom media device," and vice versa, introduce breadth but not uncertainty.**

The district court reached the wrong conclusion even though it correctly observed that two of the disclosed custom-media-device embodiments involve software emulation: one where the custom media device emulates the custom media device driver and another wherein the custom media device driver emulates the custom media device. (A13) Further, the district court correctly recognized that "emulation" had a known meaning in the art. Yet, the district court incorrectly concluded that the meaning of the term was uncertain because it encompassed multiple alternative emulation embodiments.[8] That conclusion is wrong. Simply

---

[8] Footnote 3 of the district court's memorandum opinion quotes Capital One's expert's opinion that it was not clear how a device could emulate a driver,

because the term is broad does not mean that the term is indefinite. *Ultimax Cement Mfg. v. CTS Cement Mfg.*, 587 F.3d 1339, 1352 (Fed. Cir. 2009) ("Merely claiming broadly does not render a claim insolubly ambiguous, nor does it prevent the public from understanding the scope of the patent"). Further, Media Rights Technology has already explained the district court's confusion and how it reached two contradictory and incompatible conclusions. *See* Section III.B.2. in the Statement of Facts, *supra*.

What is more, the patent describes precisely how the alternate emulation embodiments work. When the custom media device emulates the custom media driver, it not only functions as a media device but acts as or mimics the functions of the custom media device driver.[9] (A37, 13:32-47.) The patent explains that the restricted media must pass through the driver emulated by the custom media device, allowing the custom media device to restrict its output. (A37, 13:47-55.)

In the embodiment where the custom media device driver emulates the custom media device, the patent describes that the custom media device driver

and vice versa. (A13, n. 3.) But that expert opinion goes to the issue of enablement, not indefiniteness.

[9] A driver is software that typically controls hardware connected to a computer.

mimics the custom media device using the GUI and skins, making the driver appear and function as though it is also the custom media device. (A37, 13:47-50.)

### 3. Contrary to the district court's finding, the '033 Patent describes what is "custom" about the "custom media device."

The patent conspicuously describes several ways in which the "custom media device" is customized. First, the "custom media device" is communicatively coupled to the "compliance mechanism," ensuring control of media output. (A48, 36:18-35; A48, 36:62-67; A49, 37:1-21.) Second, the "custom media device" can include a switch that the "compliance mechanism" can control, depending on whether the media content's usage restrictions prohibit or allow certain functions (such as recording). (A31, 2:45-52.) Third, a standard media device can be converted (i.e. customized) to a custom media device using a skin. (A46, 32:26-33; A36, 12:63-64.) Fourth, the custom media device is tailored to the specific type of protected media on the controlled pathway (e.g., media content having embedded usage restrictions), which the custom media player but not a standard media player can present. (A37, 13:56–63, describing how secured media from the server will play on a custom media device but not on an "alternative media player application.")

The district court's opinion does not address these disclosures. Worse, the court's opinion inexplicably disregards the pertinent disclosure where a skin customizes a standard media player to make it a custom media player: "… a

specialized or custom media player may be involved in order to experience the media content, e.g., skin 306 of FIG. 3. Skin 306 may be implemented when CCM 300 cannot modify an industry standard media player application to comply with copyright restrictions and/or licensing agreements in accordance with the DMCA." (A46; 32:26-33.) The district court effectively dismissed this disclosure by holding that the "custom media player" of this embodiment was not synonymous with the claimed "custom media device." The court incorrectly reasoned that the "custom media player" and "custom media device" cannot be synonymous because the patent stated that the custom media player was optional, but the "custom media device is necessarily present in every embodiment of the invention." (Mem. Op. at 14.)

But the court's finding in this regard is wrong; the court conflated what the '033 Patent claims with what the '033 Patent discloses. While it is correct that the claims of the patent all require a "custom media device," it is not the case that all disclosed embodiments of the patent require or include a "custom media device." Consider Figure 5A, a disclosed-but-unclaimed embodiment, which omits the "custom media device." Thus one cannot fairly conclude that simply because some embodiments do not require a "media player application" that "custom media device" is not synonymous with "custom media player."

**C.    Properly construed, Custom Media Device means "*an application or driver specific to the particular media being played, viewed, or otherwise presented.*"**

Media Rights Technologies correctly argued below that "custom media device" means "an application or driver specific to the particular media being played, viewed, or otherwise presented." The '033 Patent's specification supports this construction because the specification describes what the custom media device is, what the media device does, and what the patent does not claim.

According to the specification, "custom media device" is software that is customized to operate with the compliance mechanism and customized for the particular restricted media that the patented method and system protects. The patent states that the invention involves software: "Within the context of the present invention, certain discussed processes, procedures, and steps are realized as a series of instructions (*e.g., a software program*) that reside within computer system memory units of computer system 100 and which are executed by a processor(s) of computer system 100." (A33, 5:18-23, emphasis added.) To be sure, the patent calls out custom media device 310 as an example of a software application. (A37, 13:24-37) ("… configured to utilize a custom media device application, e.g., custom media device 310….") And the patent discloses that the

"custom media device" can be a driver that emulates the device (A37, 13:47-49) or

an application that emulates a driver (A37, 13:32-34).[10]

The patent shows that the "custom media device" is customized in three

ways. First, it is coupled with the compliance mechanism. The claims recite that

the custom media device is for use with the "compliance mechanism." (A48,

36:18-67; A49, 37:1-38:67.) And the patent illustrates two ways in which "custom

media device" is customized for use with the compliance mechanism--by virtue of

switch 312 as shown in Figs. 5B and 5C.

Second, the device is customized for the usage-restricted media that is the

object of the patented method and software system. (See, e.g., A37, 13:56–63.) For

example, the patent describes how secured media will only play on a "custom

media device":

> the media content file is playable, provided the media content file
> passes through the custom media device application…. However, if an
> alternative media player application is selected, delivered media files
> from server 251 will not play on system 210.

(A37, 13:56–63.)

The patent further describes and claims that the "custom media device's"

purpose is to selectively restrict media output. (A48, 36:18-67; A49, 37:1-38:67.)

The patent describes how this purpose can be achieved, including via the

---

[10] Claims 7 and 16 claim the latter of these features.

compliance mechanism controlling software implemented switches to prevent against unauthorized output of media: "CCM 300 controls whether switches 311 and 312 are open (shown), thus preventing the incoming media 499 from reaching a recording application…." (A41, 21:46-52.) Or the custom media device can also be set as a default driver and thereby divert media from the common data output pathway (switches closed) to the controlled output pathway (one or more switches open). (A41, 21:56-62.) Also, a standard media player can be converted to a custom media player by using Skin 306. (A46, 32:26-33.) Skin 306 can govern the functions of a media player application such as, "mouse click shortcuts, keyboard shortcuts, standard system accelerators, progress bars, save functions, pause functions, rewind functions, skip track functions, forward track preview, copying to CD, copying to a portable electronic device, and the like." (A35, 9:63-67.)

Finally, the Patent also identifies the media devices that are outside the scope of the "custom media device:"

- media applications that allow recording upon output, (A37, 13:43–47) (generic ripping and recording software);

- media applications that record while selected as the default media driver, (A37, 14:21–27) ("Total Recorder"); and

- media applications that may otherwise be used as recording mechanisms, (A37, 14:29-30) ("DirectSound").

## CONCLUSION AND RELIEF SOUGHT

In view of the foregoing, Media Rights Technologies asks that the Court overturn the district court's judgment that the claims of the '033 patent are invalid as indefinite and:

1. reverse and remand the district court's ruling that the claimed "compliance mechanism" is a means-plus-function limitation;

2. if the Court affirms the district court's ruling that the claimed "compliance mechanism" is a means-plus-function limitation, reverse and remand the district court's ruling that the '033 patent failed to disclose sufficient structure corresponding to the "compliance mechanism's" function;

3. alternatively, if the Court does not reverse as requested in 2., it should reverse and remand the district court's ruling that the '033 patent failed to disclose sufficient structure corresponding to the functions of the "compliance mechanism," so the parties may present, and the court may consider, relevant expert testimony on the issue;

4. vacate and remand the district court's ruling that the claimed "custom media device" is indefinite so the district court may take relevant evidence and consider the issue in light of the Supreme Court's *Nautilus* decision;

5. alternatively, if the Court does not vacate as requested in 4., the court should reverse and remand the district court's ruling that the claimed "custom

media device" is indefinite with instructions to construe the term as ""an

application or driver specific to the particular media being played, viewed, or

otherwise presented;" and

 6. grant such other relief as this Court may deem appropriate.

Dated: September 12, 2014

<div style="margin-left:40%">

Respectfully submitted,

 /s/ Robert Greene Sterne
Robert Greene Sterne
Byron L. Pickard
Jon E. Wright
Jonathan M. Strang
STERNE KESSLER GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, DC 20005
202.371.2600

*Counsel for Appellant,*
*Media Rights Technologies*

</div>

## ADDENDUM TABLE OF CONTENTS

__ITEM__                                                                    __PAGE__

Judgment (D.I. 111) .....................................................................Add00001

Opinion & Order Construing Claims (D.I. 110)...................... Add00002-Add00017

US 7,316,033............................................................ Add00018-Add00049

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| Media Rights Technologies, Inc. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:13cv476 |
| | ) | |
| | ) | |
| Capital One Financial Corporation, et al. | ) | |
| | ) | |
| Defendant. | ) | |

**<u>JUDGMENT</u>**

Pursuant to the order of this Court entered on 12/9/2013 and in accordance with Federal Rules of Civil Procedure 58, JUDGMENT is hereby entered in favor of the Defendants and against the Plaintiff.

FERNANDO GALINDO, CLERK OF COURT

By:_____/s/_____
                    Richard Banke
                    Deputy Clerk

Dated: 12/11/2013
Alexandria, Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MEDIA RIGHTS TECHNOLOGIES, INC.,          )
                                          )
                    Plaintiff,            )
          v.                              )        Civil Action No. 1:13-cv-476
                                          )
CAPITAL ONE FINANCIAL                     )
CORPORATION, *et al.*,                    )
                                          )
                    Defendants.           )
_____ )

## OPINION AND ORDER CONSTRUING CLAIMS

This matter is before the Court for construction of the relevant claims in U.S. Patent No.

7,316,033 (the "'033 patent"). The parties have submitted briefs setting forth their proposed

constructions, and the Court held a claim construction hearing on November 5, 2013. For the

reason stated herein, the Court finds and concludes that the terms "compliance mechanism" and

"custom media device" are indefinite and that all of the claims asserted in the '033 patent are

therefore invalid and unenforceable.

### I. INTRODUCTION

Plaintiff Media Rights Technologies, Inc. ("Media Rights") filed suit on April 19, 2013,

alleging that Defendants Capital One Financial Corporation, Capital One Bank (USA), NA, and

Capital One, NA (collectively, "Capital One") infringed the '033 patent.[1] The '033 patent is

entitled "Method of Controlling Recording of Media." The patent includes twenty-seven claims,

which fall into three groups: Claims 1-9 cover a "method of preventing unauthorized recording

of electronic media"; Claims 10-18 cover a "computer readable medium having computer

implementable instructions embodied therein, said instructions for causing a client system to

perform a method of restricting recording of media content"; and Claims 19-27 cover a "system

_____

[1] The '033 patent was issued to Music Public Broadcasting, Inc., Media Rights' predecessor, on
January 1, 2008.

of preventing unauthorized recording of electronic media." '033 patent at 36-38. Claims 2-8,

11-18, and 20-27 add additional detail to the independent claims, Claims 1, 10, and 19

respectively. All of the claims are based on the same basic steps. As described in Claim 1, these

steps consist of:

> [1] activating a compliance mechanism in response to receiving media content by a client system, said compliance mechanism coupled to said client system, said client system having a media content presentation application operable thereon and coupled to said compliance mechanism;
>
> [2] controlling a data output path of said client system with said compliance mechanism by diverting a commonly used data pathway of said media player application to a controlled data pathway monitored by said compliance mechanism; and
>
> [3] directing said media content to a custom media device coupled to said compliance mechanism via said data output path, for selectively restricting output of said media content.

'033 patent at 36:20-34.

## II. STANDARD

It is the exclusive duty of the Court to construe disputed claim language of the patent at

issue. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc),

*aff'd*, 517 U.S. 370 (1996). Generally, the words of the claim are to be given their "ordinary and

customary meaning," that is, the meaning they would have "to a person of ordinary skill in the

art in question at the time of the invention." *Phillips v. AHW Corp.*, 415 F.3d 1303, 1312-13

(Fed. Cir. 2005). "[I]n interpreting an asserted claim, the court should look first to the intrinsic

evidence of record, *i.e.*, the patent itself, including the claims, the specification, and, if in

evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582

(Fed. Cir. 1996). However, the court may also consider extrinsic evidence, including, for

example, treatises, dictionaries, and expert testimony. *Phillips*, 415 F.3d at 1317-18. The

2

specification "is the single best guide to the meaning of the disputed term." *Vitronics Corp.*, 90 F.3d at 1582.

Title 35 U.S.C. § 112, ¶ 2 requires that every patent's specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as his invention." A claim that fails to satisfy this particularity requirement is invalid for indefiniteness. "The primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, *e.g.*, competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002).

Indefiniteness is a matter of claim construction, and "general principles of claim construction apply." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1348 (Fed. Cir. 2005). "Only claims not amenable to construction or insolubly ambiguous are indefinite." *Source Search Tech., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1076 (Fed. Cir. 2009) (internal quotation marks omitted). Patents are presumed valid, and an alleged infringer asserting that a claim term is indefinite must prove "by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008).

A claim to the means of accomplishing a particular task may constitute a "means-plus-function" claim falling within the scope of 35 U.S.C. § 112, ¶ 6. Title 35 U.S.C. § 112, ¶ 6 provides that "[a]n element in a claim for a combination may be expressed as a means or step for

3

performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." Thus, "§ 112, ¶ 6 operates to restrict claim limitations drafted in such functional language to those structures, materials, or acts disclosed in the specification (and their equivalents) that perform the claimed function." *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed. Cir. 1998). "Means-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function." *Phillips*, 425 F.3d at 1311. There is a rebuttable presumption that § 112, ¶ 6 applies if the word "means" appears in the claim language. *Trimed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259 (Fed. Cir. 2008).

When construing a means-plus-function claim, the court must first identify the function stated by the claim. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1428 (Fed. Cir. 1997). Next, the court must identify the corresponding structure disclosed in the specification that performs the claimed function. *Id.* The patentee will then be limited to claiming the disclosed structure and its equivalents. *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1476 (Fed. Cir. 1998). A structure disclosed in the specification is a "corresponding structure" only if "the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In order to satisfy the definiteness requirement of § 112, ¶ 2, the specification must disclose the corresponding structure "in such a manner that one skilled in the art will know and understand what structure corresponds to the means limitation." *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999).

<div align="center">4</div>

# III. CLAIMS

The parties dispute the construction of twenty-four terms and agree on the construction of one term. Because the terms "compliance mechanism" and "custom media device" play a central role in every claim of the '033 patent, the Court begins its claim construction with those terms.

## A. <u>Compliance Mechanism</u>

As an initial matter, the parties dispute whether "compliance mechanism" is a means-plus-function term. As Media Rights notes, the term does not use the word "means" and is therefore presumed to fall outside of § 112, ¶ 6. *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000). However, Capital One can rebut that presumption by showing that the claim element recites a function without reciting sufficient structure for performing that function. *Id.*

A claim phrase will not be construed as a means-plus-function term if it "denotes a type of device with a generally understood meaning in the [relevant area]." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004) (noting that, in a previous Federal Circuit case, the court found that the term "detent mechanism" was not subject to § 112, ¶ 6 because "detent" connoted a type of device with a generally understood meaning in the mechanical arts). Media Rights does not contend that "compliance mechanism" denotes a particular type of device with a generally understood meaning in the field; and courts have recognized that the term "mechanism" does not call to mind any particular structure. *See Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006) ("The term 'mechanism' standing alone connotes no more structure than the term 'means'"). Media Rights nevertheless contends that "'compliance mechanism' is . . . a specific mechanism—a tangible thing." Media

5

Rights Technologies, Inc.'s Opening Claim Construction Br. at 7. This contention, however, is difficult to reconcile with Media Rights' own proposed definition of "compliance mechanism" as "[a] set of actions or processes of a computer system (or systems) that enforce usage restrictions applicable to media content." That proposed definition suggests that a compliance mechanism is software, and not what one would ordinarily think of as "a tangible thing."

Further, the claims do not, as Media Rights argues, elucidate the structure of "compliance mechanism." The claims indicate that the compliance mechanism is coupled to a client system, a "media content presentation application," and a "custom media device," and that the compliance mechanism is activated in response to the client system receiving media content, "control[s] a data output path of [the] client system," and "monitor[s]" a "controlled data pathway." But this language merely explains how the components of the invention fit together and the functions performed by the compliance mechanism; it says nothing about the structure of the compliance mechanism itself. Thus, the Court concludes that the claims themselves do not recite a sufficient structure, and "compliance mechanism" must be construed as a means-plus-function term.

The first step, then, is to identify the function performed by the compliance mechanism. Based on the claims, the "compliance mechanism" performs the following functions:

(1) "controlling a data output path of [the] client system . . . by diverting a commonly used data pathway of [the] media player application to a controlled data pathway" (Claim 1);

(2) monitoring the controlled data pathway (Claims 1, 10 and 19);

(3) "managing an output path of [the] client system . . . by diverting a commonly used data pathway of [the] media player application to a controlled data pathway" (Claim 10); and

6

(4) "stop[ping] or disrupt[ing] the playing of [the] media content file at [the] controlled data pathway when said playing of said media file content is outside of [the] usage restriction applicable to said media file" (Claims 10 and 19).

'033 patent at 36-37.

The next step is to identify the structure in the specification that performs these functions. Capital One suggests that the corresponding structure is the "copyright compliance mechanism (CCM) 300" disclosed in Figure 3 of the '033 patent, including each of the following components: (a) Instructions 301; (b) User ID Generator 302; (c) Coder/decoder 303; (d) Agent Programs 304; (e) System Hooks 305; (f) Skins 306; (g) Custom Media Device Driver 307; and (h) Wave Shim 309. Media Rights does not appear to contest that, if "compliance mechanism" is a means-plus-function term, the corresponding structure is generally disclosed by "copyright compliance mechanism 300" in Figure 3. Rather, Media Rights contends that, under a means-plus-function construction, the compliance mechanism does not necessarily include all of the identified components, as Capital One contends. As Media Rights describes it, "[t]he '033 patent is clear . . . that the identified components can be mixed and matched as appropriate to the application," and "[t]he specific description of the various components of the compliance mechanism removes any doubt that any of the components are mandatory." Media Rights Technologies, Inc.'s Opening Claim Construction Br. at 9-10.

If, however, the disclosed structure need not include any particular components, as Media Rights reads its patent, the specification in effect discloses no structure at all. Presumably recognizing this issue, Media Rights, at the *Markman* hearing, contended that the specification indicates that some, but not all, of the specified components are required, and directed the Court

7

to the language describing the components, which it said indicates which elements are

necessarily included. *See* Hearing Tr. ("Tr.") at 67:15-20, 83:7-18 (November 5, 2013).

The specification suggests, as Media Rights contends, that "copyright compliance

mechanism 300" need not include all of the specified components. On that point, the

specification indicates that "[c]opyright compliance mechanism 300 is configured to be operable

while having portions of components, entire components, combinations of components, and/or

comp, e.g., 210, 220, and/or 230." '033 patent at 8:19-22. While incomplete, this sentence does

indicate that copyright compliance mechanism 300 includes combinations of the various

components; and in describing the components, the specification indicates that certain

components are present *in one embodiment*, while describing other components without such a

limitation. *Compare* '033 patent at 8:32-33 ("*in one embodiment*, CCM 300 is shown to include

instructions 301 . . ."); *id.* at 8:38-39 ("The copyright compliance mechanism 300 also includes,

*in one embodiment*, a user ID generator 302."); *id.* at 9:55-57 ("Copyright compliance mechanism

300 also includes one or more system hooks 305, *in one embodiment of the present invention*.");

*id.* at 11:9-11 ("*In one embodiment*, this can be performed within a driver shim, e.g., wave driver

shim 309 of Figs. 5A and 5B"); *id.* at 13:21-23 ("*In one embodiment*, copyright compliance

mechanism 300 also includes one or more custom media device driver(s) 307 . . . .") (emphasis

added), *with id.* at 9:13-15 ("copyright compliance mechanism 300 further includes one or more

coder/decoders (codec) 303 . . . ."); *id.* at 9:36-37 ("copyright compliance mechanism 300 also

includes one or more agent programs 304"); *id.* at 12:35-36 ("copyright compliance mechanism

300 also includes one or more skins 306"). Overall, this language suggests that copyright

compliance mechanism 300 necessarily includes one or more coder/decoders, one or more agent

8

programs, and one or more skins, but not instructions, a user ID generator, system hooks, a wave shim, or a custom media device driver.

The question then reduces to whether this description constitutes a sufficiently definite structure to withstand § 112, ¶ 2. The Federal Circuit has made clear that "the corresponding structure for a § 112, ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005). For a claim term to be definite, "a recited algorithm . . . need not be so particularized as to eliminate the need for any implementation choices by a skilled artisan; but it must be sufficiently defined to render the bounds of the claim—declared by section 112(f) to cover the particular structure and its equivalents—understandable by the implementer." *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379 (Fed. Cir. 2013).

According to the specification, the coder/decoder, "in one embodiment, [is] adapted to perform, but [is] not limited to, encoding/decoding of media files, compressing/decompressing of media files, detecting that delivered media files are encrypted as prescribed by CCM 300." '033 patent at 9:14-19. Essentially, a coder/decoder changes the format of incoming media content. The specification further reveals that the components labeled "agent programs" "are configured to engage in dialogs and negotiate and coordinate transfer of information between a computer system . . . a server . . . and/or media player applications . . . in one embodiment." '033 patent at 9:37-43. By this definition, agent programs would appear to be necessary components of any software. Finally, skins "are customizable interfaces that, in one embodiment, are displayed on a display device . . . of computer system 210 and provide functionalities for user interaction of delivered media content." '033 patent at 12:41-45.

9

In *Ibormeith*, the Federal Circuit addressed the definiteness of a means-plus-function term in a patent covering the monitoring of conditions affecting or indicating a driver's sleepiness and the issuing of a warning to the driver. At issue was the term "computational means," which were to "take account of sleepiness-related time-of-day information to determine the likelihood of driver sleepiness and to produce an output that . . . triggers a warning." *Ibormeith*, 732 F.3d at 1377. The Court concluded that the patent specification did not provide a sufficient algorithm for the term "computational means" because, even though it identified factors related to driver drowsiness, it did not disclose any concrete relationship between the various factors. Even if the specification could be read as disclosing a single algorithm that simply added the various factors, the court noted, Ibormeith had disclaimed such an interpretation and should be bound by that admission. Based on Ibormeith's reading, according to which the specification "cover[ed] all ways of taking into account the listed variables, or some subset of the variables," the specification did not provide "an algorithm whose terms [we]re defined and understandable." *Id.* at 1381.

The algorithm disclosed in this case, which, according to Media Rights, consists of some combination of the identified components, suffers from the same deficiency as in *Ibormeith*. Of the elements that seem to be required, only the skins provide any real idea of how the compliance mechanism achieves the requisite functions, and this alone is insufficient to provide any concrete relationship between the various components and "an algorithm whose terms are defined and understandable." *Id.* Moreover, even if the specification could be read to disclose a single structure containing all of the elements pictured in Figure 3, and even if such a structure would be sufficiently definite, Media Rights has disclaimed such an interpretation. *See Ibormeith*, 732

10

F.3d at 1381 (patentee's disclaimer of an interpretation constitutes a binding admission). The Court therefore holds that the term "compliance mechanism" is indefinite because the specification does not disclose sufficient structure.[2]

**B. <u>Custom Media Device</u>**

Media Rights contends that "custom media device" should be construed as "[a]n application or driver specific to the media content being played, viewed, or otherwise presented." Capital One contends that the term is "insolubly ambiguous."

From the claims themselves, all that is clear about the custom media device is that the media content is directed to the custom media device, which selectively restricts the output of the media content. Media Rights does not argue that "custom media device" has a commonly understood meaning; rather, it suggests that its meaning is clear from the specification. In support of this position, Media Rights first points to the portion of the specification that explains that "[a] client computer system, e.g., 210, can be configured to utilize a custom media device application, e.g., custom media device 310 . . . to control unauthorized recording of media content files." '033 patent at 13:24-28. From this description, Media Rights deduces that "[t]he patentee is plainly equating a custom media device and a custom media device application," and

---

[2] At the *Markman* hearing, Media Rights seemed to argue that one of ordinary skill in the art would understand when individual components are required based on the particular functions performed by the compliance mechanism. *See* Tr. at 75-76. Media Rights has failed, however, to offer a cogent description of the circumstances under which given components are necessary, and the Court concludes that the specification does not describe such circumstances sufficiently to disclose "an algorithm whose terms are defined and understandable." *Ibormeith*, 732 F.3d at 1381. Particularly significant in this regard is that Media Rights' expert's report fails to include any discussion of the term "compliance mechanism" or indicate that one skilled in the art would understand the bounds of the claim, including the particular structure and its equivalents. *See* Media Rights Technologies, Inc.'s Responsive Claim Construction Br. Ex. 2, Declaration of Ivan Zatkovich.

11

that the custom media device therefore can be an application. Media Rights Technologies, Inc.'s Opening Claim Construction Br. at 19-20. Media Rights then points to the specification's teaching that "[i]n one embodiment, custom media device 310 . . . is an emulation of the custom media device driver 307." '033 patent at 13:32-34. This explanation, Media Rights contends, demonstrates that the custom media device can be a driver.

The specification does seem to equate "custom media device" and "custom media device application," but this hardly helps to clarify the meaning of custom media device. Capital One's expert asserts—and Media Rights' expert does not contest—that the term "device" is typically understood to connote hardware, while "application" is typically understood to connote software. *See* Capital One's Opening Claim Construction Br. Ex. G, Chatterjee Declaration, at 10. Indeed, the specification uses the term "device" numerous times to refer to hardware. *See, e.g.*, '033 patent at 2:32-34; *id.* at 5:1-11; *id.* at 5:66-6:2. Further uncertainty arises when one considers that the custom media device is, in one embodiment, "an emulation" of a custom media device driver, '033 patent at 13:32-34, while in another embodiment, the custom media device driver emulates the custom media device, '033 patent at 14:23-24, and that the specification at other points equates the custom media device to a driver, '033 patent at 14:21-24. According to Capital One's expert on this point, an "emulator" is "generally understood by one of ordinary skill in the art to mean hardware and/or software that duplicates (or *emulates*) the functions of one computer system . . . in a different computer system . . . such that the duplicated (or *emulated*) behavior closely resembles the behavior of the real system."[3] Capital One's Opening Claim Construction

---

[3] Capital One's expert also expressed his overall opinion that "[i]t is not clear how a custom media device or custom media device driver can be an emulation of the other." Capital One's Opening Claim Construction Br. Ex. G, Chatterjee Declaration, at 11. Media Rights' expert did

12

Br. Ex. G, Chatterjee Declaration, at 11. Given this explanation, the specification indicates that the custom media device and custom media device driver can each duplicate the behavior of the other, and that they might also be the same. Far from clarifying the meaning of "custom media device," this portion of the specification further confuses the matter.

Putting aside the question whether the custom media device is hardware, software, or both, the specification fails to satisfactorily convey what makes the custom media device "custom." In its claim construction briefs, Media Rights emphasizes the following language of the specification: "A custom media device application can be, but is not limited to, a custom media audio device application for media files having sound content, a custom video device application for media files having graphical and/or numerical content, etc." '033 patent at 13:28-32. According to Media Rights, this language teaches that the custom media device is "specific to the type of media content being played, viewed, or presented (e.g., custom media audio device for sound content and custom media video device for graphical content)." Media Rights Technologies, Inc.'s Opening Claim Construction Br. at 20. But defining "custom" to mean "specific to the type of media" provides no differentiation or special attributes for the term "custom," as any media player is specific to the type media being played.

Apparently recognizing this problem, Media Rights disclaimed such a construction at the *Markman* hearing, contending that "custom" means specific to the particular media content, not the type of media content. *See* Tr. at 84-85. In support, Media Rights pointed to the following portion of the specification:

---

not respond to Capital One's expert on this point or to Capital One's expert's other opinions pertaining to the custom media device. Indeed, Media Rights' expert did not discuss the term "custom media device" at all in his report.

In one embodiment of the present invention, a specialized or custom media player may be involved in order to experience the media content, e.g., skin 306 of Fig. 3. Skin 306 may be implemented when CCM 300 cannot modify an industry standard media player application to comply with copyright restrictions and/or licensing agreements in accordance with the DMCA. Alternatively, a specialized or custom media player may not be needed to experience the media content.

'033 patent at 32:26-36.[4] Media Rights stated that "custom media device" and "custom media player" are "perhaps used interchangeably," thus suggesting that the custom media device may be a media player specialized in accordance with the relevant copyright or licensing restrictions to prevent the user from performing certain functions, for example recording. *See* Tr. at 79, 128-32.

Assuming that the meaning of "custom media player" is itself sufficiently clear, the problem with Media Rights' construction is that it does not appear from the specification that "custom media player" and "custom media device" are in fact synonyms. First, one would expect that the portion of the specification that Media Rights relies on to define "custom media device" would actually reference that term, which it does not. Further, the specification indicates that the custom media player "may be involved" in "one embodiment" of the invention, and alternatively, "may not be needed," while the custom media device is necessarily present in every embodiment of the invention. Finally, Media Rights insists that the custom media device may be an application or a driver, and the "custom media player" described in the specification seems to be limited to an application. *See* '033 patent at 17:67-18:3, 32:29-32 (indicating that a

---

[4] The specification also discusses the use of a custom media player at another point, using similar language. *See* '033 patent a 17:64-18:5 ("In one embodiment of the present invention, a specialized or custom media player may or may not be required to experience the media content, e.g., skin 306 of FIG. 3. A skin 306 may be necessary when CCM 300 cannot modify an industry standard media player application to comply with copyright restrictions and/or licensing agreements in accordance with the DMCA. Alternatively, an industry standard media player can be utilized by client computer system 210 to experience the media content.").

14

custom media player can be used when CCM 300 cannot modify an industry standard media player application). Thus, while a custom media player might be one manifestation of a custom media device, it is not at all evident that the term "custom media device" is so limited.

Because the claims and specification fail to define the bounds of the term "custom media device," they do not "give notice to the public of the extent of the legal protection afforded by the patent." *All Dental Prodx, LLC*, 309 F.3d at 779. The Court therefore concludes that the term "custom media device" is indefinite.[5]

## IV. CONCLUSION

The terms "compliance mechanism" and "custom media device" play a central role in every claim of the '033 patent, and, having concluded that those terms are indefinite, the Court

---

[5] For the first time in its responsive claim construction brief, Capital One suggests that "custom media device" is a means-plus-function term falling within the scope of § 112, ¶ 6. *See* Capital One's Responsive Claim Construction Br. at 10-11. Indeed, the Federal Circuit has made clear that "device," like "means" and "mechanism," is a generic term that "typically do[es] not connote sufficiently definite structure" to escape § 112, ¶ 6. *Mass Inst. of Tech.*, 462 F.3d at 1354. And "custom media device" does not have any inherent structure. Thus, § 112, ¶ 6 would seem to apply. However, because the parties did not focus on this issue in their briefs or at the *Markman* hearing, the Court will not rely on a "means-plus-function" analysis and will construe the term "custom media device" without reference to § 112, ¶ 6. Nevertheless, it does appear to the Court, without deciding, that "custom media device" is also indefinite if construed as a means-plus-function term. First, a structure disclosed in the specification is a "corresponding structure" for purposes of § 112, ¶ 6 only if "the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc.*, 124 F.3d at 1424. The specification in this case does not disclose any structure that is clearly linked to the function performed by the custom media device, *i.e.*, selectively restricting the output of the media content. Further, even if the "custom media player" identified in the specification is an embodiment of the custom media device and the term could be limited to that embodiment, the specification only makes clear that the "custom media player" is specialized, potentially through the use of a skin, in order to ensure compliance with copyright restrictions or licensing agreements. This description does not disclose an algorithm that is "sufficiently defined to render the bounds of the claim . . . understandable by the implementer." *Ibormeith*, 732 F.3d at 1379.

15

holds that the entire patent is invalid. It is therefore unnecessary to construe the other disputed terms.

Accordingly, it is hereby

ORDERED that Claims 1-27 of the '033 patent are indefinite under 35 U.S.C. § 112, ¶ 2; and it is further

ORDERED, based on the claims construction stated herein, that the '033 patent involved in this action be, and the same hereby is, declared invalid and unenforceable and that this action be, and the same hereby is, DISMISSED with prejudice.

The Clerk is directed to forward copies of this Order to all counsel of record and to enter judgment in defendant's favor pursuant to Fed. R. Civ. P. 58.

_____
/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
December 9, 2013

16

US007316033B2

(12) **United States Patent**
Risan et al.

(10) Patent No.: **US 7,316,033 B2**
(45) **Date of Patent:** **Jan. 1, 2008**

(54) **METHOD OF CONTROLLING RECORDING OF MEDIA**

(75) Inventors: **Hank Risan**, Santa Cruz, CA (US); **Edward Vincent Fitzgerald**, Santa Cruz, CA (US)

(73) Assignee: **Music Public Broadcasting, Inc.**, Santa Cruz, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 787 days.

(21) Appl. No.: **10/325,243**

(22) Filed: **Dec. 18, 2002**

(65) **Prior Publication Data**

US 2004/0103300 A1     May 27, 2004

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/304,390, filed on Nov. 25, 2002.

(51) **Int. Cl.**
*H04L 9/00* (2006.01)
*G06F 15/16* (2006.01)

(52) **U.S. Cl.** .......................... **726/33**; 705/57; 709/231; 713/165; 726/30

(58) **Field of Classification Search** ................ 709/231; 726/30; 705/57; 713/165, 193
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,845,065 A * 12/1998 Conte et al. .................. 726/31

| 6,389,541 | B1 * | 5/2002 | Patterson | 726/9 |
| 6,920,567 | B1 * | 7/2005 | Doherty et al. | 726/22 |
| 2004/0039911 | A1 * | 2/2004 | Oka et al. | 713/175 |

FOREIGN PATENT DOCUMENTS

WO        WO-0146952        6/2001

OTHER PUBLICATIONS

"California Software Labs Multi Monitor Display and Video Mini Port Driver Development", http://www.cswl.com/whitepapers/multi-monitor-display.html, (Oct. 2005), 1-9.

* cited by examiner

*Primary Examiner*—Gilberto Barron, Jr.
*Assistant Examiner*—Laurel Lashley

(57) **ABSTRACT**

A method of preventing unauthorized recording of electronic media is described. The method is comprised of activating a compliance mechanism in response to receiving media content by a client system. The compliance mechanism is coupled to the client system. The media content presentation application is operable and coupled to the compliance mechanism. The method is further comprised of controlling a data output path of the client computer with the compliance mechanism. The method is further comprised of directing the media content via the data output path to a custom media device for selectively restricting output of the media content. The custom media device is coupled to the compliance mechanism and to the media content presentation application. The method is further comprised of preventing a recording application coupled to the client computer system from recording the media content file when recording violates usage restriction applicable to the media content.

**27 Claims, 12 Drawing Sheets**



100



FIGURE 1

200



FIGURE 2

300



FIGURE 3



FIGURE 4



FIGURE 5A



FIGURE 5B



FIGURE 5C

600



FIGURE 6A



700

FIGURE 7A



FIGURE 7B



700

Ⓑ

Web server issues redirect with access key to get content
732

Client sends new request including access key to content server
734

Valid access key?
736
— No → Redirect Client 737

Yes

Content server transfers media with attached header to client
738

Client receives and stores delivered media
740

Codec sends authorization data to server for verification
742

Pass or Fail
744
— Fail → Unsuccessful Authorization Notification 745

Pass

Server delivers data to enable media player application to present contents of media file
746

Client's media player application presents portions of received media
748

CCM Rules Enforced ?
750
— No → Media Presentation Suspended 751
— Yes → Retreive next portion of media 752

Return

FIGURE 7C



FIGURE 8

**1**

# METHOD OF CONTROLLING RECORDING OF MEDIA

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of co-pending U.S. patent application Ser. No. 10/304,390, entitled "CONTROLLING INTERACTION OF DELIVERABLE ELECTRONIC MEDIA" by Hank Risan, et al., filed Nov. 25, 2002, assigned to the assignee of the present invention, and which is hereby incorporated by reference.

## FIELD OF THE INVENTION

The present invention relates to the recording of electronic media. More particularly, the present invention relates to preventing unauthorized recording of electronic media.

## BACKGROUND OF THE INVENTION

With advancements in hardware and software technology, computers are integral tools utilized in various applications, such as finance, CAD (computer aided design), manufacturing, health care, telecommunication, education, etc. Further, an enhancement in computer functionality can be realized by communicatively coupling computers together to form a network. Within a network environment, computer systems enable users to exchange files, share information stored in common databases, combine or pool resources, communicate via electronic mail (e-mail), and access information on the Internet. Additionally, computers connected to a network environment, e.g., the Internet, provide their users access to data and information from all over the world.

Some of the various types of data that a user can access and share include, but are not limited to, text data such as that found in a word document, graphical data such as that found in pictures, e.g., JPEGs, GIFs, TIFFs, audio data such as that found in music files, e.g., MP3 files, and video data such as that found in moving pictures files, e.g., MPEG, MOV, and AVI files, to name a few. In fact, nearly any type of data can be stored and shared with other computer systems. In many instances, the material contained within the various data types is copyrighted material.

There are many different types of network environments that can be implemented to facilitate sharing of data between computer systems. Some of the various network environment types include Ethernet, client-server, and wired and/or wireless network environments. A common utilization of a network environment type is for file sharing, such as in a P2P network or point-to-point network. Most P2P networks rely on business models based upon the transfer and redistribution of copyrighted material, e.g., audio files, between computers coupled to a network, e.g., the Internet. A P2P network allows a user to acquire the copyrighted material from a computer, a web site source, or a music broadcaster, and store and share the material with other users throughout the network, in some instances acting as a web site source or a music broadcaster.

It is also common for users sharing media files in an uncontrolled manner to use freely distributed or commercially available media player applications to experience, e.g., listen, view, and/or watch, the shared files. In many instances, these media player applications also provide for downloading the media file from a P2P network or from licensed web broadcasters, saving it locally, and then upload the media file onto an unlawful P2P or similar network

**2**

and/or consumer recording devices. Unlawfully saving/recording a media file can be as simple as selecting the save or record function on a media player application.

Additionally, many of the computers, web sites, and web broadcasters that share copyrighted material commonly do not control or monitor the files being exchanged between computers. Additionally, when web sites attempt to control or restrict the distribution of copyrighted material, e.g., audio files, users seeking to circumvent controls or restrictions can, in many cases, simply utilize the recording functionality of a media player application and save the copyrighted material, rename the particular audio file, and upload the renamed file, rendering attempts to control or restrict its distribution moot.

Further, many of the media player/recorder applications are designed to capture and record incoming media files in a manner that circumvents controls implemented by a media player application inherent to an operating system, e.g., QuickTime for Apple, MediaPlayer for Windows™, etc., or one downloadable from the Internet, e.g., RealPlayer, LiquidAudio, or those provided by webcasters, e.g., PressPlay, for controlling unauthorized recording of media files. Additionally, many digital recording devices, e.g., mini-disc recorders, MP3 recorders, and the like, can be coupled to a digital output of a computer system to capture the media file.

It is desired to prevent persons from making unauthorized copies of copyrighted material through some available network, e.g., wireline, wireless, P2P, etc., or through a communicative coupling. It is further desirable to prevent persons from making unauthorized copies of media files from or to alternative sources, e.g., CD players, DVD players, removable hard drives, personal electronic and/or recording devices, e.g., MP3 recorders, and the like.

Current methods of sharing media files do not provide adequate protection against unauthorized recording of the media files.

## SUMMARY OF THE INVENTION

Accordingly, a need exists for a method that prevents unauthorized recording of media files. Further, a need exists for a method that selectively prevents unauthorized recording of media files. Embodiments of the present invention satisfy the above mentioned needs.

In one embodiment, a method of preventing unauthorized recording of electronic media is comprised of activating a compliance mechanism in response to receiving media content by a client system. The compliance mechanism is coupled to the client system. The media content presentation application is operable and coupled to the compliance mechanism. The method is further comprised of controlling a data output path of the client computer with the compliance mechanism. The method is further comprised of directing the media content via the data output path to a custom media device for selectively restricting output of the media content. The custom media device is coupled to the compliance mechanism and to the media content presentation application. The method is further comprised of preventing a recording application coupled to the client computer system from recording the media content file when recording violates usage restriction applicable to the media content.

In another embodiment, the present invention provides computer implementable instructions stored on a computer readable medium, the instructions for causing a client system to perform a method of restricting recording of media content. The present method is comprised of animating a

US 7,316,033 B2

3

compliance mechanism coupled to the client system. The animating is in response to the client system receiving media content. The client system has a media content presentation application coupled thereto and operable with the compliance mechanism. The present method is further comprised of managing an output path of the client computer with the compliance mechanism. The present method is further comprised of governing said media content to a custom media device via the output path to a custom media device for selectively restricting output of said media content.

In another embodiment, the present invention provides a method for restricting recording of media files comprising means for activating a compliance mechanism to control a data output path of a client system. The activating is in response to said client system receiving media content. The compliance mechanism is coupled to the client system and operable in conjunction with a media content presentation application coupled to the client system and operable thereon. The present method further comprises means for directing the media content to a custom media device via said data output path controlled by said compliance mechanism, for selectively restricting output of said media content.

These and other objects and advantages of the present invention will no doubt become obvious to those of ordinary skill in the art after having read the following detailed description of the preferred embodiments which are illustrated in the various drawing figures.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and form a part of this specification, illustrate embodiments of the invention and, together with the description, serve to explain the principles of the invention.

FIG. 1 is a block diagram of an exemplary computer system that can be utilized in accordance with an embodiment of the present invention.

FIG. 2 is a block diagram of an exemplary network environment that can be utilized in accordance with an embodiment of the present invention.

FIG. 3 is a block diagram of various exemplary functional components of a copyright compliance mechanism in accordance with an embodiment of the present invention.

FIG. 4 is an illustration of an exemplary system for implementing a copyright compliance mechanism in accordance with an embodiment of the present invention.

FIG. 5A is a data flow block diagram showing an implementation of a copyright compliance mechanism for preventing unauthorized recording of media files, in accordance with one embodiment of the present invention.

FIG. 5B is a data flow block diagram showing an implementation of a component of a copyright compliance mechanism for preventing unauthorized recording of media files, in accordance with another embodiment of the present invention.

FIG. 5C is a data flow block diagram showing an implementation of copyright compliance mechanism for preventing unauthorized output of media files, in accordance with one embodiment of the present invention.

FIG. 6A is a block diagram of an environment for preventing unauthorized copying of a media file, in accordance with one embodiment of the present invention.

FIGS. 7A, 7B, and 7C are a flowchart of steps performed in accordance with an embodiment of the present invention for providing a copyright compliance mechanism to a network of client and server computer systems.

4

FIG. 8 is a diagram of an exemplary global media delivery system in which a copyright compliance mechanism can be implemented in accordance with an embodiment of the present invention.

DETAILED DESCRIPTION

Reference will now be made in detail to embodiments of the invention, examples of which are illustrated in the accompanying drawings. While the invention will be described in conjunction with embodiments, it will be understood that they are not intended to limit the invention to these embodiments. On the contrary, the invention is intended to cover alternatives, modifications, and equivalents, which may be included within the spirit and scope of the invention as defined by the appended claims. Furthermore, in the following detailed description of the present invention, numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, to one of ordinary skill in the art, the present invention may be practiced without these specific details. In other instances, well known methods, procedures, components, and circuits have not been described in detail as not to unnecessarily obscure aspects of the present invention.

Some portions of the detailed description which follows are presented in terms of procedures, logic blocks, processing, and other symbolic representations of operations on data bits within a computing system or digital memory system. These descriptions and representations are the means used by those skilled in the data processing art to most effectively convey the substance of their work to others skilled in the art. A procedure, logic block, process, etc., is herein, and generally, conceived to be a self-consistent sequence of steps or instructions leading to a desired result. The steps are those involving physical manipulations of physical quantities. Usually, though not necessarily, these physical manipulations take the form of electrical or magnetic signals capable of being stored, transferred, combined, compared, and otherwise manipulated in a computing system or similar electronic computing device. For reasons of convenience, and with reference to common usage, these signals are referred to as bits, values, elements, symbols, characters, terms, numbers, or the like, with reference to the present invention.

It should be borne in mind, however, that all of these terms are to be interpreted as referencing physical manipulations and quantities and are merely convenient labels and are to be interpreted further in view of terms commonly used in the art. Unless specifically stated otherwise as apparent from the following discussions, it is understood that discussions of the present invention refer to actions and processes of a computing system, or similar electronic computing device that manipulates and transforms data. The data is represented as physical (electronic) quantities within the computing system's registers and memories and is transformed into other data similarly represented as physical quantities within the computing system's memories or registers, or other such information storage, transmission, or display devices.

In the following description, for purposes of explanation, numerous specific details are set forth in order to provide a thorough understanding of the present invention. To one skilled in the art, the present invention may be practiced without these specific details. In other instances, well-known structures and devices are shown in block diagram form in order to avoid obscuring the present invention.

US 7,316,033 B2

5

Embodiments of the present invention are discussed primarily in the context of a network of computer systems such as a network of desktop, workstation, laptop, handheld, and/or other portable electronic device. For purposes of the present application, the term "portable electronic device" is not intended to be limited solely to conventional handheld or portable computers. Instead, the term "portable electronic device" is also intended to include many mobile electronic devices. Such mobile devices include, but are not limited to, portable CD players, MP3 players, mobile phones, portable recording devices, and other personal digital devices.

FIG. **1** is a block diagram illustrating an exemplary computer system **100** that can be used in accordance with an embodiment of the present invention. It is noted that computer system **100** can be nearly any type of computing system or electronic computing device including, but not limited to, a server computer, a desktop computer, a laptop computer, or other portable electronic device. Within the context of the present invention, certain discussed processes, procedures, and steps are realized as a series of instructions (e.g., a software program) that reside within computer system memory units of computer system **100** and which are executed by a processor(s) of computer system **100**, in one embodiment. When executed, the instructions cause computer system **100** to perform specific actions and exhibit specific behavior which is described in detail herein.

Computer system **100** of FIG. **1** comprises an address/data bus **100** for communicating information, one or more central processors **101** coupled to bus **110** for processing information and instructions. Central processor(s) **101** can be a microprocessor or any alternative type of processor. Computer system **100** also includes a computer usable volatile memory **102**, e.g., random access memory (RAM), static RAM (SRAM), dynamic RAM (DRAM), synchronous dynamic RAM (SDRAM), double data rate RAM (DDR RAM), etc., coupled to bus **110** for storing information and instructions for processor(s) **101**. Computer system **100** further includes a computer usable non-volatile memory **103**, e.g., read only memory (ROM), programmable ROM, electronically programmable ROM (EPROM), electrically erasable ROM (EEPROM), flash memory (a type of EEPROM), etc., coupled to bus **110** for storing static information and instructions for processor(s) **101**. In one embodiment, non-volatile memory **103** can be removable.

System **100** also includes one or more signal generating and receiving devices, e.g., signal input/output device(s) **104** coupled to bus **110** for enabling computer **100** to interface with other electronic devices. Communication interface **104** can include wired and/or wireless communication functionality. For example, in one embodiment, communication interface **104** is a serial communication port, but can alternatively be one of a number of well known communication standards and protocols, e.g., a parallel port, an Ethernet adapter, a FireWire (IEEE 1394) interface, a Universal Serial Bus (USB), a small computer system interface (SCSI), an infrared (IR) communication port, a Bluetooth wireless communication adapter, a broadband connection, a satellite link, an Internet feed, a cable modem, and the like. In another embodiment, a digital subscriber line (DSL) can be implemented as signal input/output device **104**. In such an instance, communication interface **104** may include a DSL modem.

Computer **100** of FIG. **1** can also include one or more computer usable data storage device(s) **108** coupled to bus **110** for storing instructions and information, in one embodiment of the present invention. In one embodiment, data storage device **108** can be a magnetic storage device, e.g., a

6

hard disk drive, a floppy disk drive, a zip drive, or other magnetic storage device. In another embodiment, data storage device **108** can be an optical storage device, e.g., a CD (compact disc), a DVD (digital versatile disc), or other alternative optical storage device. Alternatively, any combination of magnetic, optical, and alternative storage devices can be implemented, e.g., a RAID (random array of independent disks or random array of inexpensive discs) configuration. It is noted that data storage device **108** can be located internal and/or external of system **100** and communicatively coupled with system **100** utilizing wired and/or wireless communication technology, thereby providing expanded storage and functionality to system **100**. It is further noted that nearly any portable electronic device, e.g., device **100***a*, can also be communicatively coupled with system **100** via utilization of wired and/or wireless technology, thereby expanding the functionality of system **100**.

System **100** can also include an optional display device **105** coupled to bus **110** for displaying video, graphics, and/or alphanumeric characters. It is noted that display device **105** can be a CRT (cathode ray tube), a thin CRT (TCRT), a liquid crystal display (LCD), a plasma display, a field emission display (FED) or any other display device suitable for displaying video, graphics, and alphanumeric characters recognizable to a user.

Computer system **100** of FIG. **1** further includes an optional alphanumeric input device **106** coupled to bus **110** for communicating information and command selections to processor(s) **101**, in one embodiment. Alphanumeric input device **106** is coupled to bus **110** and includes alphanumeric and function keys. Also included in computer **100** is an optional cursor control device **107** coupled to bus **110** for communicating user input information and command selections to processor(s) **101**. Cursor control device **107** can be implemented using a number of well known devices such as a mouse, a trackball, a track pad, a joy stick, a optical tracking device, a touch screen, etc. It is noted that a cursor can be directed and/or activated via input from alphanumeric input device **106** using special keys and key sequence commands. It is further noted that directing and/or activating the cursor can be accomplished by alternative means, e.g., voice activated commands, provided computer system **100** is configured with such functionality.

FIG. **2** is a block diagram of an exemplary network **200** in which embodiments of the present invention may be implemented. In one example, network **200** enables one or more authorized client computer systems (e.g., **210**, **220**, and **230**), each of which are coupled to Internet **201**, to receive media content from a media content server, e.g., **251**, via the Internet **201** while preventing unauthorized client computer systems from accessing media stored in a database of content server **251**.

Network **200** includes a web server **250** and a content server **251** which are communicatively coupled to Internet **201**. Further, web server **250** and content server **251** can be communicatively coupled without utilizing Internet **201**, as shown. Web server **250**, content server **251**, and client computers **210**, **220**, and **230** can communicate with each other. It is noted that computers and servers of network **200** are well suited to be communicatively coupled in various implementations. For example, web server **250**, content server **251**, and client computer systems **210**, **220**, and **230** of network **200** can be communicatively coupled via wired communication technology, e.g., twisted pair cabling, fiber optics, coaxial cable, etc., or wireless communication technology, or a combination of wired and wireless communication technology.

7

Still referring to FIG. **2**, it is noted that web server **250**, content server **251**, and client computer systems **210**, **220** and **230** of network **200** can, in one embodiment, be each implemented in a manner similar to computer system **100** of FIG. **1**. However, the server and computer systems in network **200** are not limited to such implementation. Additionally, web server **250** and content server **251** can perform various functionalities within network **200**. It is also noted that, in one embodiment, web server **250** and content server **251** can both be disposed on a single or a plurality of physical computer systems, e.g., computer system **100** of FIG. **1**.

Further, it is noted that network **200** can operate with and deliver any type of media content, (e.g., audio, video, multimedia, graphics, information, data, software programs, etc.) in any format. In one example, content server **251** can provide audio and video files to client computers **210**-**230** via Internet **201**.

FIG. **3** is a block diagram of an exemplary copyright compliance mechanism (CCM) **300** of, access to, and/or copyright compliance of media files, in accordance with an embodiment of the present invention. In one embodiment, CCM **300** contains one or more software components and instructions for enabling compliance with DMCA (digital millennium copyright act) restrictions and/or RIAA (recording industry association of America) licensing agreements regarding media files. In one embodiment, CCM **300** may be integrated into existing and/or newly developed media player and recorder applications. In another embodiment, CCM **300** may be implemented as stand alone but in conjunction with existing media player/recorder applications, such that CCM **300** is communicatively coupled to existing media player/recorder applications.

There are currently two types of copyright licenses recognized by the DMCA for the protection of broadcasted copyrighted material. One of the broadcast copyright licenses is a compulsory license, also referred to as a statutory license. A statutory license is defined as a non-interactive license, meaning the user cannot select the song. Further, a caveat of this type of broadcast license is that a user must not be able to select a particular music file for the purpose of recording it to the user's computer system or other storage device. Another caveat of a statutory license is that a media file is not available more than once for a given period of time. In one example, the period of time can be three hours.

The other type of broadcast license recognized by the DMCA is an interactive licensing agreement. An interactive licensing agreement is commonly with the copyright holder, e.g., a record company, the artist, where the copyright holder grants permission for a server, e.g., web server **250** and/or content server **251** of FIG. **2** to broadcast copyrighted material. Under an interactive licensing agreement, there are a variety of ways that copyrighted material, e.g., music files, can be broadcast. For example, one manner in which music files can be broadcast is to allow the user to select and listen to a particular sound recording, but without the user enabled to make a sound recording. This is commonly referred to as an interactive with "no save" license, meaning that the end user is unable to save or store the media content file in a relatively permanent manner. Additionally, another manner in which music files can be broadcast is to allow a user to not only select and listen to a particular music file, but additionally allow the user to save that particularly music file to disc and/or burn the music file to CD, MP3 player, or other portable electronic device. This is commonly referred to as

8

an interactive with "save" license, meaning that the end user is enabled to save, store, or burn to CD, the media content file.

It is noted that the DMCA allows for the "perfect" reproduction of the sound recording. A perfect copy of a sound recording is a one-to-one mapping of the original sound recording into a digitized form, such that the perfect copy is virtually indistinguishable and/or has no audible differences from the original recording.

In one embodiment, CCM (copyright compliance mechanism) **300** can be stored in web server **250** and/or content server **251** of network **200** and is configured to be installed into each client computer system, e.g., **210**, **220** and **230**, enabled to access the media files stored within content server **251** and/or web server **250**. Alternatively, copyright compliance mechanism **300** can be externally disposed and communicatively coupled with a client computer system **200** via, e.g., a portable media device **100***a* of FIG. **1**.

Copyright compliance mechanism **300** is configured to be operable while having portions of components, entire components, combinations of components, and/or comp, e.g., **210**, **220**, and/or **230**.

Additionally, portions of components, entire components and/or combinations of components of CCM **300** can be readily updated, e.g., via Internet **201**, to reflect changes or developments in the DMCA, changes or developments in copyright restrictions and/or licensing agreements that pertain to any media file, changes in current media player applications and/or the development of new media player applications, or to counteract subversive and/or hacker-like attempts to unlawfully obtain one or more media files.

Referring to FIG. **3**, in one embodiment, CCM **300** is shown to include instructions **301** for enabling client computer system **210** to interact with web server **250** and content server **251** of network **200**. Instructions **301** enable client computer system **210** to interact with servers, e.g., **250** and **251** in a network, e.g., **200**.

The copyright compliance mechanism **300** also includes, in one embodiment, a user ID generator **302**, for generating a user ID or user key, and one or more cookie(s) which contain(s) information specific to the user and the user's computer system, e.g., **210**. In one embodiment, the user ID and the cookie(s) are installed in computer system **210** prior to installation of the remaining components of the copyright compliance mechanism **300**. It is noted that the presence of a valid cookie(s) and a valid user ID/user key are verified by web server **250** before the remaining components of a CCM **300** can be installed, within one embodiment of the present invention. Additionally, the user ID/user key can contain, but is not limited to, the user's name, the user's address, the user's credit card number, verified email address, and an identity (username) and password selected by the user. Furthermore, the cookie can contain, but is not limited to, information specific to the user, information regarding the user's computer system **210**, types of media applications operational therewithin, a unique identifier associated with computer system **210**, e.g., a MAC (machine address code) address and/or an IP address, and other information specific to the user and the computer system operated by the user. It is noted that the information regarding the client computer system, e.g., **210**, the user of system **210**, and an access key described herein can be collectively referred to as authorization data.

Advantageously, with information regarding the user and the user's computer system, e.g., **210**, web server **250** can determine when a user of one computer system, e.g., **210**, has given their username and password to another user using

US 7,316,033 B2

**9**

another computer system, e.g., **220**. Because the username, password, and the user's computer system **210** are closely associated, web server **250** can prevent unauthorized access to copyrighted media content, in one embodiment. It is noted that if web server **250** detects unauthorized sharing of usernames and passwords, it can block the user of computer system **210**, as well as other users who unlawfully obtained the username and password, from future access to copyrighted media content available through web server **250**. Web server **250** can invoke blocking for any specified period of time, e.g., for a matter of minutes or hours to months, years, or longer.

Still referring to FIG. **3**, copyright compliance mechanism **300** further includes one or more coder/decoders (codec) **303** that, in one embodiment, is/are adapted to perform, but is/are not limited to, encoding/decoding of media files, compressing/decompressing of media files, detecting that delivered media files are encrypted as prescribed by CCM **300**. In the present embodiment, coder/decoder **303** can also extract key fields from a header attached to each media content file for, in part, verification that the file originated from a content server, e.g., **251**.

In the present embodiment, coder/decoder **303** can also perform a periodic and repeated check of the media file, while the media file is passed to the media player application, e.g., in a frame by frame basis or in a buffer by buffer basis, to ensure that CCM **300** rules are being enforced at any particular moment during media playback. It is noted that differing coder/decoders **303** can be utilized in conjunction with various types of copyrighted media content including, but not limited to, audio files, video files, graphical files, alphanumeric files and the like, such that any type of media content file can be protected in accordance with embodiments of the present invention.

With reference still to FIG. **3**, copyright compliance mechanism **300** also includes one or more agent programs **304** which are configured to engage in dialogs and negotiate and coordinate transfer of information between a computer system, e.g., **210**, **220**, or **230**, a server, e.g., web server **250** and/or content server **251**, and/or media player applications, with or without recording functionality, that are operable within a client computer system, in one embodiment. In the present embodiment, agent program **304** can also be configured to maintain system state, verify that other components are being utilized simultaneously, to be autonomously functional without knowledge of the client, and can also present messages, e.g., error messages, media information, advertising, etc., via a display window or electronic mail. This enables detection of proper skin implementation and detection of those applications that are running. It is noted that agent programs are well known in the art and can be implemented in a variety of ways in accordance with the present embodiment.

Copyright compliance mechanism **300** also includes one or more system hooks **305**, in one embodiment of the present invention. A system hook **305** is, in one embodiment, a library that is installed in a computer system, e.g., **210**, and intercepts system wide events. For example, a system hook **305**, in conjunction with skins **306**, can govern certain properties and/or functionalities of media player applications operating within the client computer system, e.g., **210**, including, but not limited to, mouse click shortcuts, keyboard shortcuts, standard system accelerators, progress bars, save functions, pause functions, rewind functions, skip track functions, forward track preview, copying to CD, copying to a portable electronic device, and the like.

**10**

It is noted that the term govern or governing, for purposes of the present invention, can refer to a closely, disabling, deactivating, enabling, activating, etc., of a property or function. Governing can also refer to an exclusion of that function or property, such that a function or property may be operable but unable to perform in the manner originally intended. For example, during playing of a media file, the progress bar may be selected and moved from one location on the progress line to another without having an effect on the play of the media file.

It is further noted that codec **303** compares the information for the media player application operating in client computer system, e.g., **210**, with a list of "signatures" associated with known media recording applications. In one embodiment, the signature can be, but is not limited to being, a unique identifier of a media player application and which can consist of the window class of the application along with a product name string which is part of the window title for the application. Advantageously, when new media player applications are developed, their signatures can be readily added to the signature list via an update of CCM **300** described herein.

The following C++ source code is exemplary implementation of the portion of a codec **303** for performing media player application detection, in accordance with an embodiment of the present invention.

```
int
IsRecorderPresent(TCHAR * szAppClass,
                  TCHAR * szProdName)
{
    TCHAR szWndText[_MAX_PATH]; /* buffer to receive
        title string for window */
    HWND  hWnd;    /* handle to target window for operation */
    int   nRetVal;  /* return value for operation */
    /* initialize variables */
    nRetVal = 0;
    if ( _tcscmp(szAppClass,_T("#32770"))
        == 0)
    {
        /* attempt to locate dialog box with specified window title */
        if ( FindWindow((TCHAR *) 32770, szProdName)
            != (HWND) 0)
        {
            /* indicate application found */
            nRetVal = 1;
        }
    }
    else
    {
        /* attempt to locate window with specified class */
        if ( (hWnd = FindWindow(szAppClass, (LPCTSTR) 0))
            != (HWND) 0)
        {
            /* attempt to retrive title string for window */
            if ( GetWindowText(hWnd,
                    szWndText,
                    _MAX_PATH)
                != 0)
            {
                /* attempt to locate product name within title string */
                if ( _tcsstr(szWndText, szProdName)
                    != (TCHAR *) 0)
                {
                    /* indicate application found */
                    nRetVal = 1;
                }
            }
        }
    }
    /* return to caller */
    return nRetVal;
}
```

It is further noted that codec **303** can also selectively suppress waveform input/output operations to prevent

US 7,316,033 B2

11

recording of copyrighted media on a client computer system **210**. For example, codec **303**, subsequent to detection of bundled media player applications operational in a client computer system, e.g., **210**, can stop or disrupt the playing of a media content file. This can be accomplished, in one embodiment, by redirecting and/or diverting certain data pathways that are commonly used for recording, such that the utilized data pathway is governed by the copyright compliance mechanism **300**. In one embodiment, this can be performed within a driver shim, e.g., wave driver shim **309** of FIGS. **5A** and **5B**.

A driver shim can be utilized for nearly any software output device, e.g., a standard Windows™ waveform output device, e.g., Windows™ Media Player, or hardware output device, e.g., speakers or headphones. Client computer system **210** is configured such that the driver shim, (e.g., **309** of FIGS. **5A** and **5B**) will appear as the default waveform media device to client level application programs. Thus, requests for processing of waveform media input and/or output will pass through the driver shim prior to being forwarded to the actual waveform audio driver, media device driver **505** of FIGS. **5A** and **5B**. Such waveform input/output suppression can be triggered by other components of CCM **300**, e.g., agent **304**, to be active when a recording operation is initiated by a client computer system, e.g., **210**, during the play back of media files which are subject to the DMCA.

It is noted that alternative driver shims can be implemented for nearly any waveform output device including, but not limited to, a Windows™ Media Player. It is further noted that the driver shim can be implemented for nearly any media in nearly any format including, but not limited to, audio media files and audio input and output devices, video, graphic and/or alphanumeric media files and video input and output devices.

The following C++ source code is an exemplary implementation of a portion of a codec **303** and/or a custom media device driver **307** for diverting and/or redirecting certain data pathways that are commonly used for recording of media content, in accordance with an embodiment of the present invention.

```
DWORD
_stdcall
widMessage(UINT        uDevId,
     UINT             uMsg,
     DWORD            dwUser,
     DWORD            dwParam1,
     DWORD            dwParam2)
{
     BOOL        bSkip;    /* flag indicating operation to be
                    skipped */
     HWND        hWndMon;  /* handle to main window for
                    monitor */
     DWORD       dwRetVal; /* return value for operation */
     /* initialize variables */
     bSkip = FALSE
     dwRetVal = (DWORD) MMSYSERR_NOTSUPPORTED;
     if(uMsg == WIDM_START)
     {
          /* attempt to locate window for monitor application */
          if ( (hWndMon = FindMonitorWindow( ))
               != (HWND)0)
          {
               /* obtain setting for driver */
               bDrvEnabled = (   SendMessage(hWndMon,
                         uiRegMsg,
                         0,
                         0)
```

12

-continued

```
               == 0)
               ? FALSE:TRUE;
          }
          if(bDrvEnabled == TRUE)
          {
               /* indicate error in operation */
               dwRetVal = MMSYSERR_NOMEM;
               /* indicate operation to be skipped */
               bSkip = TRUE;
          }
     }
     if(bSkip == FALSE)
     {
          /* invoke entry point for original driver */
          dwRetVal = CallWidMessage(uDevId, uMsg, dwUser,
               dwParam1, dwParam2);
     }
     /* return to caller */
     return dwRetVal;
}
```

It is noted that when properly configured, system hook **305** can govern nearly any function or property within nearly any media player application that may be operational within a client computer system, e.g., **210**-**230**. In one embodiment, system hook **305** is a DLL (dynamic link library) file. It is further noted that system hooks are well known in the art, and are a standard facility in a Microsoft Windows™ operating environment, and accordingly can be implemented in a variety of ways. However, it is also noted that system hook **305** can be readily adapted for implementation in alternative operating systems, e.g., Apple™ Operating systems, Sun Solaris™ operating systems, Linux operating systems, and nearly any other operating system.

In FIG. **3**, copyright compliance mechanism **300** also includes one or more skins **306**, which can be designed to be installed in a client computer system, e.g., **210**-**230**. In one embodiment, skins **306** are utilized to assist client side compliance with the DMCA (digital millennium copyright act) regarding copyrighted media content. Skins **306** are customizable interfaces that, in one embodiment, are displayed on a display device (e.g., **105**) of computer system **210** and provide functionalities for user interaction of delivered media content. Additionally, skins **306** can also provide a display of information relative to the media content file including, but not limited to, song title, artist name, album title, artist bio, and other features such as purchase inquiries, advertising, and the like.

Furthermore, when system hook **305** is unable to govern a function of the media player application operable on a client computer system, e.g., **210**, such that client computer system could be in non-compliance with DMCA and/or RLAA restrictions, a skin **306** can be implemented to provide compliance.

Differing skins **306** can be implemented depending upon the DMCA and/or RIAA restrictions applicable to each media content file. For example, in one embodiment, a skin **306***a* may be configured for utilization with a media content file protected under a non-interactive agreement (DMCA), such that skin **306***a* may not include a pause function, a stop function, a selector function, and/or a save function, etc. Another skin, e.g., skin **306***b* may, in one embodiment, be configured to be utilized with a media content file protected under an interactive with "no save" agreement (DMCA), such that skin **306***b* may include a pause function, a stop

function, a selector function, and for those media files having an interactive with "save" agreement, a save or a burn to CD function.

Still referring to FIG. 3, it is further noted that in the present embodiment, each skin 306 can have a unique name and signature. In one embodiment, skin 306 can implemented, in part, through the utilization of an MD (message digest) 5 hash table or similar algorithm. An MD5 hash-table can, in one implementation, be a check-sum algorithm. It is well known in the art that a skin, e.g., skin 306, can be renamed and/or modified to incorporate additional features and/or functionalities in an unauthorized manner. Since modification of the skin would change the check sum and/or MD5 hash, without knowledge of the MD5 hash table, changing the name or modification of the skin may simply serve to disable the skin, in accordance with one embodiment of the present invention. Since copyright compliance mechanism 300 verifies skin 306, MD5 hash tables advantageously provide a deterrent against modifications made to the skin.

In one embodiment, copyright compliance mechanism 300 also includes one or more custom media device driver(s) 307 for providing an even greater measure of control over the media stream while increasing compliance reliability. A client computer system, e.g., 210, can be configured to utilize a custom media device application, e.g., custom media device 310 (shown in FIG. 5B), to control unauthorized recording of media content files. A custom media device application can be, but is not limited to, a custom media audio device application for media files having sound content, a custom video device application for media files having graphical and/or alphanumeric content, etc. In one embodiment, custom media device 310 of FIG. 5B is an emulation of the custom media device driver 307. With reference to audio media, the emulation is performed in a waveform audio driver associated with custom media device 310. Driver 307 is configured to receive a media file being outputted by system 210 prior to the media file being sent to a media output device, e.g., media output device 570, and/or a media output application, e.g., recording application 502. Examples of a media output device includes, but is not limited to, a video card for video files, a sound card for audio files, etc. Examples of a recording application can include, but is not limited to, CD burner applications for writing to another CDs, ripper applications which capture the media file and change the format of the media file, e.g., from a MP3 file to a .wav file. In one embodiment, client computer system 210 is configured with a custom media device driver 307 emulating custom media device 310, and which is system 210's default device driver for media file output. In one embodiment, an existing GUI (graphical user interface) can be utilized or a GUI can be provided, e.g., by utilization of skin 306 or a custom web based player application or as part of a CCM 300 installation bundle, for forcing or requiring system 210 to have driver 307 as the default driver.

Therefore, when a media content file is received by system 210 from server 251, the media content file is playable, provided the media content file passes through the custom media device application (e.g., 310 of FIG. 5B), emulated by custom media device driver 307, prior to being outputted. However, if an alternative media player application is selected, delivered media files from server 251 will not play on system 210.

Thus, secured media player applications would issue a media request to the driver, e.g., 307, for the custom media device 310 which then performs necessary media input suppression, e.g., waveform suppression for audio files,

prior to forwarding the request to the default Windows™ media driver, e.g., waveform audio driver for audio files.

It is noted that requests for non-restricted media files can pass directly through custom media device driver 307 to a Windows™ waveform audio driver operable on system 210, thus reducing instances of incompatibilities with existing media player applications that utilize waveform media, e.g., audio, video, etc. Additionally, media player applications that do not support secured media would be unaffected. It is further noted that for either secured media or non-restricted media, e.g., audio media files, waveform input suppression can be triggered by other components of CCM 300, e.g., agents 304, system hooks 305, and skins 306, or a combination thereof, to be active when a recording operation is initiated simultaneously with playback of secured media files, e.g., audio files. Custom device drivers are well known and can be coded and implemented in a variety of ways including, but limited to, those found at developers network web sites, e.g., a Microsoft™ or alternative OS (operating system) developer web sites.

Advantageously, by virtue of system 210 being configured with a custom media device as the default device driver e.g., device 310 of FIGS. 5B and 5C, emulated by a custom media device driver 307, those media player applications that require their particular device driver to be the default driver, e.g., Total Recorder, etc., are rendered non-functional for secured music. Further advantageous is that an emulated custom media device provides no native support for those media player applications used as a recording mechanism, e.g., DirectSound capture, (direct sound 504 of FIGS. 5A, 5B, and 5C) etc., that are able to bypass user-mode drivers for most media devices. Additionally, by virtue of the media content being sent through device driver 307, thus effectively disabling unauthorized saving/recording of media files, in one embodiment, media files that are delivered in a secured delivery system do not have to be encrypted, although, in another embodiment, they still may be encrypted. By virtue of non-encrypted media files utilizing less storage space and network resources than encrypted media files, networks having limited resources can utilize the functionalities of driver 307 of CCM 300 to provide compliance with copyright restrictions and/or licensing agreements applicable with a media content file without having the processing overhead of encrypted media files.

FIG. 4 is an illustration of an exemplary system 400 for implementing a copyright compliance mechanism in accordance with an embodiment of the present invention. Specifically, system 400 illustrates web server 250, content server 251, or a combination of web server 250 and content server 251 installing a copyright compliance mechanism (e.g., 300) in a client's computer system (e.g., 210) for controlling media file distribution and controlling user access and interaction of copyrighted media files, in one embodiment of the present invention.

Client computer system 210 can communicatively couple with a network (e.g., 200) to request a media file, a list of available media files, or a play list of audio files, e.g., MP3 files, etc. In response, web server 250 determines if the request originates from a registered user authorized to receive media files associated with the request. If the user is not registered with the network, web server 250 can initiate a registration process with the requesting client 210. Client registration can be accomplished in a variety of ways. For example, web server 250 may deliver to a client 210 a registration form having various text entry fields into which the user can enter required information. A variety of information can be required from the user by web server 250

15

including, but not limited to, user's name, address, phone number, credit card number, verifiable email address, and the like. In addition, registration can, in one embodiment, include a requirement for the user to select a username and password.

Still referring to FIG. 4, web server 250 can, in one embodiment, detect information related to the client's computer system, e.g., 210, and store that information in a user/media database 450. For example, web server 250 can detect a unique identifier of client computer system 210. In one embodiment, the unique identifier can be the MAC (machine address code) address of a NIC (network interface card) of client computer system 210 or the MAC address of the network interface adapter integrated on the motherboard of system 210. It is understood that a NIC enables a client computer system 210 to access web server 250 via Internet 201. It is well known that each NIC typically has a unique identifying number MAC address. Further, web server 250 can, in one embodiment, detect and store (also in database 450) information regarding the types(s) of media player application(s), e.g., Windows Media Player™, Real Player™, iTunes player™ (Apple), Live 365™ player, and those media player applications having recording functionality, e.g., Total Recorder, Cool Edit 2000, Sound Forge, Sound Recorder, Super MP3 Recorder, and the like, that are present and operable in client computer system 210. In one embodiment, the client information is verified for accuracy and is then stored in a user database (e.g., 450) within web server 250.

Subsequent to registration completion, creation of the user ID and password, and obtaining information regarding client computer system 210, all or part of this information can be installed in client computer system 210. In one embodiment, client computer system 210 information can be in the form of a cookie. Web server 250 then verifies that the user and client computer system 210 data is properly installed therein and that their integrity has not been compromised. Subsequently, web server 250 installs a copyright compliance mechanism (e.g., 300) into the client's computer system, e.g., 210, in one embodiment of the present invention. It is noted that web server 250 may not initiate installation of CCM 300 until the user ID, password, and client computer system 210 information is verified. A variety of common techniques can be employed to install an entire CCM 300, portions of components, entire components, and/or combinations or a function of components. For example, copyright compliance mechanism 300 can be installed in a hidden directory within client computer system 210, thereby preventing unauthorized access to it. In one embodiment of the present invention, it is noted that unless CCM 300 is installed in client computer system 210, its user will not be able to request, access, or have delivered thereto, media files stored by web server 250 and/or content server 251.

Referring still to FIG. 4, upon completion of client registration and installation of CCM 300, client computer system 210 can then request a media play list or a plurality of play lists, etc. In response, web server 250 determines whether the user of client computer system 210 is authorized to receive the media play list associated with the request. In one embodiment, web server 250 can request the username and password. Alternatively, web server 250 can utilize user database 450 to verify that computer 210 is authorized to receive a media play list. If client computer 210 is not authorized, web server 250 can initiate client registration, as described herein. Additionally, web server 250 can disconnect computer 210 or redirect it to an alternative web site.

16

Regardless, if the user and client computer system 210 are not authorized, web server 250 will not provide the requested play list to client computer system 210.

However, if client computer system 210 is authorized, web server 210 can check copyright compliance mechanism 300 within data base 450 to determine if it, or any of the components therein, have been updated since the last time client computer system 210 logged in to web server 250. If a component of CCM 300 has been updated, web server 250 can install the updated component and/or a more current version of CCM 300 into client computer system 210, e.g., via Internet 201. If CCM 300 has not been updated, web server 250 can then deliver the requested media play list to system 210 via Internet 201 along with an appended user key or user identification (ID). It is noted that user database 450 can also include data for one or more media play lists that can be utilized to provide a media play list to client computer system 210. Subsequently, the user of client computer system 210 can utilize the received media play list in combination with the media player application operating on system 210 to transmit a delivery request for one or more desired pieces of media content from web server 250. It is noted that the delivery request contains the user key for validation purposes.

Still referring to FIG. 4, upon receiving the media content delivery request, web server 250 can then check the validity of the requesting media application and the attached user key. In one embodiment, web server 250 can utilize user database 450 to check their validity. If either or both are invalid, web server 250, in one embodiment, can redirect unauthorized client computer system 210 to an alternative destination to prevent abuse of the system. However, if both the requesting media application and the user key are valid, CCM 300 verifies that skins 306 are installed in client computer system 210. Additionally, CCM 300 further verifies that system hook(s) 305 have been run or are running to govern certain functions of those media player applications operable within client computer system 210 that are known to provide non-compliance with the DMCA and/or the RIAA. Additionally, CCM 300 further diverts and/or redirects certain pathways that are commonly used for recording, e.g., driver 307 of FIG. 5A, device 310 of FIG. 5B, and device 570 of FIG. 5C. Once CCM 300 has performed the above described functions, web server 250 then, in one embodiment, issues to the client computer 210 a redirect command to the current address location of the desired media file content along with an optional time sensitive access key, e.g., for that hour, day, or other defined timeframe.

In response to the client computer system 210 receiving the redirect command from web server 250, the media player application operating on client computer system 210 automatically transmits a new request and the time sensitive access key to content server 251 for delivery of one or more desired pieces of media content. The validity of the time sensitive access key is checked by content server 251. If invalid, unauthorized client computer 210 is redirected to content server 250 to protect against abuse of the system and unauthorized access to content server 251. If the time sensitive access key is valid, content server 251 retrieves the desired media content from content database 451 and delivers it to client computer system 210. It is noted that, in one embodiment, the delivered media content can be stored in hidden directories and/or custom file systems that may be hidden within client computer system 210 thereby preventing future unauthorized distribution. In one embodiment, an HTTP (hypertext transfer protocol) file delivery system is

US 7,316,033 B2

17                                                            18

used to deliver the requested media files, meaning that the media files are delivered in their entirety to client computer system **210**, as compared to streaming media which delivers small portions of the media file.

Still referring to FIG. **4**, it is noted that each media file has, in one embodiment, had a header attached therewith prior to delivery of the media file. In one embodiment, the header can contain information relating to the media file, e.g., title or media ID, media data such as size, type of data, and the like. The header can also contain a sequence or key that is recognizable to copyright compliance mechanism **300** that identifies the media file as originating from a content server **251**. In one embodiment, the header sequence/key can also contain instructions for invoking the licensing agreements and/or copyright restrictions that are applicable to that particular media file.

Additionally, if licensing agreements or copyright restrictions are changed, developed, or created, or if new media player applications, with or without recording functionality, are developed, CCM **300** would have appropriate modifications made to portions of components, entire components, combinations of components, and/or the entire CCM **300** to enable continued compliance with licensing agreements and copyright restrictions. Furthermore, subsequent to modification of copyright compliance mechanism **300**, modified portions of, or the entire updated CCM **300** can easily be installed in client computer system **210** in a variety of ways. For example, the updated CCM **300** can be installed during client interaction with web server **250**, during user log-in, and/or while client computer system **210** is receiving the keyed play list.

Referring still to FIG. **4**, it is further noted that, in one embodiment, the media files and attached headers can be encrypted prior to being stored within content server **251**. In one embodiment, the media files can be encrypted utilizing randomly generated keys. Alternatively, variable length keys can be utilized for encryption. It is noted that the key to decrypt the encrypted media files can be stored in a database **450**, content database **451** or in some combination of databases **450** and **451**. It is further noted that the messages being passed back and forth between client computer system **210** and web server **250** can also be encrypted, thereby protecting the media files and the data being exchanged from unauthorized use or access. There are a variety of encryption mechanisms and programs that can be implemented to encrypt this data including, but not limited to, exclusive OR, shifting with adds, public domain encryption programs such as Blowfish, and non-public domain encryption mechanisms. It is also noted that each media file can be uniquely encrypted, such that if the encryption code is cracked for one media file, it is not applicable to other media files. Alternatively, groups of media files can be similarly encrypted. Furthermore, in another embodiment, the media files may not be encrypted when being delivered to a webcaster known to utilize a proprietary media player application, e.g., custom media device driver **307**.

Subsequent to media file decryption, the media file may be passed through CCM **300**, e.g., a coder/decoder **303**, to a media player application operating on client computer system **210**, e.g. playback application **501** of FIGS. **5A**, **5B**, **5C**, and **6A**, which can then access and utilize the delivered high fidelity media content, enabling its user(s) to experience the media content, e.g., listen to it, watch it, view it, or the like. In one embodiment of the present invention, a specialized or custom media player may or may not be required to experience the media content, e.g., skin **306** of FIG. **3**. A skin **306** may be necessary when CCM **300** cannot

modify an industry standard media player application to comply with copyright restrictions and/or licensing agreements in accordance with the DMCA. Alternatively, an industry standard media player can be utilized by client computer system **210** to experience the media content. Typically, many media player applications are available and can include, but are not limited to, Windows™ Media Player™ for PCs (personal computers), iTunes™ Player or QuickTime™ for Apple computers, and XMMS player for computers utilizing a Linux operating system. Regardless of the media player application utilized, while the media file is passed to the media player application, e.g., in a frame by frame basis or in a buffer, coder/decoder **303** will repeatedly ensure that CCM **300** rules are being enforced at any particular moment during media playback, shown as step **650** of FIG. **6C**.

As the media file content is delivered to the media player application, periodically, e.g., after a specified number of frames, after a defined period of time, or any desired time or data period, coder/decoder **303** repeatedly determines whether or not all the rules are enforced, in accordance with rules as defined by CCM **300**. If the rules are not enforced, e.g., change due to a user opening up a recording application, e.g., Total Recorder or alternative application, the presentation of the media content is, in one embodiment, suspended or halted. In another embodiment, the presentation of the media content can be modified to output the media content non audibly, e.g., silence. In yet another embodiment, the media content may be audible but recording functionality can be disabled, such that the media content cannot be recorded. These presentation stoppages are collectively shown as step **651** of FIG. **6C**.

If the rules, in accordance with CCM **300**, are enforced, the codec/decoder **303** retrieves a subsequent portion of the media content that is stored locally in client computer system **210**. The newly retrieved portion of the media file is then presented by the client's media player application. While the newly retrieved portion is presented, CCM **300** then again checks that the rules are enforced, and retrieves an additional portion of the media file or suspends presentation of the media file is the rules are not being enforced, and these steps are performed repeatedly throughout the playback of the media file, in a loop environment, until the media file's contents have been presented in their entirety. Advantageously, by constant monitoring during playing of media files, CCM **300** can detect undesired activities and enforces those rules as defined by CCM **300**.

FIG. **5A** is an exemplary logic/bit path block diagram **500**A showing utilization of a wave shim driver, e.g., wave shim driver **309** of FIG. **3**, in conjunction with copyright compliance mechanism **300**, for selectively controlling recording of copyrighted media received by a client computer system, e.g., system **210**, in one embodiment of the present invention. Copyright compliance mechanism **300** is, in one embodiment, installed and operational on client system **210** in the manner described herein.

In one embodiment, a copyright compliance mechanism **300** is shown as being communicatively coupled with a media playback application **501** via connection **520**. Therefore, CCM **300** is enabled to communicate with playback application **501**. In one embodiment, CCM **300** can be integrated into a media playback application. CCM **300** is also coupled to and controls a selectable switch **311** in wave shim driver **309** (as described in FIG. **3**) via connection **522**. CCM **300** is further coupled to and controls a selectable switch **511** in direct sound **504** via connection **521**. Depending upon the copyright restrictions and licensing agreements

applicable to an incoming media file, e.g., **499**, CCM **300** controls whether switches **311** and **511** are open (shown), thus preventing incoming media **499** from reaching a media recording application, or closed (not shown) to allow recording of incoming media **499**.

For example, incoming media **499** may originate from a content server, e.g., **251**, coupled to system **210**. In another example, incoming media **499** may originate from a personal recording/electronic device, e.g., a MP3 player/recorder or similar device, coupled to system **210**. Alternatively, incoming media **499** may originate from a magnetic, optical or alternative media storage device inserted into a media device player coupled to system **210**, e.g., a CD or DVD inserted into a CD or DVD player, a hard disk in a hot swappable hard drive, an SD (secure digital card) inserted into a SD reader, and the like. In yet another example, incoming media **499** may originate from another media player application or media recording application. It is noted that incoming media **499** can originate from nearly any source that can be coupled to system **210**. However, regardless of the source of incoming media **499**, embodiments of the present invention, described herein, can prevent unauthorized recording of the media.

FIG. **5**A shows a media playback application **501**, e.g., an audio, video, or other media player application, operable within system **210** and configured to receive incoming media **499**. Playback application **501** can be a playback application provided by an operating system, e.g., Media Player for Windows™ by Microsoft, a freely distributed playback application downloadable from the Internet, e.g., RealPlayer or LiquidAudio, a playback application provided by a webcaster, e.g., PressPlay, or a playback application commercially available.

FIG. **5**A shows media device driver **505** which, in one implementation, may be a software driver for a sound card coupled to system **210** having a media output device **570**, e.g., speakers or headphones, coupled therewith for media files having audio content. In another implementation, media device driver **505** may be a software driver for a video card coupled with a display device, e.g., **105**, for displaying media files having alphanumeric and/or graphical content, and so on. With reference to audio files, it is well known that a majority of recording applications assume a computer system, e.g., **210**, has a sound card disposed therein, providing full-duplex sound functionality to system **210**. This means media output driver **505** can simultaneously cause playback and recording of incoming media files **499**. For example, media device driver **505** can playback media **499** along wave-out line **539** to media output device **570** (e.g., speakers for audible playback) via wave-out line **580** while outputting media **499** on waveout line **540** to eventually reach recording application **502**.

For purposes of FIGS. **5**A, **5**B, and **5**C, the terms wave-in line and wave-out line are referenced from the perspective of media device driver **505**. Additionally, for the most part, wave-in lines are downwardly depicted and wave-out lines are upwardly depicted in FIGS. **5**A, **5**B, and **5**C.

Continuing with FIG. **5**A, playback application **501** is coupled with an operating system (O/S) multimedia subsystem **503** and direct sound **504** via wave-in lines **531** and **551** respectively. O/S multimedia subsystem **503** is coupled to a wave shim driver **309** via wave-in line **533** and wave-out line **546**. O/S multimedia subsystem **503** is also coupled to a recording application **502** via wave-out line **548**. Operating system (O/S) multimedia subsystem **503** can be any O/S multimedia subsystem, e.g., a Windows™ multimedia subsystem for system **210** operating under a Microsoft O/S, a

QuickTime™ multimedia subsystem for system **210** operating under an Apple O/S, and so on. Playback application **501** is also coupled with direct sound **504** via wave-in line **551**.

Direct sound **504**, in one instance, may represent access to a hardware acceleration feature in a standard audio device, enabling lower level access to components within media device driver **505**. In another instance, direct sound **504** may represent a path that can be used by a recording application, e.g., Total Recorder, that can be further configured to bypass the default device driver, e.g., media device driver **505** to capture incoming media **499** for recording. For example, direct sound **504** can be enabled to capture incoming media **499** via wave-in line **551** and unlawfully output media **499** to a recording application **502** via wave-out line **568**, as well as media **499** eventually going to media device driver **505**, the standard default driver.

Still referring to FIG. **5**A, wave shim driver **309** is coupled with media device driver **505** via wave-in line **537** and wave-out line **542**. Media device driver **505** is coupled with direct sound **504** via wave-in line **553** which is shown to converge with wave-in line **537** at media device driver **505**. Media device driver **505** is also coupled with direct sound **504** via wave-out line **566**.

Wave-out lines **542** and **566** are shown to diverge from wave-out line **540** at media device driver **505** into separate paths. Wave-out line **542** feeds into wave shim driver **309** and wave-out line **566** feeds into direct sound **504**. When selectable switch **311** and **511** are open (shown), incoming media **499** cannot flow to recording application **502**, thus preventing unauthorized recording of it.

For example, incoming media **499** is received at playback application **501**. Playback application **501** activates and communicates to CCM **300** regarding copyright restrictions and/or licensing agreements applicable to incoming media **499**. If recording restrictions apply to media **499**, CCM **300** can, in one embodiment, open switches **311** and **511**, thereby blocking access to recording application **502**, effectively preventing unauthorized recording of media **499**. In one embodiment, CCM **300** can detect if system **210** is configured with direct sound **504** selected as the default driver to capture incoming media **499**, via wave-in line **551**, or a recording application is detected and/or a hardware accelerator is active, such that wave driver shim **309** can be bypassed by direct sound **504**. Upon detection, CCM **300** can control switch **511** such that the output path, wave-out line **568**, to recording application **502** is blocked. It is further noted that CCM **300** can detect media recording applications and devices as described herein, with reference to FIG. **3**.

Alternatively, if media device driver **505** is selected as the default driver, incoming media **499** is output from playback application **501** to O/S multimedia subsystem **503** on wave-in line **531**. From subsystem **503**, media **499** is output to wave shim driver **309** via wave-in line **533**. The wave shim driver **309** was described herein with reference to FIG. **3**. Media **499** is output from wave shim driver **309** to media device driver **505** via wave-in line **537**. Once received by media device driver **505**, media **499** can be output via wave-out line **539** to a media output device **570** coupled therewith via wave-out line **580**. Additionally, media device driver **505** can simultaneously output media **499** on wave-out line **540** back to wave shim driver **309**. Dependent upon recording restrictions applicable to media **499**, CCM **300** can, in one embodiment, close switch **311** (not shown as closed), thereby allowing media **499** to be output from wave shim driver **309** to subsystem **503** (via wave-out line **546**) and then to recording application **502** via wave-out line **548**.

21

Alternatively, CCM **300** can also open switch **311**, thereby preventing media **499** from reaching recording application **502**.

It is particularly noted that by virtue of CCM **300** controlling both switches **311** and **511**, and therefore controlling wave-out line **548** and wave-out line **568** leading into recording application **502**, incoming media files, e.g., media **499**, can be prevented from being recorded in an unauthorized manner in accordance with applicable copyright restrictions and/or licensing agreements related to the incoming media. It is also noted that embodiments of the present invention in no way interfere with or inhibit the playback of incoming media **499**.

FIG. **5**B is an exemplary logic/bit path block diagram **500**B of a client computer system, e.g., **210**, configured with a copyright compliance mechanism **300** for preventing unauthorized recording of copyrighted media according to an embodiment of the present invention. Copyright compliance mechanism **300** is, in one embodiment, coupled with and operational on client system **210** in the manner with reference to FIGS. **4**, **5**A, **6**, and **7**.

Diagram **500**B of FIG. **5**B is similar to diagram **500**A of FIG. **5**A, with a few changes. Particularly, diagram **500**B includes a custom media device **310** communicatively interposed between and coupled to O/S multimedia subsystem **503** and wave shim driver **309**. Custom media device **310** is coupled to O/S multimedia subsystem via wave-in line **533** and wave-out line **546**. Custom media device **310** is coupled with wave shim driver **309** via wave-in line **535** and wave-out line **544**. Additionally, custom media device **310** is coupled with direct sound **504** via wave-in line **553** which converges with wave-in line **533** and wave-out line **566** which diverges from wave-out line **546**, in one embodiment.

Also added to FIG. **5**B is a media hardware output device **570** that is coupled to media device hardware driver **505** via line **580**. Media hardware output device **570** can be, but is not limited to, a sound card for audio playback, a video card for video, graphical, alphanumeric, etc, output, and the like.

In one embodiment, CCM **300** is communicatively coupled with playback application **501** via connection **520**, waveform driver shim **309** via connection **522**, and custom media device **310**, via connection **521**. CCM **300** is coupled to and controls a selectable switch **311** in waveform driver shim **309** via connection **522**. CCM **300** is also coupled to and controls a selectable switch **312** in custom audio device **310** via connection **521**. Depending upon the copyright restrictions and licensing agreements applicable to an incoming media file, e.g., media **499**, CCM **300** controls whether switches **311** and **312** are open (shown), thus preventing the incoming media **499** from reaching a recording application, or closed (not shown) so as to allow recording of the incoming media **499**.

Continuing with FIG. **5**B, direct sound **504** is shown coupled with custom media device **310** via wave-in line **553**, instead of being coupled with media device driver **505** (FIG. **5**A). In one embodiment, custom audio device **310** mandates explicit selection through system **210**, meaning that custom audio device **310** needs to be selected as a default driver of system **210**. By virtue of having the selection of custom media device **310** as the default driver of system **210**, the data path necessary for direct sound **504** to capture the media content is selectively closed.

For example, incoming media **499** originating from nearly any source with reference to FIG. **5**A is received by media playback application **501** of system **210**. Playback application **501** communicates to CCM **300**, via connection **520**, to determine whether incoming media **499** is protected by any

22

copyright restrictions and/or licensing agreements. Playback application **501** communicates with CCM **300** to control switch **311** and **312** accordingly. In the present example, recording of incoming media **499** would violate applicable restrictions and/or agreements and therefore switch **312** is in an open position, such that the output path to recording application **502**, e.g., wave-out line **548** and/or wave-out line **568**, is effectively blocked, thereby preventing unauthorized recording of media **499**.

Alternatively, if media device driver **505** is selected as the default driver, incoming media **499** continues from O/S multimedia subsystem **503**, through custom audio device **310**, wave driver shim **309**, and into media device driver **505** where media **499** can be simultaneously output to media output device **570** via line **580**, and output on wave-out line **540** to wave-and outputted by media device driver **505** to wave shim driver **309** on wave-out line **542**. However, by virtue of CCM **300** controlling switch **311**, wave-out line **544** which eventually leads to recording application **502** is blocked, thus effectively preventing unauthorized recording of media **499**.

It is particularly noted that by virtue of CCM **300** controlling both switches **311** and **312** and therefore controlling wave-out line **548** and wave-out line **568**, any incoming media files, e.g., incoming media **499**, can be prevented from being recording in an unauthorized manner in accordance with applicable copyright restrictions and/or licensing agreements related to the incoming media.

Still referring to FIG. **5**B, it is further noted that custom media device **310** allows for unfettered playback of incoming media **499**. Additionally, at any time during playback of media **499**, custom media device **310** can be dynamically activated by CCM **300**.

FIG. **5**C is an exemplary logic/bit path block diagram **500**C of a client computer system, e.g., **210**, configured with a copyright compliance mechanism **300** for preventing unauthorized output and unauthorized recording of copyrighted media according to an embodiment of the present invention. Copyright compliance mechanism **300** is, in one embodiment, coupled with and operational on client system **210** in the manner with reference to FIGS. **4**, **5**A, **5**B, **6**, and **7**.

Diagram **500**C of FIG. **5**C is similar to diagram **500**B of FIG. **5**B, with a few changes. Particularly, diagram **500**C includes a media hardware output device **570** that is coupled with a media device driver **505**. In one embodiment, media hardware output device **570** can be a S/PDIF (Sony/Phillips Digital Interface) card for providing multiple outputs, e.g., an analog output **573** and a digital output **575**. An alternative media hardware output device providing similar digital output can also be implemented as device **570** including, but not limited to, a USB (universal serial bus) output device and/or an externally accessible USB port located on system **210**, a FireWire (IEEE1394) output device and/or an externally accessible FireWire port located on system **210**, with wireline or wireless functionality. In the present embodiment, media hardware output device **570** is shown to include a switch **571** controlled by CCM **300** via communication line **523**, similar to switches **311** and **312**, for controlling output of incoming media **499**.

In one embodiment, CCM **300** is communicatively coupled with playback application **501** via connection **520**, waveform driver shim **309** via connection **522**, custom media device **310**, via connection **521**, and media hardware output device **570** via connection **523**. CCM **300** is coupled to and controls a selectable switch **311** in waveform driver shim **309** via connection **522**. CCM **300** is also coupled to

US 7,316,033 B2

23

and controls a selectable switch **312** in custom audio device **310** via connection **521**. CCM **300** is further coupled to and controls a selectable switch **571** in media hardware output device **570** via connection **523**. Depending upon the copyright restrictions and licensing agreements applicable to an incoming media file, e.g., media **499**, CCM **300** controls whether switches **311** and **312** are open (shown), thus preventing the incoming media **499** from reaching a recording application, or closed (not shown) so as to allow recording of the incoming media **499**. Additionally, CCM **300** controls whether switch **571** is open (shown), thus preventing incoming media **499** from being output from digital output **575** of media hardware output device **570**, or closed (not shown) to allow incoming media **499** to be output from media hardware output device **570**.

By controlling media hardware output device **570**, copyright compliance mechanism **300** can prevent unauthorized output of incoming media **499** to, e.g., a digital recording device that may be coupled with digital output **575** of media hardware output device **570**. Accordingly, in one embodiment, CCM **300** is enabled to also detect digital recording devices that may be coupled to a digital output line, e.g., **571**, of a media hardware output device, e.g., **570**. Examples of a digital recording device that can be coupled to media hardware output device **570** can include, but is not limited to, mini-disc recorders, MP3 recorders, personal digital recorders, digital recording devices coupled with multimedia systems, and/or nearly any digital device that can capture an incoming media **499** being output from a media hardware output device **570**, e.g. a sound card.

Continuing with FIG. **5C**, direct sound **504** is shown coupled with custom media device **310** via wave-in line **553**, instead of being coupled with media device driver **505** (FIG. **5A**). In one embodiment, custom audio device **310** mandates explicit selection through system **210**, meaning that custom audio device **310** is needs to be selected as a default driver of system **210**. By virtue of having the selection of custom media device **310** as the default driver of system **210**, the data path necessary for direct sound **504** to capture the media content is selectively closed.

For example, incoming media **499** originating from nearly any source with reference to FIG. **5A** is received by media playback application **501** of system **210**. Playback application **501** communicates to CCM **300**, via connection **520**, to determine whether incoming media **499** is protected by any copyright restrictions and/or licensing agreements. Playback application **501** communicates with CCM **300** to control switch **311**, **312**, and **571** accordingly. In the present example, recording of incoming media **499** would violate applicable restrictions and/or agreements and therefore switch **312** is in an open position, such that the output path to recording application **502**, e.g., wave-out line **548** and/or wave-out line **568**, is effectively blocked, thereby preventing unauthorized recording of media **499**.

Alternatively, if media device driver **505** is selected as the default driver, incoming media **499** continues from O/S multimedia subsystem **503**, through custom audio device **310**, wave driver shim **309**, and into media device driver **505** where media **499** can be simultaneously output to media output device **570** via line **580**, and output on wave-out line **540** to wave-and outputted by media device driver **505** to wave shim driver **309** on wave-out line **542**. However, by virtue of CCM **300** controlling switch **311**, wave-out line **544** which eventually leads to recording application **502** is blocked, thus effectively preventing unauthorized recording of media **499**.

24

It is particularly noted that by virtue of CCM **300** controlling both switches **311** and **312** and therefore controlling wave-out line **548** and wave-out line **568**, any incoming media files, e.g., incoming media **499**, can be prevented from being recording in an unauthorized manner in accordance with applicable copyright restrictions and/or licensing agreements related to the incoming media.

Still referring to FIG. **5C**, it is particularly noted that although CCM **300** can prevent unauthorized recording of incoming media **499** by controlling switches **311** and **312**, thus preventing incoming media **499** from reaching recording application **502**, controlling switches **311** and **312** do nothing to prevent incoming media **499** from being captured by a peripheral digital device, e.g., a mini-disc recorder, etc., coupled to a digital output **575** of device **570**. Thus, by also controlling the output, via digital output **575** of media hardware output device **570**, through control of switch **571**, CCM **300** can prevent unauthorized capturing of incoming media **499** during output, e.g., on a sound card for audio files, a video card for video and/or graphical files, regardless of whether incoming media **499** is received in a secure and encrypted manner. However, when switch **571** is in a closed position, incoming media **499** may be played back in an unfettered manner. Additionally, at any time during playback of media **499**, switch **312** of custom media device **310**, switch **311** of media device driver **309**, and/or switch **571** of media hardware output device **570** can be dynamically activated by CCM **300**.

FIG. **6A** is a block diagram of a media file, e.g., incoming media **499**, adapted to be received by a playback application, e.g., **501** of FIGS. **5A**, **5B**, and **5C**, configured with an indicator **605** for enabling incoming media **499** to comply with rules according to the SCMS (serial copy management system). When applicable to a media file, e.g., **499**, the SCMS allows for one copy of a copyrighted media file to be made, but not for copies of copies to be made. Thus, if incoming media **499** can be captured by a recording application, e.g., **502** of FIGS. **5A**, **5B**, and/or **5C**, and/or a recording device, e.g. **529**, and/or a peripheral recording device and/or a recording application coupled to a digital output of a media hardware output device, e.g., digital output **575** of media hardware output device **570** of FIGS. **5B** and **5C**, unauthorized copying and/or recording may be accomplished.

Playback application **501** is coupled with CCM **300** via communication line **520** in a manner analogous to FIGS. **5A**, **5B** and/or **5C**. Although not shown in FIG. **6**, it is noted that CCM **300** is also coupled to switches **311** and **511** as shown in FIG. **5A**, switches **311** and **312** in FIG. **5B**, and switches **311**, **312**, and **571** in FIG. **5C**.

In one embodiment, an indicator **605** is attached to incoming media **499** for preventing unauthorized copying or recording in accordance with the SCMS. In one embodiment, indicator **605** can be a bit that may be transmitted prior to beginning the delivery of incoming media **499** to playback application **501**. In another embodiment, indicator **605** may placed at the beginning of the bit stream of incoming media **499**. In another embodiment, indicator **605** may be placed within a frame period of incoming media **499**, e.g., every fifth frame, or any other desired frame period. In another embodiment, indicator **605** may be transmitted at a particular time interval or intervals during delivery of the media file, e.g. incoming media **499**. Thus, indicator **605** may be placed nearly anywhere within or attached to the bit stream related to incoming media **499**.

Indicator **605** may be comprised of various indicators, e.g., a level **0** indicator, a level **1** indicator, and a level **2**

indicator, in one embodiment of the present invention. In the present embodiment, a level **0** indicator may be for indicating to CCM **300** that copying is permitted without restriction, e.g., incoming media **499** is not copyrighted or that the copyright is not asserted. In the present embodiment, a level **1** indicator may be for indicating to CCM **300** that one generation of copies of incoming media **499** may be made, such that incoming media **499** is an original copy and that one copy may be made. In the present embodiment, a level **2** indicator may be for indicating to CCM **300** that incoming media **499** is copyright protected and/or a copy thereof, and as such no digital copying is permitted.

For example, incoming media **499** is received by playback application **501**. Application **501** detects an indicator **605** attached therewith, in this example, a level **2** bit is placed in the bit stream for indicating to CCM **300** that copying is not permitted.

For example, when CCM **300** is configured in system **210** such as that shown in FIG. **5**A, in response to a level **2** indicator bit, CCM **300**, while controlling the audio path, then activates switches **311** and **511** to prevent any recording of incoming media **499**.

When CCM **300** is configured in system **210** such as that shown in FIG. **5**B, in response to a level **2** indicator bit, CCM **300**, while controlling the audio path, then activates switches **311** and **312** to prevent any recording of incoming media **499**.

When CCM **300** is configured in system **210** such as that shown in FIG. **5**C, in response to a level **2** indicator bit, CCM **300**, while controlling the audio path, then activates switches **311**, **312**, and **571** to prevent any recording of incoming media **499**.

It is noted that CCM **300** can activate or deactivate switches coupled therewith, as described herein with reference to FIGS. **5**A, **5**B, and **5**C, thereby funneling incoming media **499** through the secure media path, in this instance the audio path, to prevent unauthorized copying of incoming media **499**. It is further noted that CCM **300** can detect media recording applications and devices as described herein, with reference to FIG. **3**.

FIGS. **7**A, **7**B, and **7**C, are a flowchart **700** of steps performed in accordance with one embodiment of the present invention for controlling end user interaction of delivered electronic media. Flowchart **700** includes processes of the present invention which, in one embodiment, are carried out by processors and electrical components under the control of computer readable and computer executable instructions. The computer readable and computer executable instructions reside, for example, in data storage features such as computer usable volatile memory **104** and/or computer usable non-volatile memory **103** of FIG. **1**. However, the computer readable and computer executable instructions may reside in any type of computer readable medium. Although specific steps are disclosed in flowchart **700**, such steps are exemplary. That is, the present invention is well suited to performing various other steps or variations of the steps recited in FIGS. **7**A, **7**B, and **7**C. Within the present embodiment, it should be appreciated that the steps of flowchart **700** may be performed by software, by hardware or by any combination of software and hardware.

The present embodiment provides a mechanism for restricting recording of high fidelity media content delivered via one or more communication networks. The present embodiment delivers the high fidelity media content to registered clients while preventing unauthorized clients from directly receiving media content from a source database. Once the client computer system receives the media

content, it can be stored in hidden directories and/or custom file systems that may be hidden to prevent subsequent unauthorized sharing with others. It is noted that various functionalities can be implemented to protect and monitor the delivered media content. For example, the physical address of the media content can be hidden from media content recipients. In another example, the directory address of the media content can be periodically changed. Additionally, an access key procedure and rate control restrictor can also be implemented to monitor and restrict suspicious media content requests. Furthermore, a copyright compliance mechanism, e.g., CCM **300**, can be installed in the client computer system **210** to provide client side compliance with licensing agreements and copyright restrictions applicable to the media content. By implementing these and other functionalities, the present embodiment restricts access to and the distribution of delivered media content and provides a means for copyrighted media owner compensation.

It is noted that flowchart **700** is described in conjunction with FIGS. **2**, **3**, **4**, **5**A, **5**B, **5**C, in order to more fully describe the operation of the present embodiment. In step **702** of FIG. **7**A, a user of a computer system, e.g., **210**, causes the computer to communicatively couple to a web server, e.g., **250**, via one or more communication networks, e.g., Internet **201**, and proceeds to attempt to log in. It is understood that the log in process of step **602** can be accomplished in a variety of ways in accordance with the present invention.

In step **704** of FIG. **7**A, web server **250** accesses a user database, e.g., **450**, to determine whether the user and the computer system **210** logging in are registered with it. If the user and computer system **210** are registered with web server **250**, the present embodiment proceeds to step **714**. However, if the user and computer system **210** are logging in for the first time, web server **250** can initiate a user and computer system **210** registration process at step **706**.

In step **706**, registration of the user and computer system **210** is initiated. The user and computer system registration process can involve the user of computer system **210** providing personal information including, but not limited to, their name, address, phone number, credit card number, and the like. Web server **250** can verify the accuracy of the information provided. Web server **250** can also acquire information regarding the user's computer system **210** including, but not limited to, identification of media players disposed and operable on system **210**, a unique identifier corresponding to the computer system, etc. In one embodiment, the unique identifier corresponding to the computer system can be a MAC address. Additionally, web server **250** can further request that the user of computer system **210** to select a username and password.

In step **708** of FIG. **7**A, subsequent to the completion of the registration process, web server **250** generates a unique user identification (ID) or user key associated with the user of client computer system **210**. The unique user ID, or user key, is then stored by web server **250** in a manner that is associated with that registered user. Furthermore, one or more cookies containing that information specific to that user and the user's computer system **210**, is installed in a non-volatile memory device, e.g., **103** and/or data storage device **108** of computer system **210**. It is noted that the user ID and cookie can be stored in a hidden directory within one or more non-volatile memory devices within computer system **210**, thereby preventing user access and/or manipulation of that information. It is further noted that if the unique user ID, or user key, has been previously generated for the user

27

28

and computer **210** that initially logged-in at step **702**, the present embodiment proceeds to step **714**

In step **710**, web server **250** verifies that the user ID and the cookie(s) are properly installed in computer system **210** and verifies the integrity of the cookie(s) and the user ID, thereby ensuring no unauthorized alterations to the user ID or the cookie has occurred. If the user ID is not installed and/or not valid, web server **250** can re-initiate the registration process at step **706**. Alternatively, web server **250** can decouple computer system **210** from the network, thereby requiring a re-log in by the user of computer **210**. If the cookie(s) and user ID are valid, the present embodiment proceeds to step **712**.

In step **712** of FIG. **7A**, web server **250** can install a version of a copyright compliance mechanism, e.g., **300**, onto one or more non-volatile memory devices of computer system **210**. Installing CCM **300** into user's computer system **210** can facilitate client side compliance with licensing agreements and copyright restrictions applicable to specific delivered copyrighted media content. At step **712**, the components of CCM **300**, such as instructions **301**, coder/decoder (codec) **303**, agent programs **304**, system hooks **305**, skins **306**, and custom media device drivers **307** (e.g., custom media device **310** of FIGS. **5B** and **5C**), are installed in computer system **210**, such as that shown in FIGS. **5A**, **5B**, and **5C**. In one embodiment, a hypertext transfer protocol file delivery system can be utilized to install CCM **300** into computer system **210**. However, step **712** is well suited to install CCM **300** on computer system **210** in a wide variety of ways in accordance with the present embodiment. For example, CCM **300** can be installed as an integrated component within a media player application, media recorder application, and/or media player/recorder applications. Alternatively, CCM **300** can be installed as a stand alone mechanism within a client computer system **210**. Additionally, CCM **300** can be installed as a stand alone mechanism and/or as part of a bundled application from a media storage device, e.g., a CD, a DVD, an SD, and/or as part of an installation package.

In step **714**, web server **250** can request the previously established username and password of the user of client computer system **210**. Accordingly, the user of client computer system **210** causes it to transmit to web server **250** the previously established username and password. Upon the receipt thereof, web server **250** may access a user database, e.g., **450**, to determine their validity. If the username and password are invalid, web server **250** refuses access wherein flowchart **500** may be discontinued (not shown). Alternatively, if the username and password are valid, the present embodiment proceeds to step **716**.

In step **716** of FIG. **7A**, web server **250** can access media file database **450** to determine if copyright compliance mechanism **300** has been updated to reflect changes made to the DMCA (digital millennium copyright act) and/or to the interactive/non-interactive licensing agreements recognized by the DMCA. It is noted that alternative licensing agreements can be incorporated into copyright compliance mechanism **300**. Advantageously, by providing a copyright compliance mechanism that can be readily updated to reflect changes in existing copyright restrictions and/or the introduction of other types of licensing agreements, and/or changes to existing media player applications, or the development of new media player applications, copyright compliance mechanism **300** can provide compliance with current copyright restrictions.

Continuing with step **716**, if web server **250** determines that CCM **300**, or components thereof, of computer **210** has

been updated, web server **250** initiates installation of the newer components and/or the most current version of CCM **300** into computer system **210**, shown as step **718**. If web server **250** determines that the current version of CCM **300** installed on system **210** does not have to be updated, the present embodiment proceeds to step **720** of FIG. **7B**.

In step **720** of FIG. **7B**, the user of client computer system **210** causes it to transmit to web server **250**, e.g., via Internet **201**, a request for a play list of available media files. It is noted that the play list can contain all or part of the media content available from a content server, e.g., **251**.

In step **722**, in response to web server **250** receiving the play list request, web server **250** transmits to client computer system **210** a media content play list together with the unique user ID associated with the logged-in user. The user ID, or user key, can be attached to the media content play list in a manner invisible to the user. It is noted that the media content in content server **251** can be, but is not limited to, high fidelity music, audio, video, graphics, multimedia, alphanumeric data, and the like. The media content play list of step **720** can be implemented in diverse ways. In one example, web server **250** can generate a media content play list by combining all the available media content into a single play list. Alternatively, all of the media content titles, or different lists of titles, can be loaded from content server **251** and passed to a CGI (common gateway interface) program operating on web server **250** where the media titles, or differing lists of titles, can be concatenated into a single dimensioned array that can be provided to client computer system **210**. It is understood that the CGI can be written in nearly any software computing language.

In step **724** of FIG. **7B**, the user of client computer system **210** can utilize the received media content play list in conjunction with a media player application in order to cause client computer system **210** to transmit a request to web server **250** for delivery of desired media content, and wherein the user ID is automatically included therewith. The media content play list provided to client computer system **210** by web server **250** can enable the user to create one or more customized play lists by the user selecting desired media content titles. It is noted that a customized media play list can establish the media content that will eventually be delivered to client computer system **250** and the order in which the content will be delivered. Additionally, the user of client computer system **250** can create one or more customized play lists and store those play lists in system **250** and/or within web server **250**. It is noted that a customized play list does not actually contain the desired media content titles, but rather the play list includes one or more identifiers associated with the desired media content that can include, but is not limited to, a song, an audio clip, a video clip, a picture, a multimedia clip, an alphanumeric document, or particular portions thereof. In another embodiment, the received media content play list can include a random media content delivery choice that the user of client computer system **210** can transmit to web server **250**, with the user ID, to request delivery of the media content in a random manner.

In step **726**, upon receiving the request for media content from client computer system **210**, web server **250** determines whether the requesting media application operating on client computer system **210** is a valid media application. One of the functions of a valid media application is to be a player of media content as opposed to an application that downloads media content in an unauthorized or unregulated manner. If web server **250** determines that the media application operating on system **210** is not a valid media application, the present embodiment proceeds to step **727** which

US 7,316,033 B2

29

in one embodiment, redirects client computer system **210** to a web site where the user of system **210** can download a valid media player application or to a software application which can identify client computer system **210**, log system **210** out of web server **250** and/or prevent future logging-in for a defined period of time, e.g., 15 minutes, an hour, a day, a week, a month, a year, or any specified amount of time. If web server **250** determines that the media application operating on system **210** is a valid media application, the present embodiment proceeds to step **728**.

In step **728** of FIG. **7B**, the present embodiment causes web server **250** to determine whether the user ID (or user key) that accompanied the media delivery request sent by client computer system **210** is valid. If web server **250** determines that the user ID is invalid, the present embodiment proceeds to step **729** where client computer system **210** can be logged off web server **250** or client computer system **250** can be returned to step **706** (of FIG. **7A**) to re-register and to have another unique user ID generated by web server **250**. It is noted that the order in which steps **726** and **728** are performed can be altered such that step **728** can be performed prior to step **726**. If web server **250** determines that the user ID is valid, the present embodiment proceeds to step **730**.

In step **730**, prior to web server **250** authorizing the delivery of the redirect and access key for the requested media file content, shown as step **732**, CCM **300** governs certain media player applications and/or functions thereof that are operable on client computer system **210**. These governed functions can include, pause, stop, progress bar, save, etc. It is noted that, in one embodiment, CCM **300** can utilize system hooks **305** to accomplish the functionality of step **730**.

In step **732** of FIG. **7C**, the present embodiment causes web server **250** to transmit to client computer system **210** a redirection command along with a time sensitive access key (for that hour, day or for any defined period of time) thereby enabling client computer system **210** to receive the requested media content. The redirection command can include a time sensitive address of the media content location within content server **251**. The address is time sensitive because, in one embodiment, the content server **251** periodically renames some or all of the media address directories, thereby making previous content source addresses obsolete. Alternatively, the address of the media content is changed. In another embodiment, the location of the media content can be changed along with the addresses. Regardless, unauthorized users and/or applications are restricted from directly retrieving and/or copying the media content from content server **251**. Therefore, if someone with inappropriate or unlawful intentions is able to find where the media content is stored, subsequent attempts will fail, as the previous route no longer exists, thereby preventing future unauthorized access.

It is noted that in one embodiment of the present invention, the addresses (or routes) of content server **251** that are actively coupled to one or more client computer systems (e.g., **210**-**230**) are maintained while future addresses, or routes, are being created for new client devices. It is further noted that as client computer systems are uncoupled from the media content source of content server **251**, that directory address, or link, can be immediately changed, thereby preventing unauthorized client system or application access.

In another embodiment, the redirection of client computer system **210** to content server **251** can be implemented by utilizing a server network where multiple servers are content providers, (e.g., **251**), or by routing a requesting client

30

computer system (e.g., **210**, **220**, or **230**) through multiple servers. In yet another embodiment, the delivery of media content from a central content provider (e.g., **251**) can be routed through one or more intermediate servers before being received by the requesting client computer system, e.g., **210**-**230**.

The functionality of step **732** is additionally well suited to provide recordation of the Internet Protocol (IP) addresses of the client computer systems, e.g., **210**, the media content requested and its transfer size, thereby enabling accurate monitoring of royalty payments, clock usage and transfers, and media content popularity.

In step **734** of FIG. **7C**, upon receiving the redirection command, the present embodiment causes the media playback application **501** (FIGS. **5A**, **5B**, and **5C**) operating on client computer system **210** to automatically transmit to content server **251** a new media delivery request which can include the time sensitive access key and the address of the desired media content.

In step **726** of FIG. **7C**, content server **251** determines whether the time sensitive access key associated with the new media delivery request is valid. If content server **251** determines that the time sensitive access key is valid, the present embodiment proceeds to step **738** of FIG. **7C**. However, if content server **251** determines that the time access key is not valid, the present embodiment proceeds to step **737**, a client redirect.

In step **737**, content server redirects client computer **210** to step **732** (not shown) where a new access key is generated. Alternatively, step **737** causes the present embodiment to return to step **704** of FIG. **7A**. In yet another embodiment, step **737** causes client computer system **210** to be disconnected from content server **251**.

In step **738** of FIG. **7C**, content server **251** transmits the requested high fidelity media content to client computer system **210**. It is noted that each media content file delivered to client computer system **210** can have a header attached thereto, prior to delivery, as described with reference to FIG. **4**. It is further noted that both the media content and the header attached thereto can be encrypted. In one embodiment, the media content and the header can be encrypted differently. Alternatively, each media content file encrypted differently. In another embodiment, groups of media files are analogously encrypted. It is noted that public domain encryption mechanisms, e.g., Blowfish, and/or non-public domain encryption mechanisms can be utilized.

Still referring to step **738**, content server **251** transmits the requested media content in a burst load (in comparison to a fixed data rate), thereby transferring the content to client computer system **210** as fast as the network transfer rate allows. Further, content server **251** can have its download rate adapted to be equal to the transfer rate of the network to which it is coupled. In another embodiment, the content server **251** download rate can be adapted to equal the network transfer rate of the client computer system **210** to which the media content is being delivered. For example, if client computer system **210** is coupled to Internet **201** via a T1 connection, then content server **251** transfers the media content at transmission speeds allowed by the T1 connection line. As such, once the requested media content is transmitted to client computer system **210**, content server **251** is then able to transmit requested media content to another client computer system, e.g., **220** or **230**. Advantageously, this provides an efficient means to transmit media content, in terms of statistical distribution over time and does not overload the communication network(s).

US 7,316,033 B2

31

It is noted that delivery of the requested media content by content server **250** to client computer system **210** can be implemented in a variety of ways. For example, an HTTP (hypertext transfer protocol) file transfer protocol can be utilized to transfer the requested media content as well as a copyright compliance mechanism **300** to client **210**. In this manner, the copyright compliance mechanism as well as each media content file/title can be delivered in its entirety. In another embodiment, content server **251** can transmit to client computer system **250** a large buffer of media content, e.g., audio clips, video clips, and the like.

In step **740** of FIG. **7**C, upon receiving the requested high fidelity media content from content server **251**, the present embodiment causes client computer system **210** to store the delivered media content in a manner that is ready for presentation, e.g., play. The media content is stored in client computer system **210** in a manner that restricts unauthorized redistribution. For example, the present embodiment can cause the high fidelity media content to be stored in a volatile memory device, utilizing one or more hidden directories and/or custom file systems that may be hidden, where it may be cached for a limited period of time. Alternatively, the present embodiment can cause the high fidelity media content to be stored in a non-volatile memory device, e.g., **103** or data storage device **108**. It is noted that the manner in which each of the delivered media content file(s) is stored, volatile or non-volatile, can be dependent upon the licensing restrictions and copyright agreements applicable to each media content file. It is further noted that in one embodiment, when a user of client computer system **210** turns the computer off or causes client computer system **210** to disconnect from the network, the media content stored in a volatile memory device is typically deleted therefrom.

Still referring to step **740**, in another embodiment, the present embodiment can cause client computer system **210** to store the received media content in a non-volatile manner within a media application operating therein, or within one of its Internet browser applications (e.g., Netscape Communicator™, Microsoft Internet Explorer™, Opera™, Mozilla™, and the like) so that delivered media content can be used in a repetitive manner. Further, the received media content can be stored in a manner making it difficult for a user to redistribute in an unauthorized manner, while allowing the user utilization of the received media content, e.g., by utilizing one or more hidden directories and/or custom file systems that may also be hidden. It is noted that by storing media content with client computer system **210** (when allowed by applicable licensing agreements and copyright restrictions), content server **251** does not need to redeliver the same media content to client computer system **210** each time its user desires to experience (e.g., listen to, watch, view, etc.) the media content file.

In step **742** of FIG. **7**C, the received media content file is then fed into a media player application (e.g., playback application **501** of FIGS. **5**A, **5**B, and **5**C), which then runs it through a codec, e.g., coder/decoder **303** of CCM **300**, in one embodiment. In response, coder/decoder **303** sends an authorization request to the server, e.g., **251**, with attached authorization data, as described herein. In response to receiving codec's **303** authorization request, server **251** compares the received authorization data with that stored in server **251**, and subsequently, the present embodiment proceeds to step **744**.

In step **744**, the server **251** responds with a pass or fail authorization. If server **251** responds with a fail, such that the received authorization data is invalid, the present method can proceed to step **745**, where server **251** can, in one

32

embodiment, notify the user of client system **210**, e.g., by utilization of skin **306**, that there was an unsuccessful authorization of the requested media content file. It is noted that alternative messages having similar meanings may also be presented to the user of client computer system **210**, thereby informing the user that the delivery failed. However, if the authorization data passes, the present method proceeds to step **746**.

In step **746**, server **251** transmits certain data back to the media player application which enables the media player application to present the contents of the media file via media playback application **501** of FIGS. **5**A, **5**B, and **5**C. In one embodiment, a decryption key can be included in the transmitted data to decrypt the delivered media content file. In another embodiment, an encryption/decryption key can be included in the transmitted data to allow access to the contents of the media file. The present method then proceeds to step **748**.

In step **748** of FIG. **6**C, subsequent to media file decryption, the media file may be passed through CCM **300**, e.g., a coder/decoder **303**, to a media player application operating on client computer system **210**, e.g., playback application **501** of FIGS. **5**A, **5**B, and **5**C, which can then access and utilize the delivered high fidelity media content, enabling its user(s) to experience the media content, e.g., listen to it, watch it, view it, or the like. In one embodiment of the present invention, a specialized or custom media player may be involved in order to experience the media content, e.g., skin **306** of FIG. **3**. Skin **306** may be implemented when CCM **300** cannot modify an industry standard media player application to comply with copyright restrictions and/or licensing agreements in accordance with the DMCA. Alternatively, a specialized or custom media player may not be needed to experience the media content. Instead, an industry standard media player can be utilized by client computer system **210** to experience the media content. Typically, many media player applications are available and can include, but are not limited to, Windows™ Media Player™ for PCs (personal computers), iTunes™ Player or QuickTime™ for Apple computers, and XMMS player for computers utilizing a Linux operating system. Regardless of the media player application utilized, while the media file is passed to the media player application, e.g., in a frame by frame basis or in a buffer by buffer basis, coder/decoder **303** will repeatedly ensure that CCM **300** rules are being enforced at any particular moment during media playback, shown as step **750**.

In step **750**, as the media file content is delivered to the media player application, e.g., media player application **501** of FIGS. **5**A, **5**B, and **5**C, periodically, e.g., after a specified number of frames, after a defined period of time, or any desired time or data period, coder/decoder **303** repeatedly determines whether or not all the rules are enforced, in accordance with rules as defined by CCM **300**. If the rules are not enforced, e.g., change due to a user opening up a recording application (e.g., Total Recorder or alternative application) the present method proceeds to step **751**. If the rules, in accordance with CCM **300**, are enforced, the present method then proceeds to step **752**.

In step **751** of FIG. **7**C, if the rules according to CCM **300** are not enforced, the presentation of the media content is, in one embodiment, suspended or halted. In one embodiment, CCM **300** can selectively control switches **311** and **511** (FIG. **5**A) to prevent output of incoming media **499** (FIGS. **5**A, **5**B, and **5**C) to a recording application **502** (FIGS. **5**A, **5**B, and **5**C, via wave shim driver **309** and direct sound **504** respectively, thus preventing unauthorized recording of

incoming media **499**. In another embodiment, CCM **300** can selectively control switches **311** and **312** (FIG. **5**B) to prevent output of incoming media **499** to recording application **502** via wave shim driver **309** and custom media device **310**, thus preventing unauthorized recording of incoming media **499**. In yet another embodiment, CCM **300** can selectively control switches **311**, **312**, to not only prevent incoming media **499** from being recorded in an unauthorized manner but can also selectively control switch **571** (FIG. **5**C) to prevent unauthorized output of incoming media **499** via digital output **575** of media hardware output device **570**. In one embodiment, incoming media **499** may not be output from digital output **575**. In another embodiment, incoming media **499** may be output via digital output **575** but in an inaudible manner, e.g., silence. In yet another embodiment, incoming media **499** be audible but recording functionality can be disabled, such that the media content cannot be recorded.

In step **752**, if the rules are enforced in accordance with CCM **300**, coder/decoder **303** retrieves a subsequent portion of the media content that is stored locally in client computer system **210**. The newly retrieved portion of the media file is then presented by the client's media player application, shown in the present method as step **748**. While the newly retrieved portion is presented, embodiments of the present method then again perform step **750**, then step **752** or **751**, then step **748**, then **750**, etc., in a continual loop until the media file contents are presented in their entirety. Advantageously, by constantly monitoring playing media files, CCM **300** can detect undesired activities and enforce those rules defined by CCM **300**.

FIG. **8** is a diagram of an exemplary high-speed global media content delivery system **800**, in accordance with one embodiment of the present invention. In one embodiment, system **800** can be utilized to globally deliver media content, e.g., audio media, video media, graphic media, multimedia, alphanumeric media, etc., to a client computer system, e.g., **210**, **220**, and/or **230**, in conjunction with a manner of delivery similar to that described herein. In one embodiment, system **800** includes a global delivery network **802** that can include multiple content servers, e.g., **804**, **806**, **808**, **810**, **812**, **814**, and **816**, that can be located throughout the world and which may be referred to as points of presence or media delivery point(s). Each of content server **804**-**816** can store a portion, a substantial portion, or the entire contents of a media content library that can be delivered to client computer systems via a network, e.g., Internet **201**, or a WAN (wide area network). Accordingly, each of content server **804**-**816** can provide media content to of client computer systems in its respective vicinity in the world. Alternatively, each content server can provide media content to a substantial number of client computer systems

For example, a media delivery point (MDP) **816**, located in Tokyo, Japan, is able to provide and deliver media content from the media content library stored in its content database, e.g., **451**, to client computer systems within the Asiatic regions of the world while a media delivery point **812**, located in New York City, N.Y., USA, is able to provide and deliver media content from its stored media content library to client devices within the Eastern United States and Canada. It is noted that each city name, e.g., London, Tokyo, Hamburg, San Jose, Amsterdam, or New York, associated with one of the media delivery points **804**-**816** represents the location of that particular media delivery point or point of presence. However, it is further noted that these city names are exemplary because media delivery points **804**-**816** can

located anywhere within the world, and as such are not limited to the cities shown in global network **802**.

Still referring to FIG. **8**, it is further noted that global system **802** is described in conjunction with FIGS. **2**, **3**, **4**, **5**, and **6**, in order to more fully describe the operation of embodiment of the present invention. Particularly, subsequent to a client computer system, e.g., client computer system **210** of FIG. **2**, interacting with a web server, e.g., web server **250** of FIG. **2**, as described herein, web server **250**, in one embodiment, can redirect client computer system **210** to receive the desired media content from an MDP (e.g., **804**-**816**) based on one or more differing criteria.

For example, computer system **210** may be located in Brattleboro, Vt., and its user causes it to log-in with a web server **250** which can be located anywhere in the world. It is noted that steps **702**-**730** of FIGS. **7**A and **7**B can then be performed as described herein such that the present embodiment proceeds to step **732** of FIG. **7**C. At step **732**, the present embodiment can determine which media delivery points, e.g., **804**, **806**, **808**, **810**, **812**, **814**, or **816**, can subsequently provide and deliver the desired media content to client computer system **210**.

Still referring to FIG. **8**, one or more differing criteria can be utilized to determine which media delivery point to select for delivery of the desired media content. For example, the present embodiment can base its determination upon which media delivery point is in nearest proximity to client computer system **210**, e.g., media delivery point **816**. This can be performed by utilizing the stored registration information, e.g., address, provided by the user of client computer system **210**. Alternatively, the present embodiment can base its determination upon which media delivery point provides media content to the part of the world in which client computer system is located. However, if each media delivery point (e.g., **804**-**816**) stores differing media content, the present embodiment can determine which one can actually provide the desired media content. It is noted that these are exemplary determination criteria and the embodiments of the present invention are not limited to such implementation.

Subsequent to determination of which media delivery point is to provide the media content to client computer system **210** at step **732**, web server **250** transmits to client computer system **210** a redirection command to media delivery point/content server **812** along with a time sensitive access key, also referred to as a session key, (e.g., for that hour, day, or any defined time frame) thereby enabling client computer system **210** to eventually receive the requested media content. Within system **800**, the redirection command can include a time sensitive address of the media content location within media delivery point **812**. Accordingly, the New York City media delivery point **812** can subsequently provide and deliver the desired media content to client computer system **210**. It is noted that steps **732**-**742** and step **737** of FIG. **7**C can be performed by media delivery point **812** in a manner similar to content server **251** described herein.

Advantageously, by utilizing multiple content servers, e.g., media delivery point **804**-**816**, to provide high fidelity media content to client computer systems, e.g., **210**-**230**, located throughout the world, communication network systems of the Internet **201** do not become overly congested. Additionally, global network **802** can deliver media content to a larger number of client computer systems (e.g., **210**-**230**) in a more efficient manner. Furthermore, by utilizing communication technology having data transfer rates of up to 320 Kbps (kilobits per second) or higher, embodiments of

35

the present invention provide for rapid delivery of the media content in a worldwide implementation.

Referring still to FIG. **8**, it is noted that media delivery points/content servers **804-816** of global network **802** can be coupled in a wide variety of ways in accordance with the present embodiment. For example, media delivery point **804-816** can be coupled utilizing wired and/or wireless communication technologies. Further, it is noted that media delivery points **804-816** can be functionally coupled such that if one of them fails, another media delivery point can take over and fulfill its functionality. Additionally, one or more web servers similar to web server **250** can be coupled to global network **802** utilizing wired and/or wireless communication technologies.

Within system **800**, content server/media delivery point **804** includes a web infrastructure that, in one embodiment, is a fully redundant system architecture. It is noted that each MDP/content server **806-816** of global network **802** can be implemented to include a web infrastructure in a manner similar to the implementation shown in MDP **804**.

Specifically, the web infrastructure of media delivery point **804** includes firewalls **818** and **820** which are each coupled to global network **802**. Firewalls **818** and **820** can be coupled to global network **802** in diverse ways, e.g., utilizing wired and/or wireless communication technologies. Particularly, firewalls **818** and **820** can each be coupled to global network **702** via a 10/100 Ethernet handoff. However, system **800** is not limited in any fashion to this specific implementation. It is noted that firewalls **818** and **820** are implemented to prevent malicious users from accessing any part of the web infrastructure of media de**1836**, e.g., a router or other switching mechanism, coupled therewith and a DB (database) server **840** coupled to device **836** while firewall **820** includes a device **838**, e.g., a router or other switching mechanism, coupled therewith and a DB (database) server **842** coupled to device **838**. Furthermore, DB server **840** is coupled with device **838** and DB server **842** is coupled with device **836**.

Still referring to FIG. **8**, and within media delivery point **804**, firewall **818** is coupled to a director device **822** which is coupled to internal web application server **826** and **828**, and a hub server **830**. Firewall **820** is coupled to a director **824** which is coupled to internal web application servers **826** and **828**, and hub server **830**. Hub server **830** can be implemented in a variety of ways including, but not limited to, as a Linux hub server. Hub server **780** is coupled to a data storage device **832** capable of storing media content. Data storage device **832** can be implemented in a variety of ways, e.g., as a RAID (redundant array of inexpensive/independent disks) appliance.

It is noted that media delivery points **804-816** can be implemented in any manner similar to content server **250** described herein. Additionally, media delivery points **804-816** of the present embodiment can each be implemented as one or more physical computing devices, e.g., computer system **100** of FIG. **1**.

Advantageously, by providing a copyright compliance mechanism, e.g., **300**, which can be easily and readily installed in a client computer system, e.g., **210**, embodiments of the present invention can be implemented to control access to, control the delivery of, and control the user's experience with media content subject to copyright restrictions and licensing agreements, fore example, as defined by the DMCA. Additionally, by closely associating a client computer system, e.g., **210**, with the user thereof,

36

and the media content they receive, embodiments of the present invention further provide for accurate royalty recording.

The foregoing disclosure regarding specific embodiments of the present invention have been presented for purposes of illustration and description. They are not intended to be exhaustive or to limit the invention to the precise forms disclosed, and many modifications and variations are possible in light of above teaching. The embodiments were chosen and described in order to best explain the principles of the invention and its practical application, to thereby enable others skilled in the art to best utilize the invention and various embodiments with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention be defined by the Claims appended hereto and their equivalents.

What is claimed is:

**1**. A method of preventing unauthorized recording of electronic media comprising:

activating a compliance mechanism in response to receiving media content by a client system, said compliance mechanism coupled to said client system, said client system having a media content presentation application operable thereon and coupled to said compliance mechanism;

controlling a data output path of said client system with said compliance mechanism by diverting a commonly used data pathway of said media player application to a controlled data pathway monitored by said compliance mechanism; and

directing said media content to a custom media device coupled to said compliance mechanism via said data output path, for selectively restricting output of said media content.

**2**. The method as recited in claim **1** further comprising preventing a recording application coupled to said client system from recording said media content when said recording violates usage restriction applicable to said media content.

**3**. The method as recited in claim **1** further comprising allowing a recording application coupled to said client system to record said media content when said recording complies with usage restrictions applicable to said media content.

**4**. The method as recited in claim **1** further comprising restricting said client system to have said custom media device implemented as a default media device.

**5**. The method as recited in claim **1** further comprising authorizing said client system to receive said media content.

**6**. The method as recited in claim **1** further comprising accessing an indicator associated with said media content for indicating to said compliance mechanism a usage restriction applicable to said media content.

**7**. The method as recited in claim **1** wherein said custom media device is an emulation of a custom media driver.

**8**. The method as recited in claim **1** further comprising altering said compliance mechanism in response to a change in said usage restriction, said usage restriction comprising a copyright restriction or licensing agreement applicable to said media content.

**9**. The method as recited in claim **1** wherein said media content is received from a source coupled to said client system, said source from the group consisting of: a network, an electronic media device, a media storage device, a media storage device inserted in a media device player, a media player application, and a media recorder application.

US 7,316,033 B2

37

**10**. A computer readable medium having computer implementable instructions embodied therein, said instructions for causing a client system to perform a method of restricting recording of media content, said method comprising:

animating a compliance mechanism coupled to said client system, said animating in response to said client system receiving media content, said client system having a media content presentation application coupled thereto and operable with said compliance mechanism;

managing an output path of said client system with said compliance mechanism by diverting a commonly used data pathway of said media player application to a controlled data pathway monitored by said compliance mechanism; and

governing said media content via said output path to a custom media device for selectively restricting output of said media content, said compliance mechanism utilized to stop or disrupt the playing of said media content file at said controlled data pathway when said playing of said media file content is outside of said usage restriction applicable to said media file.

**11**. The computer readable medium of claim **10** wherein said instructions cause said client system to perform said method further comprising:

authorizing said client system to receive said media content.

**12**. The computer readable medium of claim **10** wherein said instructions cause said client system to perform said method further comprising:

allowing a recording application coupled to said client system to record said media content file when said recording complies with a usage restriction applicable to said media content.

**13**. The computer readable medium of claim **10** wherein said instructions cause said client system to perform said method further comprising:

preventing a recording application coupled to said client computer from recording said media content when said recording violates a usage restriction applicable to said media content.

**14**. The computer readable medium of claim **10** wherein said custom media device is selected as a default media device.

**15**. The computer readable medium of claim **10** wherein said instructions cause said client system to perform said method further comprising:

accessing an indicator corresponding to said media content for indicating to said compliance mechanism a usage restriction applicable to said media content.

**16**. The computer readable medium of claim **10** wherein said custom media device is an emulation of a custom media driver.

**17**. The computer readable medium of claim **10** wherein said instructions cause said client computer system to perform said method further comprising:

altering said compliance mechanism is response to changes in said usage restriction, said usage restriction a copyright restriction or licensing agreement applicable to said media content.

**18**. The computer readable medium of claim **10** wherein said media content is from a source coupled with said client

38

system, wherein said source is from the group consisting of: a network, an electronic media device, a media storage device, a media storage device inserted in a media device player, a media player application, and a media recorder application.

**19**. A system of preventing unauthorized recording of electronic media comprising:

means for activating a compliance mechanism to control a data output path of a client system, said activating in response to said client system receiving media content, said

compliance mechanism coupled to said client system and operable in conjunction with a media

content presentation application coupled to said client system and operable thereon; and

means for directing said media content to a custom media device via said data output path controlled by said compliance mechanism, for selectively restricting output of said media content by diverting a commonly used data pathway of said media player application to a controlled data pathway monitored by said compliance mechanism, said compliance mechanism utilized to stop or disrupt the playing of said media content file at said controlled data pathway when said playing of said media file content is outside of said usage restriction applicable to said media file.

**20**. The system as recited in claim **19** further comprising:

means for allowing said media content to be recorded when said recording complies with usage restrictions applicable to said media content.

**21**. The system as recited in claim **19** further comprising:

means for preventing recording of said media content when said recording violates usage restriction applicable to said media content.

**22**. The system as recited in claim **19** further comprising:

means for restricting said client system to have said custom media device as a default media device.

**23**. The system as recited in claim **19** further comprising:

means for authorizing said client system to receive said media content.

**24**. The system as recited in claim **19** further comprising:

means for accessing an indicator for indicating to said compliance mechanism said usage restriction applicable to said media content, said indicator attached to said media content.

**25**. The system as recited in claim **19** further comprising:

means for utilization of a custom media driver to emulate said custom media device.

**26**. The system as recited in claim **19** further comprising:

means for altering said compliance mechanism is response to changes in said usage restriction, said usage restriction a copyright restriction or licensing agreement applicable to said media content.

**27**. The system as recited in claim **19** wherein said media content is from a source coupled with said client system, wherein said source is from the group consisting of: a network, an electronic media device, a media storage device, a media storage device inserted in a media device player, a media player application, and a media recorder application.

\*   \*   \*   \*   \*

## CERTIFICATE OF SERVICE

I, Robert Greene Sterne, hereby certify that on this 12th day of September, 2014, a copy of the **BRIEF FOR APPELLANT MEDIA RIGHTS TECHNOLOGIES [CORRECTED]** and **ADDENDUM** to same was served by electronic mail and the CM/ECF system, addressed to:

Robert A. Angle
Dabney Jefferson Carr, IV
George A. Somerville
Nicholas R. Klaiber
Troutman Sanders LLP
1001 Haxall Point
P.O. Box 1122
Richmond, VA 23218
Tel: 804.697.1246
Fax: 804.698.5124
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com
george.somerville@troutmansanders.com
nicholas.klaiber@troutmansanders.com

*Attorneys for Appellees, Capital One Financial Corporation, Capital One Bank (USA) N.A., and Capital One N.A.*

Dated: September 12, 2014          /s/ Robert Greene Sterne
Robert Greene Sterne
STERNE KESSLER GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, DC 20005
202.371.2600

*Counsel for Appellant, Media Rights Technologies*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

⊠      The brief contains 10,097 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

⊠      The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.


 /s/ Robert Greene Sterne
Robert Greene Sterne

*Counsel for Appellant,*
*Media Rights Technologies*

September 12, 2014