2014-1218

# United States Court of Appeals for the Federal Circuit

_____

MEDIA RIGHTS TECHNOLOGIES, INC.,

*Plaintiff-Appellant*,

v.

CAPITAL ONE FINANCIAL CORPORATION,
CAPITAL ONE BANK (USA), N.A., and
CAPITAL ONE, N.A.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the Eastern District of Virginia
in *Media Rights Technologies v. Capital One Financial Corp., et al.,*
Case No. 1:13-cv-00476-AJT-TRJ, Judge Anthony J. Trenga.

_____

## BRIEF OF APPELLEES

_____

Robert A. Angle
Dabney J. Carr IV
George A. Somerville
Nicholas R. Klaiber
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
(804) 697-1200

Douglas D. Salyers
TROUTMAN SANDERS LLP
600 Peachtree Street, NE
Suite 5200
Atlanta, GA 30308-2216
(404) 885-3000

*Counsel for Appellees*

# CERTIFICATE OF INTEREST

Counsel for Appellees certifies the following:

1.  The full name of every party or amicus curiae represented by me is:

    > Capital One Financial Corporation;
    > Capital One Bank (USA), National Association; and
    > Capital One, National Association

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    > N/A

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    > Capital One Financial Corporation, a publicly held company, is the parent corporation of—and owns more than 10% of the stock of—Capital One Bank (USA), National Association and Capital One, National Association.

    > Capital One Financial Corporation has no parent corporation and no publicly held corporation owns more than 10% of its stock.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or agency or are expected to appear in this court are:

    > **Troutman Sanders LLP:** Robert A. Angle, Dabney J. Carr IV, Megan C. Rahman, Mary Catherine Zinsner, Syed Mohsin Reza, George A. Somerville, Nicholas R. Klaiber and Douglas D. Salyers.

Dated: October 24, 2014                    Respectfully submitted,


                                           /s/ Dabney J. Carr IV
                                             Dabney J. Carr IV
                                             TROUTMAN SANDERS LLP
                                             1001 Haxall Point
                                             Richmond, VA 23219
                                             (804) 697-1200

                                             *Counsel for Appellees*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ....................................................1

STATEMENT OF THE ISSUES.........................................................1

STATEMENT OF THE CASE............................................................2

    I.    The '033 patent does not claim an "elegant solution" but is vaguely written and covers an abstract idea..........................................3

        A.    Claim 1 ....................................................................4

        B.    Dependent Claims 5 and 6 ..........................................7

        C.    Claims 10, 11, 15 and 18 ...........................................8

        D.    Claims 19, 23, 24 and 27 ...........................................9

    II.    MRT Has Consistently Described its Claimed Invention in Vague Terms and Has Never Offered Definite Constructions for "Compliance Mechanism" or "Custom Media Device." ...................9

        A.    Compliance Mechanism............................................12

        B.    Custom Media Device..............................................14

    III.    The District Court Correctly Found the '033 Patent Indefinite. .........16

SUMMARY OF THE ARGUMENT ....................................................17

STANDARD OF REVIEW ..............................................................18

ARGUMENT ...............................................................................18

    I.    The judgment below should be affirmed because the '033 patent is patent ineligible under 35 U.S.C. §101. .............................18

        A.    *Alice's* First Step – Do Claims Cover A Patent-Ineligible Concept?.................................................................19

            1.    Claims that result in broad preemption or cover fundamental economic practices or methods of organizing human activity are not patentable.................20

      2.     The '033 patent's claims are directed to patent-ineligible abstract ideas. ................................................22

    B.    *Alice's* Second Step – Do Claims Have An Inventive Concept?.................................................................25

        1.     Claim 1 is an invalid method claim. ...............................27

        2.     Claims 5 and 6 are invalid method claims......................32

        3.     Claims 10, 11, 15 and 18 are invalid under §101...........33

        4.     Claims 19, 23, 24 and 27 are invalid under §101...........34

    C.    The '033 Patent Is Patent Ineligible..........................................35

II.    The Claim Term "Custom Media Device" Is Indefinite Under §112(b) and the Claims Are Therefore Invalid. ...................................36

    A.    The District Court Properly Found "Custom Media Device" Is Indefinite. ..................................................36

    B.    The District Court Applied The Correct Legal Standard..........40

    C.    The District Court's Analysis Was Not Flawed. ......................41

        1.     The specification teaches that the "custom media device" could be hardware, software, or both. ...............41

        2.     The specification's reference to "custom media device" as a driver and as emulating or being emulated by a driver creates further ambiguity..............43

        3.     The specification fails to describe what is "custom" about the custom media device. ....................45

    D.    MRT's Proposed Construction Of "Custom Media Device" Confirms Its Indefiniteness.........................................48

III.    The Court Should Affirm that "Compliance Mechanism" Is a Means-Plus-Function Claim Limitation.............................................50

    A.    "Compliance Mechanism" Is A Means-Plus-Function Claim. ......................................................................50

B.   The Specification Lacks Corresponding Structure For Each Of The Claimed Functions Of The "Compliance Mechanism." .........................................................................55

1.   The specification fails to disclose any algorithm or structure corresponding to the *controlling/ managing-a-data-output-pathway-by-diverting* function. ......................................................................57

2.   The specification fails to disclose any algorithm or structure corresponding to the *stopping-or-disrupting-the-playing-of-said-media-content* function. ......................................................................58

3.   The district court was not required to consider expert testimony on indefiniteness. ................................59

C.   The District Court Correctly Concluded That "Compliance Mechanism" Is Indefinite. ..................................60

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................61

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page(s)

CASES

*Accenture Global Servs., GMBH v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Cir. 2013), *cert. denied*, ---U.S.---, 134 S.Ct. 2871
    (2014) ............................................................................................19, 27, 32, 34

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, ---U.S.---,
    134 S.Ct. 2347 (2014)...................................................................*passim*

*All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*,
    309 F.3d 774 (Fed. Cir. 2002) .............................................................16

*Apple Inc. v. Motorola, Inc.*,
    757 F.3d 1286 (Fed. Cir. 2014) .........................................................52

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
    ---U.S.---, 133 S.Ct. 2107 (2013)........................................................20

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co.*,
    687 F.3d 1266 (Fed. Cir. 2012) ...................................................27, 34

*Bilski v. Kappos*,
    561 U.S. 593 (2010)........................................................................*passim*

*Blackboard, Inc. v. Desire2Learn Inc.*,
    574 F.3d 1371 (Fed. Cir. 2009) .........................................................56

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350, 2014 U.S. App. LEXIS 16987 (Fed. Cir. 2014)......21, 25, 32, 35

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002) .........................................................55

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) ......................................20, 32, 33, 34

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005) .........................................................39

*Dealertrack, Inc. v. Huber*,
  674 F.3d 1315 (Fed. Cir. 2012) ...................................................*passim*

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
  412 F.3d 1291 (Fed. Cir. 2005) ...........................................59

*Diamond v. Diehr*, 450 U.S. 175 (1981)...................................................26

*Elcommerce.com, Inc. v. SAP AG*, 745 F.3d 490 (Fed. Cir.),
  *vacated*, 2014 U.S. App. LEXIS 11068 (Fed. Cir. 2014)...................................59

*EnOcean GmbH v. Face Int'l Corp.*,
  742 F.3d. 955 (Fed. Cir. 2014) .................................................... 50-51

*Flo Healthcare Solutions, LLC v. Kappos*,
  697 F.3d 1367 (Fed. Cir. 2012) ...........................................52

*Fort Props., Inc. v. Am. Master Lease LLC*,
  671 F.3d 1317 (Fed. Cir. 2012) ...........................................20

*Function Media, L.L.C. v. Google Inc.*,
  708 F.3d 1310 (Fed. Cir. 2013) ...................................................56, 60

*Gottschalk v. Benson*,
  409 U.S. 63 (1972)...........................................................26

*Halliburton Energy Servs., Inc. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008) ...........................................38

*Interval Licensing, LLC v. AOL, Inc.*, 766 F.3d 1364,
  2014 U.S. App. LEXIS 17459 (Fed. Cir. 2014) .........................................*passim*

*Inventio AG v. Thyssenkrupp Elevator Ams. Corp.*,
  649 F.3d 1350 (Fed. Cir. 2011) ...................................................52, 55

*JVW Enters. v. Interact Accessories, Inc.*,
  424 F.3d 1324 (Fed. Cir. 2005) ...........................................55

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
  382 F.3d 1354 (Fed. Cir. 2004) ...................................................51, 55

*Linear Tech. Corp. v. Impala Linear Corp.*,
  379 F.3d 1311 (Fed. Cir. 2004) ...........................................55

*Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*,
  2014 U.S. Dist. LEXIS 122244 (E.D. Tex. 2014) (Bryson, J., sitting by
  designation) .................................................................................................. 22, 31

*Mayo Collaborative Servs. v. Prometheus Labs, Inc.*,
  ---U.S.---, 132 S.Ct. 1289 (2012) ............................................................ *passim*

*MIT v. Abacus Software*,
  462 F.3d 1344 (Fed. Cir. 2006) ............................................................... 51, 53

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S.Ct. 2120 (2014) .............................................................................. *passim*

*Noah Sys., Inc. v. Intuit Inc.*,
  675 F.3d 1302 (Fed. Cir. 2012) ............................................................... 56, 59

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ............................................................... 51

*Robert Bosch, LLC v. Snap-On Inc.*, ---F.3d---,
  2014 U.S. App. LEXIS 19671 (Fed. Cir. 2014) ........................................ *passim*

*Saffran v. Johnson & Johnson*,
  712 F.3d 549 (Fed. Cir. 2013) ................................................................. 56

*Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1349 (Fed. Cir. 2013),
  *vacated and remanded sub nom. WildTangent, Inc. v. Ultramercial, LLC*,
  ---U.S.---, 134 S.Ct. 2870 (2014) ............................................................ 23

*United Carbon Co. v. Binney & Smith Co.*,
  317 U.S. 228 (1942) ................................................................................. 39

*Welker Bearing Co. v. PHD, Inc.*,
  550 F.3d 1090 (Fed. Cir. 2008) ............................................................... 50, 53

## STATUTES

35 U.S.C. §101 ............................................................................................ *passim*

35 U.S.C. §112(b) ....................................................................................... *passim*

35 U.S.C. §112(f) ........................................................................................ *passim*

**OTHER AUTHORITY**

C. Bohannan & H. Hovenkamp, Creation without Restraint: Promoting Liberty and Rivalry in Innovation 112 (2012)........................................................21

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action in the lower court was previously before this or any other appellate court.  This appeal may directly affect co-pending litigation captioned *Media Rights Technologies, Inc. v. Microsoft Corp.*, Civil Action No. 5:13-cv-01916-PSG, before the United States District Court for the Northern District of California.  That co-pending suit involves the patent at issue in this appeal, U.S. Patent No. 7,316,033 ("'033 patent").

## STATEMENT OF THE ISSUES

Appellees Capital One Financial Corporation, Capital One Bank (USA), N.A., and Capital One, N.A. (collectively, "Capital One") disagree with appellant Media Rights Technologies, Inc.'s ("MRT") statement of the issues.  This appeal presents the following three issues:

1.      Should the district court's decision be affirmed on the ground that the '033 patent's claims are patent ineligible under 35 U.S.C. §101 because they are directed to the abstract idea of controlling a data output path by diverting it from a commonly used pathway to a controlled pathway to be monitored, and directing media content to a media device for selectively restricting output?

2.      Did the district court correctly determine that the '033 patent's claims are invalid under 35 U.S.C. §112(b) because the claim term "custom media device"

fails to inform those skilled in the art about the scope of the invention with reasonable certainty?

3.     Did the district court correctly determine that the '033 patent's claims are invalid under §112(b) because the claim term "compliance mechanism" is a means-plus-function term and the patent's specification fails to disclose any algorithm or sufficient structure corresponding to the claimed functions as required by 35 U.S.C. §112(f)?

## STATEMENT OF THE CASE

In April 2013, MRT brought this suit against Capital One alleging that virtually *all* of the ways in which "Capital One's website delivers various types of media to the user including graphics, information, and data" infringe MRT's '033 patent.  Joint Appendix ("JA") 50 (Compl. ¶1).  On October 1, 2013, Capital One filed a motion for judgment on the pleadings seeking invalidation of the '033 patent under 35 U.S.C. §101 and §112(b).  JA436-38.  This motion was filed, briefed and argued simultaneously with claim construction.  On December 9, 2013, the district court ruled that the claim terms "compliance mechanism" and "custom media device"—which appear in each of the independent claims of the patent—are indefinite, and thus the '033 patent is invalid under §112(b).

Although the district court did not address Capital One's motion for judgment on the pleadings under §101, the *Alice* case confirms as a matter of law

that the claims are directed to non-patentable subject matter—the abstract idea of controlling data output by diverting it from a commonly used pathway to a controlled pathway to be monitored and directing media content to a media device for selectively restricting output. The basic concept of diverting pathways and restricting output cannot be patentable subject matter since it would preempt a broad range of common activities. The addition of indefinite terms like "compliance mechanism" and "custom media device" does not render the '033 patent's claims patentable because they do not add any inventive concept and, indeed, merely create indefiniteness.

## I.   THE '033 PATENT DOES NOT CLAIM AN "ELEGANT SOLUTION" BUT IS VAGUELY WRITTEN AND COVERS AN ABSTRACT IDEA.

MRT misleadingly asserts that its '033 patent provides "[a]n elegant solution to prevent unauthorized output of electronic media content" and that it prevents a computer user from "unrestricted recording, copying and playback." Brief for Appellant Media Rights Technologies, Inc. ("Br.") at 4. Regardless of what it might disclose, the '033 patent does not *claim* an "elegant solution" to protect media content, much less one that occurs on a computer. Rather, the claims are abstract and confusing, suffering from numerous defects that render them patent ineligible and indefinite. Even MRT cannot explain in concrete, non-abstract,

terms how the claimed invention works, nor what exactly the "compliance mechanism" and "custom media device" are.

## A.    Claim 1

Claim 1, an independent claim that sets forth the claimed invention in a method format, provides:

> A method of preventing unauthorized recording of electronic media comprising:
>
> activating a compliance mechanism in response to receiving media content by a client system, said compliance mechanism coupled to said client system, said client system having a media content presentation application operable thereon and coupled to said compliance mechanism;
>
> controlling a data output path of said client system with said compliance mechanism by diverting a commonly used data pathway of said media player application to a controlled data pathway monitored by said compliance mechanism; and
>
> directing said media content to a custom media device coupled to said compliance mechanism via said data output path, for selectively restricting output of said media content

JA48. While the specification discusses the purported invention in the context of peer-to-peer sharing of media files, the claims of the '033 patent are drawn much more broadly, vaguely and abstractly.

The method of claim 1, which is representative of the other independent claims, involves four basic steps:

> (1) <u>activating</u> a compliance mechanism in response to a client system receiving media content;

   (2) <u>controlling</u> a ***data output path*** of the client system with the compliance mechanism by <u>diverting</u> a commonly used data pathway to a controlled data pathway;

   (3) <u>monitoring</u> the controlled data pathway by the compliance mechanism; and

   (4) <u>directing</u> the ***media content*** to a custom media device for <u>selectively restricting</u> output of the media content.

Significantly, these four basic steps are directed at two different and disconnected concepts. The first three steps describe a compliance mechanism that controls and diverts a "data output pathway" which is then monitored by the compliance mechanism. The fourth step, on the other hand, describes directing "media content" to a custom media device for selectively restricting output of that media content. Claim 1 does not meaningfully link these two concepts, however, and uses such vague and ambiguous language that is difficult to discern with reasonable certainty what is being claimed.

   The abstractness of the claimed invention comes from the use of ambiguous claim language that obscures ***how*** or ***why*** any of the claimed steps are performed or ***what*** is performing the steps. For example, in the directing media content step, claim 1 gives no indication of ***what*** is "directing" media content to the custom media device or ***how*** such "directing" is done. Likewise, the claim language is

5

ambiguous about **what** is "selectively restricting output" of the media content,[1] and silent as to **when** or **why** the media content output is selectively restricted and **how** it is done. What is certain, however, is that the claim language does not limit "selectively restricting" to the opening and closing of switches as MRT claims. Br.4-5.

In the controlling data output path step, the "compliance mechanism" appears to perform the "controlling,"[2] but it is unclear **what** is performing the "diverting" of the "commonly used data pathway" to a "controlled data pathway," and the claim language gives no indication **when** or **why** the compliance mechanism diverts that pathway or **how** it is done. Similarly, in the monitoring controlled data pathway step, while the "compliance mechanism" is claimed as monitoring the "controlled data pathway," the claim language gives no clue as to **what** the compliance mechanism is monitoring for, much less **how** or **why** it is monitoring that "controlled data pathway."

Another fundamental problem with claim 1 is that it embodies two concepts that are not tied together in any coherent way. In particular, the "pathway

---

[1] While the claim language states that media content is directed to the custom media device "**for** selectively restricting output," it does not claim or require that the custom media device do the selective restricting.

[2] Even the controlling language could be interpreted differently depending on whether "**with**" modifies "controlling" or "client system."

diversion" concept (the first three steps) involves diversion of a "data output path" to a controlled data pathway for monitoring by the compliance mechanism, whereas the "selectively restricting output" concept (the fourth step) involves directing "media content" to a custom media device for selectively restricting output. These two concepts involve different objects (data pathways v. media content) using different components (compliance mechanism v. custom media device) performing different functions (controlling and monitoring v. restricting output)—and nothing in the claim ties these elements together.[3] To make matters worse, as discussed above, claim 1 fails to clearly describe or explain *why* or ***how*** many of the claimed functions are being performed, thus making it even more difficult to determine how (if at all) the first and second concepts are related.

### B.    Dependent Claims 5 and 6

Asserted claims 5 and 6, which depend on claim 1, include insignificant additional steps that add no specificity to the claimed invention. Claim 5 adds "authorizing said client system to receive said media content," and Claim 6 adds "accessing an indicator associated with said media content for indicating to said

---

[3] Although confusingly the custom media device is "coupled to the compliance mechanism via said data output path" the claims do not indicate ***why*** this coupling is present (*e.g.*, the compliance mechanism is not claimed as selectively restricting output from the custom media device) nor ***which*** data output path provides the coupling (*i.e.*, is it the "data output path," the "commonly used data pathway" or the "controlled data pathway"?).

compliance mechanism a usage restriction applicable to said media content."
JA48. These steps are nothing more than routine functions that modestly refine
how the claimed invention restricts the "output of said media content."

### C.    Claims 10, 11, 15 and 18

Although asserted claims 10, 11, 15 and 18 are apparatus claims drafted in a
*Beauregard* format, they closely track the method claims and are grounded by the
same limitations as claims 1, 5 and 6 without adding any consequential steps or
patentable subject matter. Independent claim 10 includes the same four basic steps
of claim 1, though with slightly different function terms, and adds that the
"compliance mechanism [is] utilized to stop or disrupt the playing of said media
content file…." JA49. This added step is, again, nothing more than a routine
function performed by a generic device.

Likewise, dependent claims 11 and 15 mirror dependent claims 5 and 6 and
add nothing more than routine functions, *i.e.*, authorizing the client system to
receive media content (claim 11), and accessing an indicator that indicates to the
compliance mechanism the usage restriction applicable to the media content (claim
15). JA49. Claim 18 merely provides that the source of the media content is a
group of generic devices. *Id.*

### D.    Claims 19, 23, 24 and 27

Independent claim 19 merely repackages claim 1 as a system claim.  Indeed, other than adding "means for" to several elements, claim 19 includes the same steps as claim 1 and merely adds the same routine function as claim 10 (*i.e.*, "said compliance mechanism [is] utilized to stop or disrupt the playing of said media content file…."). JA49.  Likewise, claims 23, 24 and 27, which depend from claim 19, mirror dependent claims 11, 15 and 18 and add the same generic elements as those claims, *i.e.*, authorizing the client system to receive media content (claim 23), accessing an indicator (claim 24), and identifying sources of media content as coming from a group of generic devices (claim 27).  *Id.*  Thus, claims 19, 23, 24 and 27 add no significant limitations or inventive steps.

## II.    MRT HAS CONSISTENTLY DESCRIBED ITS CLAIMED INVENTION IN VAGUE TERMS AND HAS NEVER OFFERED DEFINITE CONSTRUCTIONS FOR "COMPLIANCE MECHANISM" OR "CUSTOM MEDIA DEVICE."

MRT opens its Brief by stating that "[t]he '033 Patent claims and discloses methods and implementing software architecture for preventing a computer user who receives protected media content on a client computer system from executing actions on that content that are prohibited by agreement or law (such as copyright law), such as recording, copying or playback" (Br.4)—and then spends 15 pages trying to explain and defend how the "compliance mechanism" and "custom media device" implement this purported "elegant solution."  In reality, "the specification

is at best muddled" and provides only a "hazy relationship between the claims and the written description [that] fails to provide the clarity that the subjective claim language needs." *Interval Licensing, LLC v. AOL, Inc.*, 766 F.3d 1364, 2014 U.S. App. LEXIS 17459, *19 (Fed. Cir. 2014). MRT's attempt to describe the purported invention is flawed in several fundamental respects.

First, the invention described by MRT does not match what is claimed. For example, MRT describes functions, like monitoring for "embedded usage restrictions" and monitoring for "user requests for output operations" (Br.8), that the '033 patent does not claim. MRT also refers to numerous "embodiments" from the specification, like "software switches" and "wave shim drivers" (Br.5), that also are not part of any claim. When MRT finally discusses the actual language of claim 1, it argues that "to understand how the claims work, it is helpful to consider in detail three components of the invention" and lists "media usage restriction indicators" as one of those claimed components—yet the "indicator" concept is only found in the dependent claims. Br.9.

Second, MRT confusingly describes how the claimed elements work together. For example, MRT asserts that the claimed "controlled pathway" can be composed of "different components" including a "custom media device," which is a separate element not claimed as part of this pathway. Br.5. MRT also asserts that the "custom media device" is used "to selectively restrict media output"

(Br.14), but the claim does not say, and MRT fails to explain, how the "custom media device" performs this function.

Finally, MRT attempts to illustrate a "controlled data pathway" by modifying (adding an indicator) and annotating Figure 5 from the specification. Br.15-18. But the mere addition of an indicator and green and red lines to show MRT's interpretation of the "controlled data pathway" (a term that appears only in the claims) does not explain or describe how the purported invention actually works.

Even after MRT's best efforts to describe the purported invention, it is unclear what components of the claimed invention perform which functions or how those functions are performed. And, in fact, the specification repeatedly disclaims being tied to any specific devices or components, and thus suggests the invention can be practiced with other undisclosed devices or components. JA32(4:8-25).

The specification is not only muddled and hazily related to the claims, but the "compliance mechanism" and "custom media device" are described so ambiguously that they have no identifiable boundaries that would enable a skilled artisan to determine the scope of the claimed invention. Indeed, MRT still cannot articulate a consistent and definite formulation of what the "compliance mechanism" and "custom media device" are, what functions they perform, and how they perform those functions.

11

### A.    Compliance Mechanism

MRT asserts that the compliance mechanism is the heart of the invention (Br.4), but does not contest that compliance mechanism "lacks a known meaning in the art."  Br.33-34.  Although the specification provides various descriptions of the "copyright compliance mechanism (CCM 300)"—which MRT contends is somehow narrower than the claimed "compliance mechanism" (Br.12)[4]—MRT never clearly describes what the CCM (or broader "compliance mechanism") is or how it performs its claimed functions.

Embracing the '033 patent's lack of clarity, MRT proposed that the district court construe "compliance mechanism" as "a set of actions and processes of a computer system (or systems) that enforce usage restrictions applicable to media content."  JA615.[5]  This proposed construction is unsupported by the specification and inconsistent with the functions (*e.g.*, controlling, monitoring and diverting data pathways) associated with the "compliance mechanism" in the claims.  Moreover, MRT's proposed construction is so ambiguous and broad as to be without any meaningful boundaries.  Other than tying the term to "computer systems" (which is

---

[4]  The term "compliance mechanism" appears only in the claims and the summary of the invention (which largely repeats the claims in a sentence format), and thus there is no description of the "compliance mechanism" that is different from or broader than the "copyright compliance mechanism" (CCM 300).

[5]  MRT construed "media content" to be "audio, video, multimedia, graphics, information, data, software programs, and other types of content in any format." JA615.

12

unsupported by the specification), MRT's proposed construction would include any "action or process" that can enforce usage restrictions on data of any type or format—a classic example of an abstract idea.

Recognizing that MRT's proposed construction would render the patent indefinite, Capital One proposed construing "compliance mechanism" using 35 U.S.C. §112(f) because the claimed "compliance mechanism" refers not to a particular structure, but only to a general category of structures that may perform the specified functions (*e.g.*, monitoring). Capital One identified the structure shown in Figure 3 of the specification (and the related description in the specification) as corresponding to the compliance mechanism's claimed function. MRT disputed Capital One's proposed construction and asserted (as it asserts on appeal) that Figure 3 of the patent shows subcomponents that "can" or "may be" included in the compliance mechanism but never identifies which of those subcomponents is required. Br.13.

In its Brief, MRT confirms its inability to define clearly the "compliance mechanism" by describing it using a confusing mix of its alleged functions and connections. For example, MRT contends the compliance mechanism:

- "is broader than the disclosed CCM" and "can be used to prevent the unauthorized output of any kind of media, not just copyrighted media" (Br.12);

13

- is "coupled to a 'Playback Application 501,' 'Wave Shim Driver 309,' 'Custom Media Device 310' and 'Output Device 570'" (Br.36);

- controls: "a switch" in the custom media device (Br.14); "a selectable switch 311 in waveform driver shim 309" (Br.40); and "a selectable switch 571 in media hardware output device 570" (Br.41);

- "discloses [in Figure 3] several structural components that together or in various sub-combinations can comprise the compliance mechanism" (Br.43), and "each subcomponent depicted in Figure 3 may be included in different embodiments of the invention" (Br.13);

- "monitors user requests for output operations on the incoming data stream, such as a request to record audio," and when it "detects a requested output operation that violates a usage restriction, it opens one or more switches on the controlled data output pathway" (Br.8).

These various descriptions are completely unrelated to MRT's proposed construction of "compliance mechanism" and confirm the lack of any boundaries or limits to this claim term.

**B.    Custom Media Device**

Like the "compliance mechanism," the term "custom media device" has no ordinary meaning to one of skill in the art, a point not contested by MRT.  JA12. Moreover, the evidence below supports the district court's indefiniteness ruling as Capital One's expert, Dr. Chatterjee, offered an undisputed expert opinion that "[t]aken as a whole, it is unclear whether the 'custom media device' is hardware, software, or some combination of both."  JA622-39(Declaration of Dr. Sandeep Chatterjee ("Chatterjee__") ¶36).  Dr. Chatterjee also provided his expert opinion that the specification's reference to the "custom media device" as an emulation or

14

emulator is confusing because "it is not apparent how the custom media device could be an 'emulation' of its own driver." JA631-32(Chatterjee ¶37). This opinion was not disputed by MRT or its expert. JA13-14; JA726-30.

Given the '033 patent's inconsistent and confusing descriptions of the "custom media device," Capital One was unable to propose a construction for this claim term and asserted that it was indefinite. MRT, on the other hand, has proposed a construction of "custom media device" that it created from whole cloth: "[a]n application or driver specific to the media content being played, viewed, or otherwise presented." JA616. This construction is vague and overbroad and the district court properly rejected it when it found the claim term indefinite. Even now, MRT cannot clearly or definitely identify what the "custom media device" is. In its brief, MRT refers to it in variously inconsistent and confusing ways, for example stating that it is:

- "essentially software switches" (Br.5) and "a switch that the 'compliance mechanism' can control" (Br.14);

- a "subcomponent depicted in Figure 3" that is part of the "compliance mechanism" (Br.13), and "communicatively coupled to the 'compliance mechanism' ensuring control of media output" (Br.14);

- "part of the player" in Figure 5A (although there is no "player" in Figure 5A) (Br.18,fn.3), or "a standard media device driver [that] can be converted (i.e., customized) to a custom media device using a skin 306" (Br.15), or synonymous with "custom media player" (Br.55);

- "emulates the custom media driver" and "not only functions as a media driver but acts as or mimics the functions of the custom media

device driver" and "the restricted media must pass through the driver emulated by the custom media device, allowing the custom media driver to restrict its output" (Br.53);

- "selectively restrict[ing] media output by virtue of switch 312 (although MRT says the same switch is also controlled by CCM 300)" (Br.18); and

- a "default driver" that "divert[s] media from the common data output pathway (switches closed) to the controlled output pathway (one or more switches open)" (Br.58).

Again, these various descriptions are completely unrelated to MRT's proposed construction of "custom media device" and confirm the lack of any boundaries or limits to this claim term.

## III.   THE DISTRICT COURT CORRECTLY FOUND THE '033 PATENT INDEFINITE.

On December 9, 2013, the district court issued its Opinion and Order Construing Claims, finding the '033 patent invalid under §112(b).  JA16-17.   The district court, after considering the '033 patent, the declarations of the parties' expert witnesses, and the arguments of the parties, concluded that the '033 patent was invalid under §112(b) because "the term 'compliance mechanism' is indefinite because the specification does not disclose sufficient [corresponding] structure" (JA12), and "the claims and specification fail to define the bounds of the term 'custom media device,' [and] they do not 'give notice to the public of the extent of the legal protection afforded by the patent.'" JA16(quoting *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779 (Fed. Cir. 2002)).

16

## SUMMARY OF THE ARGUMENT

The '033 patent is invalid as a matter of law.

First, the '033 patent is directed to patent-eligible subject matter under 35 U.S.C. §101. The Supreme Court has long held that "abstract ideas" are not patent-eligible. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, ---U.S.---, 134 S.Ct. 2347, 2354 (2014). A party cannot patent concepts that are fundamental economic practices or methods of organizing human activity that have broad preemptive effect. Moreover, that prohibition cannot be circumvented by the "draftsman's art" of expressing the idea as a series of routine steps, implementing it using generic computer components and functions, or adding inconsequential features and field-of-use limitations. *Id.* at 2356-60. The asserted claims of the '033 patent are directed to the abstract idea of diverting data pathways and selectively restricting media content and, at most, recite generic computer implementation and append inconsequential steps. As this Court and the Supreme Court have found in prior cases, such claims are patent ineligible under §101.

Second, as the district court correctly held, the '033 patent claims are indefinite under 35 U.S.C. §112(b). The court determined that the terms "custom media device" and "compliance mechanism" do not fairly apprise one of ordinary skill in the art of the claims' scope, in light of the intrinsic record, with reasonable certainty. In its brief before this Court, MRT still cannot clearly and definitively

17

articulate what the "custom media device" and "compliance mechanism" are or identify objective boundaries for either of those terms.

Hence, the district court's judgment below should be affirmed.

## STANDARD OF REVIEW

Capital One agrees with MRT's statement of the Standard of Review, and adds that the *de novo* standard also applies to Capital One's alternative ground for affirmance under §101. *See Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) (citation omitted) ("Whether a patent claim is drawn to patent-eligible subject matter is an issue of law that is reviewed de novo.").

## ARGUMENT

### I.    THE JUDGMENT BELOW SHOULD BE AFFIRMED BECAUSE THE '033 PATENT IS PATENT INELIGIBLE UNDER 35 U.S.C. §101.

The Supreme Court has long recognized that the "Inventions Patentable" under 35 U.S.C. §101 "contains an important implicit exception" for "laws of nature, natural phenomena, and abstract ideas." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S.Ct. 1289, 1293 (2012) (quotation marks and citations omitted). Abstract ideas are not patentable because "they are the basic tools of scientific and technological work," which are "free to all men and reserved exclusively to none." *Id.* (citations omitted). The underlying policy concern is "the grant of patents that tie up [abstract idea] use will inhibit future innovation premised upon them." *Id.* at 1301. In its recent unanimous decision in *Alice*, the

Supreme Court clarified the two step process for analyzing claims to determine whether they are directed to patent-ineligible subject matter.[6]

### A.    *Alice's* **First Step – Do Claims Cover A Patent-Ineligible Concept?**

A court must first "determine whether the claims at issue are directed to one of those patent-ineligible concepts" such as an abstract idea. *Alice*, 134 S.Ct. at 2355 (citing *Mayo*, 132 S.Ct. at 1302-03).  In *Alice*, the Supreme Court clarified that unpatentable abstract ideas are not limited to just "preexisting, fundamental truths" that "exist in principle apart from any human action" but can include many other basic concepts involving human activity.  *Id.* at 2356.  For example, *Alice* characterized *Bilski's* patent—which "simply involved a 'series of steps instructing how to hedge risk'"—as "a method of organizing human activity, not a 'truth' about the natural world 'that has always existed,'" and affirmed that this "fundamental economic practice" was patent-ineligible.  *Id.* at 2356-57 (citations omitted).  Likewise, this Court's prior decisions confirm that the category of "abstract ideas" extends well beyond "fundamental truths" or mathematical formulas.  *See, e.g.*, *Accenture Global Servs., GMBH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341-42 (Fed. Cir. 2013), *cert. denied*, ---U.S.---, 134 S.Ct. 2871 (2014) (computerized system for organizing insurance transactions); *Dealertrack*,

---

[6]   The Supreme Court also confirmed that patent eligibility is a threshold question of law (*see Bilski v. Kappos*, 561 U.S. 593, 602 (2010)), and thus is appropriate to address at the outset.

19

674 F.3d at 1333-34 (implementing a loan clearinghouse in a computer-aided environment); *Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1323-24 (Fed. Cir. 2012) (dividing an aggregated portfolio of real estate into interests in a computer environment); and *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011) (detecting fraud in credit card transactions by gathering the IP addresses used to make prior purchases with a computer and analyzing them).

> 1.    Claims that result in broad preemption or cover fundamental economic practices or methods of organizing human activity are not patentable.

Recent cases have identified some useful indicators that a claim is to an unpatentable abstract idea.  For one, claims that use "highly general language covering all processes" and thereby preempt use of the idea in many fields are unpatentable under §101.  *Mayo*, 132 S.Ct. at 1302.  Because "[l]aws of nature, natural phenomena, and abstract ideas are 'the basic tools of scientific and technological work[,]' … 'monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws."  *Alice*, 134 S.Ct. at 2354 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S.Ct. 2107, 2116 (2013); *Mayo*, 132 S.Ct. at 1293); *see also Bilski*, 561 U.S. at 611-12 ("Allowing petitioners to patent risk hedging would preempt use of this approach

in all fields, and would effectively grant a monopoly over an abstract idea."). This preemption danger "becomes acute when a patented process amounts to no more than an instruction to 'apply the natural law.'" *Mayo*, 132 S.Ct. at 1301. As one commentator has noted, "[o]ne problem with [process] patents is that the more abstractly their claims are stated, the more difficult it is to determine precisely what they cover," which increases the preemption danger. *Id.* at 1302 (citing C. Bohannan & H. Hovenkamp, Creation without Restraint: Promoting Liberty and Rivalry in Innovation 112 (2012)). Thus, a broadly written and inherently vague claim that would preempt the use of an idea in many fields is a strong indicator of patent-ineligiblity.

Second, *Alice* and *Bilski* emphasized that claims directed to concepts that are a "fundamental economic practice" or "a method of organizing human activity" are not patentable. *Alice*, 134 S.Ct. at 2356-57; *Bilski*, 561 U.S. at 611. For example, this Court recently found method claims directed to "guaranteeing a party's performance of its online transaction" patent ineligible because they were "squarely about creating a contractual relationship … that is beyond question of ancient lineage" and based on "long-familiar commercial transactions." *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 2014 U.S. App. LEXIS 16987, *2, *10-11 (Fed. Cir. 2014). Thus, claims that recite fundamental economic practices or

methods of organizing human activity, often of long standing, have repeatedly been found patent-ineligible.

As explained below, both of these indicators are present in the '033 patent, which claims a fundamental method for controlling data output and preempts use of this abstract concept in many different contexts.

> 2. <u>The '033 patent's claims are directed to patent-ineligible abstract ideas.</u>

As explained above, the '033 patent covers the abstract idea of diverting data pathways and selectively restricting media output. As a result, the '033 patent claims have broad preemptive effect "[b]ecause the claims are largely functional in nature, … [and] do not provide any significant description of the particular means by which the various recited functions are performed." *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 2014 U.S. Dist. LEXIS 122244, *38 (E.D. Tex. 2014) (Bryson, J., sitting by designation). The '033 patent effectively preempts all applications of the abstract ideas of diverting a data pathway or selectively restricting media content output—be it in the context of computerized implementation or otherwise.[7]

---

[7]    Although MRT suggests that the '033 patent must be computer implemented, claim 1 is not so limited. The components at the heart of the claimed invention— the "compliance mechanism" and the "custom media device"—could be a variety of non-computerized devices. Although the district court did not construe these terms, the Court can rely on MRT's proposed constructions in assessing patent

According to MRT, the '033 patent covers virtually ***all*** of the ways in which "Capital One's website delivers various types of media to the user including graphics, information, and data.…" JA50(Compl. ¶ 1). Under MRT's theory, the '033 patent would cover not just all forms of Capital One's online banking, but also any process by which a website "diverts" users from one data pathway to a controlled data pathway or "restricts" media output—concepts that would even include the Court's ECF system. The '033 patent would also preempt methods of controlling data that have been practiced for decades in many different contexts. While many examples exist, the following amply illustrate the abstractness of the '033 patent:

- Stereo: a user (compliance mechanism) tunes the radio of his stereo receiver to the frequency (common data pathway) of a radio station playing music, and the user directs that music through the stereo receiver to an audio cable (controlled data pathway) which the user uses to monitor and control the data pathway, and then the user directs the media content (music) to a tape recorder (custom media device) to selectively restrict the output of the music (*e.g.,* recording the music, controlling how long it is recorded, the quality of the recording, etc.);

- Television: a user watching television changes from the public television channel (common data pathway) to a movie channel (controlled data pathway) controlled by the cable network provider (compliance mechanism) which is monitored and controlled, and then,

---

eligibility. *See Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1349 (Fed. Cir. 2013), *vacated and remanded sub nom. WildTangent, Inc. v. Ultramercial, LLC*, 134 S.Ct. 2870 (2014) (where the district court did not construe the claims, it should have adopted a construction most favorable to the patentee when ruling on patent eligibility).

after the user selects a pay-per-view program (media content), the pay-per-view program is directed to the television (custom media device) for selectively restricted output;

- Telephone: a caller uses a telephone line (commonly used data pathway) to call a conference bridge service (compliance mechanism) and, after entry of a code, the caller is transferred to a conference call line (controlled data pathway) which is monitored by the conference bridge service, allowing the caller to participate in the conference call and then a conference call (media content) is directed to a user's speaker phone (custom media device) for selectively restricted output.

Even before computers, the basic concepts of controlling data output by diverting pathways or sending content to a device for restricting output was commonplace.   This happens any time there is some type of gatekeeper (compliance mechanism) that control an output path of a system by diverting it to another path or any time a media device (custom media device) allows output to be restricted—methods of organizing human activity that businesses and governments have been doing for decades if not centuries.[8]  These commonplace activities do not become patentable merely by implementing them using generic computer components performing generic computer functions.   "[T]ransformation into a patent-eligible application requires "more than simply stat[ing] the [abstract idea]

---

[8]   Examples of this are legion and would include tasks as simple as attending a movie, where a consumer purchases a ticket from the theater (the compliance mechanism) to move from the ticket line (the common data pathway) to the movie theater (the controlled data pathway) monitored by the theater, and then the movie (media content) is directed to a movie screen (the custom media device) for selectively restricted output.

while adding the words 'apply it.'" *Alice*, 134 S.Ct. at 2357 (quoting *Mayo*, 132 S.Ct. at 1294).

At bottom, the pathway diversion and restricting output concepts claimed in the '033 patent are no less abstract than the concepts of mitigating settlement risk in *Alice*, hedging against financial risk in *Bilski*, and providing transaction performance guarantees in *buySAFE*. As in those cases, the '033 patent is directed to a method of organizing human activity—diverting data pathways to a controlled pathway and sending media content to a device that can restrict output—that is practiced every day by innumerable businesses with and without the use of computers. Because the '033 patent preempts the use of this fundamental, building block concept in many different contexts, it is patent-ineligible.

## B.  *Alice's* Second Step – Do Claims Have An Inventive Concept?

If a patent-ineligible concept, like an abstract idea, is present, Alice's second step considers "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S.Ct. at 2355 (quoting *Mayo*, 132 S.Ct. at 1297-98). This second step is "a search for an 'inventive concept'—*i.e.,* an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id*. (quoting *Mayo*, 132 S.Ct. at 1294). In considering

this second step, recent cases have identified several approaches that do ***not*** support the existence of an "inventive concept."

First, *Alice* reinforced that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 2358. Claims that do not "purport to improve the functioning of the computer itself" or "reflect an improvement in any other technology or technical field" are not patent eligible. *Id.* at 2359-60 (citations omitted).

Second, the Supreme Court and this Court have repeatedly held that taking an abstract idea and adding "'well-understood,'" "'routine,'" or "'conventional'" activities or features "previously known to the industry" contributes nothing inventive. *Id.* at 2359 (quoting *Mayo*, 132 S. Ct. at 1294); *see also Gottschalk v. Benson*, 409 U.S. 63, 67-68 (1972).

Third, "the prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment.'" *Bilski*, 561 U.S. at 610 (quoting *Diamond v. Diehr*, 450 U.S. 175, 191 (1981)); *see also Dealertrack*, 674 F.3d at 1334 (patent ineligibility affirmed despite patentee's attempt to limit claimed clearinghouse invention to applications for car loans).

Fourth, this Court has repeatedly rejected attempts to find the "inventive concept" in the specification, instead of the claims. As this Court has explained,

"the important inquiry for a §101 analysis is to look to the claim." *Accenture*, 728 F.3d at 1345. "[T]he complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method." *Id*. "This is because a claim may 'preempt' only that which the claims encompass, not what is disclosed but left unclaimed." *Dealertrack*, 674 F.3d at 1334.

Finally, the Supreme Court and this Court have held that when a patent uses "the draftsman's art" to cover the same abstract idea using different claim formats, the different claim sets are treated no differently than the abstract idea. *Alice*, 134 S.Ct. at 2360; *Bancorp Servs., L.L.C. v. Sun Life Assurance Co.*, 687 F.3d 1266, 1276-77 (Fed. Cir. 2012). This equivalent treatment reflects the fact that changing claim format, just like using a generic computer to implement an abstract idea, does not add any "inventive concept."

As explained below, the '033 patent claims an abstract idea that lacks any "inventive concept," and MRT's reliance on the foregoing approaches cannot save the claims.

### 1.    Claim 1 is an invalid method claim.

The claim addressed in *Alice* is similar to claim 1 of the '033 patent. In *Alice*, the representative method claim recited the steps of "(1) 'creating' shadow records for each counterparty to a transaction; (2) 'obtaining' start-of-day balances

based on the parties' real-world accounts at exchange institutions; (3) 'adjusting' the shadow records as transactions are entered, allowing only those transactions for which the parties have sufficient resources; and (4) issuing irrevocable end-of-day instructions to the exchange institutions to carry out the permitted transactions." *Alice*, 134 S.Ct. at 2359.   Considered individually, these steps merely perform conventional computer functions; considered together, the computer components of the method add nothing that is not already present when the steps are considered separately.   *Id.*   The method "simply recite[d] the concept of intermediated settlement as performed by a generic computer," and neither improved the functioning of the computer nor achieved an improvement in any other technology. *Id.* at 2359-60.

Much like the method claim in *Alice*, the steps of claim 1 of the '033 patent, considered individually, are merely conventional functions ("activating," "controlling," "monitoring," "directing"), whether performed with computer components or other devices.   For example, the first step of claim 1 describes "activating" a "compliance mechanism" (*i.e.*, any set of actions or processes for enforcing restrictions) in response to receiving "media content" (*i.e.*, any data). JA48.   "Activating" involves no inventive concept.   And MRT claims that the "compliance mechanism" encompasses *any* set of actions or processes, not a new or novel way of enforcing restrictions that may have constituted an "inventive

step." Likewise, to the extent that the "compliance mechanism" and "client system" may be computer components, they are nothing more than conventional computer components performing conventional functions. Nothing about the first step of claim 1 improves the operation of any computer or represents a technological advance in any field.

The second and third steps describe "controlling" a data output path of the client system by diverting a "commonly used data pathway" of a media player application (*i.e.*, any application for presenting data) to a "controlled data pathway" which is "monitored" by the compliance mechanism. *Id.* There is nothing inventive in the concept of diverting data from one pathway to another or in monitoring that pathway, and MRT does not claim otherwise. Likewise, the claim language does not identify **why** or **how** the "compliance mechanism" is monitoring the controlled data pathway, and so includes **all ways** in which a compliance mechanism (*i.e.*, "any set of actions or processes") "monitors" a pathway, thus encompassing the entire abstract concept of monitoring any type of data pathway.

Finally, the fourth step consists of "directing" the "media content" (*i.e.*, any data) to a "custom media device" for the purpose of "selectively restricting output of said media content." Again, this step—which is disconnected from the other steps of claim 1—does not improve the operation of the computer or accomplish

any other technical advancement.  Further, this fourth step does not state **how** or **why** the output is restricted.  For example, the claims are not, as MRT implies (Br.5-8), limited to using switches controlled by the compliance mechanism to restrict data output.  Moreover, MRT has construed "custom media device" broadly to include any "application or driver specific to the media content being played, viewed or otherwise presented" (JA616), and thus it could be any device used to play, view or present any data—including, for example, a general purpose computer, a stereo, a telephone or a television.  Hence, this step encompasses the entire abstract concept of restricting the output of media content using generic computer components.

When considered as "an ordered combination," the elements of claim 1 add nothing that is not present when the elements are considered separately.  *Alice*, 134 S.Ct. at 2359.  The steps of claim 1 merely provide that a data pathway is "controlled" by "diverting" it to a pathway "monitored" by a "compliance mechanism" and that media content is "direct[ed]" to a "custom media device" for "selectively restricting" output.  MRT's broad constructions of "compliance mechanism" as "any set of actions or processes" and of "custom media device" as "an application or driver" demonstrate that no novel set of actions is claimed. While a "new way" of monitoring pathways or enforcing media content restrictions could have been disclosed and claimed, MRT's broad construction proves that the

'033 patent seeks coverage of an abstract idea and adds nothing inventive to this field of technology. "[T]here is no detail about how those functions are performed … [and] there is no suggestion that those functions are performed in any novel or unusual manner." *Loyalty Conversion Sys.*, 2014 U.S. Dist. LEXIS 122244, \*23-24. Indeed, the '033 patent does little more than "describe a problem, announce purely functional steps that purport to solve the [identified] problem, and recite standard computer operations to perform some of those steps." *Id*. at \*43. Rather, by claiming "any set of actions or processes" for diverting pathways or "an application or driver" for selectively restricting output, MRT leaves it to others to come up with the missing inventive step.

What is more, given the absence of any specific or unique functions or components in claim 1, the claimed invention is not limited to any particular technological environment. The "compliance mechanism," "client system," and "custom media device" are, according to MRT, generic computer components or applications (though they could be non-computerized devices as well). The lack of any meaningful limitation on the compliance mechanism which MRT claims is the "heart of the patent's invention" (Br.4), points up that the "heart" of the invention is merely an abstract idea. Likewise, the conventional functions of "activating," "controlling," "directing," and "monitoring" are little more than "post-solution activity" that the Supreme Court has found are insufficient to render a claim

31

patentable. *Mayo*, 132 S. Ct. at 1298; *CyberSource*, 654 F.3d at 1372 (citation omitted) ("[E]ven if some physical steps are required to obtain information from the database (*e.g.*, entering a query via a keyboard, clicking a mouse), such data-gathering steps cannot alone confer patentability."). Hence, MRT's attempted narrowing of the abstract idea of restricting data output to a computerized environment does not save the claim from patent ineligibility. *buySAFE*, 2014 U.S. App. LEXIS 16987, *11.

Finally, MRT cannot look to the specification to provide the missing patentable subject matter. As this Court explained in *Accenture*, 728 F.3d at 1345, and *Dealertrack*, 674 F.3d at 1334, the §101 analysis focuses on the claims, not the specification, because a claim preempts only what the claims encompass. MRT's brief routinely violates this rule, however, by focusing on what the specification teaches (Br.4-18), and ignoring the broad scope of the claims. As explained in detail above, even MRT's reliance of the specification is unavailing as it "fails to provide the clarity that the subjective claim language needs." *Interval Licensing*, 2014 U.S. App. LEXIS 17459, *19.

### 2.    Claims 5 and 6 are invalid method claims.

Asserted claims 5 and 6 are invalid for the same reasons as claim 1 from which they depend. These claims merely add insignificant steps involving routine functions and generic components. Claim 5 adds "authorizing said client system to

receive said media content," and Claim 6 adds "accessing an indicator associated with said media content for indicating to said compliance mechanism a usage restriction applicable to said media content." These steps are nothing more than modest refinements of how the claimed invention restricts the "output of said media content." As such, these claims are routine "post-solution" activity that cannot transform an unpatentable claim into a patentable one.

3.    Claims 10, 11, 15 and 18 are invalid under §101.

Asserted claims 10, 11, 15 and 18 are invalid for the same reasons as claim 1. *Alice*, 134 S.Ct. at 2360. Claims 10, 11, 15 and 18 are apparatus claims drafted in a *Beauregard* format to a computer readable medium. *CyberSource*, 654 F.3d at 1373. "Regardless of what statutory category ('process, machine, manufacture, or composition of matter,' 35 U.S.C. §101) a claim's language is crafted to literally invoke," the Court must "look to the underlying invention for patent-eligibility purposes." *Id.* at 1374.

Here, the *Beauregard* claims simply take the limitations from claim 1 and largely re-label them as program instructions stored in a computer readable medium. Claim 10 uses the terms "animating," "managing" and "governing" in place of "activating," "controlling" and "directing" and adds that the compliance mechanism is "utilized to stop or disrupt" the playing of media. These differences, however, do not alter the abstract nature of the claim. Similarly, claims 11 and 15

add steps of "authorizing" and "accessing" (respectively) that are no less abstract than the steps in claim 10. Finally, claim 18 purports to restrict the source of the media content, which is, at most, a field of use limitation. As the Court found in *CyberSource*, claiming an abstract idea in the form of a computer readable medium does not convert it into a special-purpose computer that is patent eligible. 654 F.3d at 1376-77; *see also Bancorp*, 687 F.3d at 1277 (no material difference between method and medium claims for patent eligibility purposes).

### 4.    Claims 19, 23, 24 and 27 are invalid under §101.

Asserted system claims 19, 23, 24 and 27 are also invalid. *Alice*, 134 S.Ct. at 2360; *Accenture*, 728 F.3d at 1341 ("[S]ystem claims that closely track method claims and are grounded by the same meaningful limitations will generally rise and fall together."); *Bancorp*, 687 F.3d at 1277 (finding that it is "readily apparent" that method and system claims are equivalent for purposes of patent eligibility). These claims simply relabel elements of claims 1 and 10 as systems claims. Indeed, other than adding "means for" to several elements, claim 19 includes the same steps and is substantially the same as claim 1 with the addition of the element of the compliance mechanism being "utilized to stop or disrupt" the playing of media. Likewise, claims 23, 24 and 27, which depend from claim 19, merely

parallel the additional elements of claims 11, 15 and 18 in system claim language.[9] These claims add no consequential steps or patentable subject matter, and so, like claim 1, they are invalid under §101.

### C.    The '033 Patent Is Patent Ineligible.

Much like the claims found unpatentable in *Alice* and *buySAFE*, the '033 patent claims abstract ideas covering fundamental practices and methods of organizing human activity that broadly preempt the use of those ideas in many contexts.   Moreover, as in *Alice* and *buySAFE*, the '033 patent implements the abstract ideas using generic computer components performing conventional functions but without improving any computer operations or providing any technological advancement.   Accordingly, the district court's judgment should be affirmed on the ground that the '033 patent is invalid under §101.

---

[9]   The other means-plus-function terms in the '033 patent do not add significant limitations or any "inventive concept" needed to avoid patent ineligibility.  The corresponding structure for the "means for activating" (claim 19) is simply a generic computer component (media playback application).  JA40(19:58-61, 20:32-36).  The other means-plus-function terms ("means for directing…" in claim 19; "means for authorizing…" in claim 23, and "means for accessing…" in claim 24) are indefinite because the specification does not disclose a structure that is clearly linked to the function recited in the claim, *see* JA780-84, JA545-550, and, in any event, they merely add conventional steps performed by generic computing components.

## II.   THE CLAIM TERM "CUSTOM MEDIA DEVICE" IS INDEFINITE UNDER §112(B) AND THE CLAIMS ARE THEREFORE INVALID.

The '033 patent claims are invalid under 35 U.S.C. §112(b) because, as the district court held, the claim term "custom media device" is indefinite. The district court's conclusion is amply supported by the intrinsic record and evidence submitted by Capital One, and is confirmed by MRT's inability to identify the bounds of a "custom media device" and MRT's failure to have its expert address the meaning or scope of that term. Accordingly, this Court should affirm the judgment below.

### A.   The District Court Properly Found "Custom Media Device" Is Indefinite.

As the Supreme Court recently stated in *Nautilus, Inc. v. Biosig Instruments, Inc.*, §112(b) "require[s] that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." 134 S.Ct. 2120, 2129 (2014). Section 112(b) serves an important public notice function:

> [A] patent must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open to them…. Otherwise there would be [a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims.

*Id.* (citations, quotation marks omitted) This Court recognized in *Interval Licensing*, that "a patent does not satisfy the definiteness requirement of §112 merely because 'a court can ascribe *some* meaning to a patent's claims.'… The

36

claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art."  2014 U.S. App. LEXIS 17459, \*15 (quoting *Nautilus*, 134 S.Ct. at 2130 & n.8 (indefiniteness problem exists if the claim language "might mean several different things and no informed and confident choice is available among the contending definitions" (citations, quotation marks omitted))).

Here, the district court properly found that "custom media device" has no identifiable boundaries or limits that would enable a skilled artisan to determine the scope of the claimed invention.  MRT acknowledges, as it must, that the specification refers to the "custom media device" variously as (i) a "device," suggesting it could be hardware, (ii) an "application," suggesting it could be software, (iii) a "driver," suggesting it could be specific software for controlling hardware, (iv) being "emulated" by a driver, suggesting that some other component (a driver) could be duplicating the functions of the "custom media device," and/or (v) emulating a driver, suggesting it could be hardware and/or software that duplicates the functions of another component (a driver).  JA13-14(13:24-28,33-37,47-49; 14:21-24).  But the muddled specification fails to provide the clarity that the claim language needs for a skilled artisan to identify the objective boundaries of the "custom media device."  Capital One's expert confirmed this conclusion.

JA630-33(Chatterjee ¶¶32-39).   And MRT failed to dispute this evidence, as the district court specifically noted.  JA12.

*Nautilus* states that a "meaningful definiteness check" is necessary to eliminate the "powerful incentives [applicants face] to inject ambiguity into their claims," and "'the patent drafter is in the best position to resolve the ambiguity in … patent claims.'"  134 S.Ct. at 2129 (*quoting Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008)).  Here, however, MRT tried to benefit from the   033 patent's ambiguity by proposing a construction ("an application or driver specific to the media content being played, viewed or otherwise presented") that serves MRT's litigation objectives rather than "giv[ing] proper notice of the scope of the claims to competitors."  *Halliburton*, 514 F.3d at 1254.

MRT's proposed construction—which is only vaguely tied to a specification so confusing that it could be cited to support many different constructions— effectively eliminates "custom" from the claim term.   Any "media device" is "specific to the media content being played, viewed or presented" in that all media devices are designed to play or present specific types of media (*e.g.*, Windows Media Player™ is specific to presenting certain audio and video media).  Thus, even standard "media players" fall within MRT's construction of "custom media device"—as do a host of other software programs (*e.g.*, Microsoft Word®,

Microsoft Excel®, Internet Explorer®, etc.) that are specific to the media content (*i.e.*, data) presented, but are not considered to be "media devices" or "customized."  At the same time, MRT's proposed construction would exclude hardware even though the specification clearly suggests that the "custom media device" could be hardware like all of the other "devices" referenced it the specification.

Perhaps the most striking example of the unbounded scope of the "custom media device" comes from MRT's attempt to identify "media devices that are outside of the scope of the 'custom media devices.'"  Br.57.  All of MRT's "excluded" examples, however, are "application[s] or driver[s] specific to the media content being played, viewed or otherwise presented," and thus are "custom media devices" as construed by MRT.

As MRT's proposed construction confirms, the specification provides no objective boundaries to the custom media device, "thus leaving the skilled artisan to consult the 'unpredictable vagaries of any one person's opinion.'"  *Interval Licensing*, 2014 U.S. App. LEXIS 17459, *23 (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005)).  Such ambiguity falls within the "innovation-discouraging 'zone of uncertainty'" against which the Supreme Court has warned.  *Nautilus*, 134 S.Ct. at 2130 (quoting *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942)).

### B.    The District Court Applied The Correct Legal Standard.

Preferring to focus on procedure rather than substance, MRT's first argues that the district court failed to apply the *Nautilus* standard.  Br.50.  But the legal standard applied by the district court was even more favorable to MRT than the standard announced in *Nautilus*.

In *Nautilus*, the Supreme Court found that the prior indefiniteness standard—particularly its reliance on the "insolubly ambiguous" and "not amenable to construction" expressions—"lack[s] the precision §112[(b)] demands" and "leave[s] courts and the patent bar at sea without a reliable compass."  134 S.Ct. at 2130.  Instead, the Court held that §112(b) "require[s] that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty."  *Id.* at 2129.  While *Nautilus* rejected the more "amorphous" definiteness standard applied by the district court, the adoption of a clearer standard making it *less* difficult to prove indefiniteness provides no basis for reversal. MRT certainly provides no explanation for how a remand to the district court would change the outcome.  Nor does MRT explain why this Court, applying its *de novo* review standard, is less capable of applying the new standard than the district court.

Consistent with *Nautilus*, the district court received and considered evidence of whether the '033 patent's claims, viewed in light of the specification and

prosecution history, informed those skilled in the art about the scope of the invention with reasonable certainty. Dr. Chatterjee, a person of skill in the art, addressed at length how the '033 patent is confusing, ambiguous, contradictory and unclear about what the "custom media device" is and what purpose(s) or function(s) it serves. JA630-33(Chatterjee ¶¶32-29). Tellingly, MRT's expert failed to address or rebut any of Dr. Chatterjee's opinions about the "custom media device." JA726-30(Declaration of Ivan Zatkovich). Having failed to present any evidence to the contrary, MRT cannot fault the district court for relying on the only evidence before it.

### C.    The District Court's Analysis Was Not Flawed.

MRT argues that the district court committed a "fundamentally flawed misreading of the specification" in concluding "(i) that 'custom media device' was hardware, not software;… (ii) that the 'custom media device driver,' which emulated the 'custom media device', and vice versa, introduced uncertainty,… and (iii) that nothing in the patent described what was custom about this element." Br.50. These arguments, however, mischaracterize the district court's opinion and misconstrue the specification.

### 1.    The specification teaches that the "custom media device" could be hardware, software, or both.

MRT argues that the district court erred in concluding that "'custom media device' was hardware, and not software" (Br.50), but that is not what the district

court actually concluded.  Rather, the district court simply recognized what is inescapable from the specification—*i.e.*, that one cannot determine whether the "custom media device" is hardware, software, or both—without deciding the issue. JA12-14("[p]utting aside the question whether the custom media device is hardware, software, or both….").

The district court properly considered the specification's ambiguous treatment of "custom media device" in finding the claim term indefinite.  As the district court noted, "Capital One's expert asserts—and [MRT's] expert does not contest—that the term 'device' is typically understood to connote hardware, while 'application' is typically understood to connote software."  JA13.  MRT does not contest that the specification repeatedly uses the term "device" to refer to hardware components.  JA19,23-25,31,33(2:32-34; 5:1-10; 5:66-6:2; Figs. 1, 5A, 5B and 5C).  Likewise, the specification identifies a "custom media device driver" (*e.g.*, FIG. 3) and, as MRT admits (Br.52,n.9), "[a] driver is software that typically controls hardware connected to a computer," thus suggesting that the "custom media device" is the hardware on which the driver operates.

The specification also suggests that the "custom media device" could be an application or software.  MRT specifically relies on two specification passages that refer to a "custom media device application."  Br.25,55-56; JA37(13:24-28; 13:58-59).  These passages, though, refer to the "custom media device" using "*e.g.*"

42

rather than "*i.e.*," and so they confusingly suggest that the "custom media device" is merely an example of the "custom media device application," rather than the same thing.[10]  As the Court explained in *Interval Licensing*, the use of "e.g." does not "constitute an exclusive definition" and leaves the skilled artisan "to wonder what other forms" the "custom media device" could take.  2014 U.S. App. LEXIS 17459, *23.  Furthermore, nothing in the specification suggests that the custom media device is only software and could never be hardware (or hardware and software combined).  Thus, as the district court found and Capital One's expert opined, the specification suggests that the custom media device could be software, or hardware, or both.  *See* JA631(Chatterjee ¶36).

> 2.    The specification's reference to "custom media device" as a driver and as emulating or being emulated by a driver creates further ambiguity.

The specification also suggests that the custom media device could be a "driver," or that it could emulate a "custom media device driver," or that it could be emulated by the "custom media device driver."  While MRT argues that these various references merely add "breadth" to the meaning of "custom media device" (Br.51-52), the district court properly concluded that they "further confuse[] the matter" and show the indefiniteness of this claim term.

---

[10]   If the "custom media device" was necessarily an application or software, as MRT suggests, then referring to it as the "custom media device application" would be redundant.

The specification clearly identifies the "custom media device 310" and "custom media device driver 307" as separate components. *E.g.*, JA21,24-25(FIGS. 3, 5B and 5C). In fact, the "custom media device driver 307" is a subcomponent within the compliance mechanism CCM 300. JA21(FIG. 3). Yet, the specification also suggests that the "custom media device" can be an example of a driver. Again, the specification uses "e.g." rather than "i.e." in relating the "custom media device" to a driver (JA37(14:21-24)), leading the skilled artisan "to wonder what other forms" the custom media device could take. *Interval Licensing*, 2014 U.S. App. LEXIS 17459, *23. Confusingly, the specification never describes the "custom media device" as performing the function of a driver. Furthermore, if the "custom media device" is a driver, then it renders the "custom media device driver 307" redundant of the "custom media device 310" and results in either one driver (custom media device driver 307) driving another driver (custom media device 310).

The specification also suggests that the "custom media device" could be emulated by the "custom media device driver 307," and vice-versa. *E.g.*, JA37(13:33-37; 14:23-24). MRT agrees that the district court correctly recognized that "emulation" has a known meaning in the art, but contends that the court "incorrectly concluded that the meaning of [custom media device] was uncertain because it encompassed multiple alternative emulation embodiments." Br.51. But

the specification's fleeting suggestion that the custom media device could be an emulation of the custom media device driver (or vice-versa), without any explanation, simply adds to the uncertainty and ambiguity about what the "custom media device" is and what it does.   This was confirmed by Dr. Chatterjee's opinion—evidence the district court specifically noted that MRT's expert failed to rebut or address.  JA13-14.  Thus, the specification fails to inform a skilled artisan how to identify the metes and bounds of the "custom media device," which could include drivers, things emulated by drivers, and/or things that can emulate a driver.

   3. <u>The specification fails to describe what is "custom" about the custom media device.</u>

  MRT recognizes that the "custom media device" must be different from a standard "media device" in that it is "customized" in some way.   But the specification fails to describe in what way this thing—be it hardware, software, a driver, emulated by/emulating a driver, or some combination of these—is customized in a way that differentiates it from a standard media device.

  MRT first suggests that the custom media device is customized by being "communicatively coupled" to the compliance mechanism.  Br.53.  But coupling a media device to another component does not "customize" that media device.  To the contrary, the compliance mechanism is described as coupled to other devices and components, none of which is thereby "customized."  *See* JA34,39(7:33-34;

18:57-59). Likewise, standard "media devices" are routinely coupled to other components without being thereby "customized."

Second, MRT argues that the "custom media device" is customized because it includes a "switch" controllable by the compliance mechanism. Br.53. Again, MRT does not explain how the presence of a switch "customizes" a media device, particularly given that standard media devices can also have switches. Moreover, the specification describes other devices and components that also have a switch controlled by the compliance mechanism, none of which is thereby "customized." *E.g.*, JA39,41(18:63-66; 22:56-60).

Third, MRT contends that "a standard media device can be converted (i.e. customized) to a custom media device using a skin." Br.53. MRT cites two sections of the specification (12:63-64 and 32:26-33), but neither section—nor any other section—supports MRT's argument. Indeed, these passages never mention "custom media device," as the district court noted in rejecting MRT's argument. JA15. Column 12 discusses skins generally and never mentions media devices. Column 32 refers to a "specialized or custom *media player*," but never indicates that the "specialized or custom media player" is a "custom media device," and suggests the opposite by using different terminology.[11] To the extent the

---

[11] In describing FIG 7C in columns 30-32, the specification refers repeatedly to the "media player application 501" of FIGS. 5A, 5B and 5C (*e.g.*, JA46(31:54-55,

"specialized or custom media player" is supposed to be a "custom media device," the inconsistent description in column 32 just adds to the ambiguity.

Finally, MRT argues that the "custom media device" is "tailored to the specific type of protected media on the controlled pathway." (Br.53). Tellingly, MRT does not explain this argument, and the portion of the specification MRT cites (13:56-61) does not suggest that the "custom media device" is customized or "tailored" to any specific type of protected media.[12] MRT suggests that the "custom media device" is customized because, in one embodiment, a media content file will be playable if it passes through the custom media device application, but not if it an alternative "media player application" is selected. Br.53. But this does not make the custom media device "customized" because, in other embodiments, a media content file can pass through other devices and components (*e.g.*, "media output device 570," "recording application 502") to be playable. *E.g.*, JA40(20:33-21:3). Moreover, media files routinely pass through

---

32:12-13, 32:23-25)), and contrasts the "specialized or custom media player" with readily available media player applications. JA46(32:26-41). Given this context and the absence of any reference to the "custom media device 310" in column 32, the "specialized or custom media player" appears to be some variation of a standard media ***player*** rather than any attempt to define or describe the "custom media device."

[12] 13:56-61 discusses the custom media device application being emulated by the custom media device driver 307, not the custom media device itself.

standard media devices.  Thus, the specification does not support that the "custom media device" is "customized" because media files pass through it.

### D. MRT's Proposed Construction Of "Custom Media Device" Confirms Its Indefiniteness.

MRT contends that the district court also erred in failing to adopt its proposed construction of "custom media device" as "an application or driver specific to the media content being played, viewed or otherwise presented." Because this litigation-driven construction was intended to support MRT's broad infringement theory, it is disconnected from the specification, and MRT is forced to weave disparate passages together to justify its construction.[13]

MRT starts by citing 5:18-23 to support that the "custom media device" must be software, but that passage discusses the invention generally and never mentions the "custom media device."  MRT also cites to the various ambiguous passages that suggest the "custom media device" could be an application, a driver, an emulation of a drive, and/or emulated by a driver (Br.55-56), but ignores the many passages that suggest the "custom media device" could also be hardware.

At the same time, MRT's proposed construction includes a limitation—that the custom media device be "specific to the media content" being played—that is

---

[13] MRT ignores that its proposed construction is unrelated to, and conflicts with, the various elements discussed above that, according to MRT, show how the media device is customized.

unsupported by the specification.  MRT failure to identify any passage in the specification teaching that the custom media device is "specific to the media content being played" is unsurprising given that, as discussed above and as the district court noted, "any media device is specific to the media content being played" (JA14) in that all media devices are designed to play certain types of media.  That an MP3 player plays MP3 audio files does not make the MP3 player a "custom media device."

As its final argument, MRT attempts to identify "media devices that are outside of the scope of the 'custom media devices.'"  Br.57.  But each of the purportedly excluded media devices is, in fact, "an application or driver specific to the media content being played, viewed or otherwise presented" and would be a "custom media device" under MRT's construction.  Thus, even MRT cannot identify the metes and bounds of "custom media device," confirming its indefiniteness.

In short, MRT's proposed construction of "custom media device" lacks any support in the specification and confirms the indefiniteness of this claim term.  Accordingly, this Court should affirm the district court's judgment.

## III. THE COURT SHOULD AFFIRM THAT "COMPLIANCE MECHANISM" IS A MEANS-PLUS-FUNCTION CLAIM LIMITATION.

The district court properly concluded that (A) "compliance mechanism" is a means-plus-function claim limitation, and (B) the specification fails to disclose a sufficient algorithm or structure for performing the claimed functions of the "compliance mechanism," thus rendering the claims indefinite under §112(b).

### A. "Compliance Mechanism" Is A Means-Plus-Function Claim.

This Court applies a two-step process in determining whether §112(f) applies: first, the Court "must determine if the claim limitation is drafted in the means-plus-function format." *Robert Bosch, LLC v. Snap-On Inc.*, ---F.3d---, 2014 U.S. App. LEXIS 19671, *5 (Fed. Cir. 2014). If the Court concludes that §112(f) applies, then it "proceed[s] to the second step and attempt[s] to construe the disputed claim term by identifying the 'corresponding structure, material, or acts described in the specification' to which the claim term will be limited." *Id.* at *5-6 (quoting *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1097 (Fed. Cir. 2008)).

While there is a rebuttable presumption that §112(f) does not apply to claim limitations lacking the term "means," that presumption may be overcome "if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* at *5 (quoting *EnOcean GmbH v. Face Int'l Corp.*,

742 F.3d 955, 958 (Fed Cir. 2014)).  "The question is whether the claim language names particular structures or, instead, refers only to a general category of whatever may perform specified functions."  *Id.* at *9 (citation omitted); *see also Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004) ("What is important is whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for.'").

Here, "compliance mechanism" as used in the claims refers not to any particular structure, but to a general category of things ("actions and processes" under MRT's construction) that perform compliance functions.  The term is nothing more than "a purely functional placeholder in which structure is filled in by the specification."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1311 (Fed. Cir. 2005).  MRT does not dispute that "compliance mechanism" has no generally understood structure or meaning and is not used in common parlance or by skilled artisans to describe structure.  JA6; JA626(Chatterjee ¶¶17-19).  Moreover, as this Court has recognized previously, the term "mechanism" connotes no more structure than the term "means" and can be a substitute for the term "means for," triggering application of §112(f).  *MIT v. Abacus Software¸* 462 F.3d 1344, 1354 (Fed. Cir. 2006).

51

Not only is "mechanism" a generic word lacking any structure, the adjective "compliance" has no structure of its own and does not provide any structure to "compliance mechanism." *See id.* (surrounding claim language can sometimes add sufficient structure); *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1374 (Fed. Cir. 2012) (looking to surrounding claim language and dictionary definitions to determine whether a term has sufficient structure). "Compliance" is simply a functional word that means the act or process of complying, and MRT does not contend otherwise. Thus, as used in the '033 patent, "compliance mechanism" is a substitute for the phrase "means for compliance"—something that is entirely devoid of structure.

Given that "compliance mechanism" does not have any generally understood structural meaning, the Court "must construe the claim limitation to decide if it connotes 'sufficiently definite structure'" to avoid application of §112(f). *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1296 (Fed. Cir. 2014); *Inventio AG v. Thyssenkrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1356 (Fed. Cir. 2011) ("the focus remains on whether the claim as properly construed recites sufficiently definite structure to avoid the ambit" of §112(f)). Significantly, MRT's proposed construction of "compliance mechanism," *i.e.*, "a set of actions or processes of a computer system (or systems) that enforce usage restrictions applicable to media content," confirms the absence of any structure. MRT's construction is an

abstraction that describes a function performed by undefined "actions or processes."[14]   Hence, MRT's proposed construction does not connote sufficient structure to avoid application of §112(f).

Even though its proposed construction is unsupported by the specification, MRT asserts that Capital One failed to overcome the presumption that "compliance mechanism" is not a means-plus-function limitation because the specification contains structure corresponding to the compliance mechanism's functions.  Br.34. This argument is meritless.   Every ***valid*** means plus function limitation has corresponding structure in the specification, so the presence of corresponding structure adds nothing to the analysis.[15]   If the presence of structure corresponding to the claim term at issue was sufficient to determine that §112(f) does not apply, as MRT suggests, then §112(f) would never apply to "valid" claim terms.  It would only apply when no corresponding structure could be found, which would render

---

[14]   Even treating "compliance mechanism" as a software-implemented term, MRT's construction contains no algorithm, flowchart or specific set of structures or rules.

[15]   For example, in *Welker Bearing*, the Court held that the term "mechanism for moving said finger" should be treated as a means-plus-function term even though the specification identified a "mechanism 68" for performing the claimed function. 550 F.3d at 1097-98.   Similarly, in *MIT*, this Court affirmed that "colorant selection mechanism" was a means-plus-function claim term even though the district court identified corresponding structure in the specification.  462 F.3d at 1354-55.

the claim invalid under §112(b). Thus, under MRT's view, §112(f) would apply to a null set.

MRT has been forced to take this erroneous view of §112(f) because the only place it can find evidence that compliance mechanism has a structural meaning is in the specification.[16] "Compliance mechanism" lacks any generally understood structural meaning, and MRT presented no evidence from technical dictionaries or skilled artisans to show that "compliance mechanism" connotes structure. Instead, MRT relies solely on embodiments in the specification as evidence that "compliance mechanism" conveys the presence of structure. Br.35-36 (citing Figs. 5B and 5C); Br.39-40 (same); Br.38 (citing Fig. 5A and wave shim driver 309); Br.40-41 (citing CCM 300 and exemplary source code). But a description of structure in the specification corresponding to a claim term cannot,

---

[16] While MRT points to claim language that the compliance mechanism is "coupled to" the "client system" and to the "custom media device" (Br.35), the district court correctly found "this language merely explains how the components of the invention fit together and the functions performed by the compliance mechanism; it says nothing about the structure of the compliance mechanism itself." JA7; *see also Robert Bosch*, 2014 U.S. App. LEXIS 19671, *10-11 (noting that specification's description of how "program recognition device" connects and functions with various components are insufficient to provide structure of the "program recognition device" itself).

standing alone, establish that §112(f) does not apply without rendering §112(f) an empty vessel.[17]

In short, the term "compliance mechanism" has no generally understood structural meaning, connotes no structure to a skilled artisan, and was construed by MRT in a manner that confirms its lack of structure. Hence, the district court properly concluded that "compliance mechanism" is subject to §112(f).

## B. The Specification Lacks Corresponding Structure For Each Of The Claimed Functions Of The "Compliance Mechanism."

For claim terms drafted in means-plus-function format, the Court must first identify the function being performed, and, second, the Court must identify the corresponding structure in the specification. *JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005). Here, the district court found, and

---

[17] While MRT cites *Inventio* for the proposition that the existence of any structure in the specification is sufficient to avoid application of §112(f), that is not what *Inventio* or any other decision of this Court has held. Rather, this Court consistently has looked first to the claim term itself—including how that term is used in technical dictionaries and by skilled artisans—and to the surrounding claim language to determine whether the term connotes sufficient structure. Only after first determining that the claim term or surrounding claim language provided evidence of structure does the Court consider the specification to confirm that conclusion. *See, e.g.*, *Lighting World*, 382 F.3d at 1361 (finding that the term "connector" had a reasonably well-understood meaning as a name for structure); *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004) (citing technical dictionaries and claim language to determine that "circuit" connotes structure); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369-70 (Fed. Cir. 2002) (relying on claims and dictionary definitions of "member").

MRT does not dispute, that the "compliance mechanism" performs the following functions:

(1) controlling/managing a data output path of the client system by diverting a commonly used pathway of the media player application to a controlled data pathway (claims 1 and 10);

(2) monitoring the controlled data pathway (claims 1, 10 and 19); and

(3) stopping or disrupting the playing of the media content file at the controlled data pathway when said playing of said media file content is outside of the usage restrictions applicable to said media file (claims 10 and 19).

JA7-8; Br.21.

The structures corresponding to each of these functions must be found in the specification. *Saffran v. Johnson & Johnson*, 712 F.3d 549, 563 (Fed. Cir. 2013). The "patentee cannot avoid providing specificity as to structure simply because someone of ordinary skill in the art would be able to devise a means to perform the claimed function." *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009). Thus, MRT cannot, as it tries to do (Br.45-46), "rely on the knowledge of one skilled in the art to fill in the gaps" where no corresponding structure is disclosed. *Function Media, L.L.C. v. Google Inc.*, 708 F.3d 1310, 1319 (Fed. Cir. 2013). Furthermore, for computer-implemented means-plus-function limitations, the specification must disclose an algorithm for performing the claimed function. *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012). Yet, as explained below, the specification fails to disclose any algorithm or

structure to perform the claimed "managing/controlling a data output path by diverting" function or the "stopping or disrupting" function.

1.    The specification fails to disclose any algorithm or structure corresponding to the *controlling/managing-a-data-output-pathway-by-diverting* function.

MRT agrees that "managing/controlling a data output path by diverting" is one of the primary functions performed by the "compliance mechanism" and contends that "[t]he patent sets forth two source code algorithms for this function…." Br.46 (citing 11:37-12:20 and the '390 Application).[18] But this is not so. Capital One presented evidence, through Dr. Chatterjee, establishing that the referenced source code "does not teach one of ordinary skill in the art the recited functionality of 'diverting and/or redirecting certain data pathways that are commonly used for recording of media.'" JA633(Chatterjee ¶ 39). This evidence was undisputed, as MRT's expert did not contest this point. JA726-30. Since MRT failed to identify any algorithm or structure corresponding to the "managing/controlling a data output path by diverting" functionality (Br.46), the term "compliance mechanism" is indefinite.

---

[18] While MRT claims there is a second source code algorithm for diverting "in the incorporated '390 Application," the cited pages of the '390 Application contain the *identical* source code that is at 11:37-12:20 of the '033 patent specification. Thus, there are not two algorithms, but rather one that is located in two locations.

2.    The specification fails to disclose any algorithm or structure corresponding to the *stopping-or-disrupting-the-playing-of-said-media-content* function.

MRT contends that "stopping or disrupting the playing of said media content" function is disclosed in the "exemplary source code for codec 303 and custom media device drive 307's function of redirecting or diverting data pathways…."  Br.47 (citing JA35(10:22-25)).  Again, this is not so.  The specification states that the referenced C++ source code is "for performing media player application detection…."  JA35(10:23-24).  Nothing in the specification suggests that this source code also performs the function of redirecting or diverting any data pathways.

MRT also points to "Figure 6A and its accompanying text" as examples of the algorithm corresponding to the "stopping or disrupting" functionality.  Br.48 (citing  JA42-43(24:51-53,  25:14-17,  25:18-22)).  Again,  none  of  the  cited examples provides the requisite stopping/disrupting algorithm or structure.  Rather, these passages merely discuss the use of an "indicator" to indicate that copying or recording is barred—they do not disclose any algorithm or structure for preventing such copying or recording.[19]  Hence, the specification fails to disclose any algorithm or structure corresponding to the stopping/disrupting function.

_____

[19]  Similarly, MRT cites to "presentation stoppages" described in the specification (Br.48 citing JA39 (18:20-32)), but the passages cited by MRT merely state that

3.    <u>The district court was not required to consider expert testimony on indefiniteness.</u>

Capital One was not required, as MRT asserts (Br.43), to proffer evidence that a skilled artisan would have understood that the '033 patent lacked a corresponding algorithm for the functions performed by the "compliance mechanism." "While it is undisputed that the question of whether a claim is indefinite is based on how the claim limitation would be understood by one of skill in the art, 'the testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification.'" *Noah Sys.*, 675 F.3d at 1312 (quoting *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005)). Thus, the principle that the sufficiency of a disclosed algorithmic structure must be judged in light of what a skilled artisan would understand has no application where the specification discloses no algorithm. *Id*. at 1313 (citation omitted).[20] Regardless, Capital One introduced unrebutted expert testimony from Dr. Chatterjee that the specification and source code cited therein did not disclose the claimed functionality, and so MRT's premise is simply false.

---

media may be halted if certain rules are not enforced. No algorithm or structure is provided. JA39(18:20-32).

[20] The cases MRT cites are not to the contrary and the primary case cited by MRT, *Elcommerce.com, Inc. v. SAP AG*, was vacated. 745 F.3d 490, 506 (Fed. Cir.), *vacated*, 2014 U.S. App. LEXIS 11068 (Fed. Cir. 2014).

### C.    The District Court Correctly Concluded That "Compliance Mechanism" Is Indefinite.

In short, the claim term "compliance mechanism" is indefinite because the specification fails to disclose algorithms corresponding to the functions performed by the "compliance mechanism." Indeed, with respect to the "managing/controlling a data output path by diverting" and "stopping/disrupting" functions, the specification fails to disclose any algorithms at all, thus precluding the public from determining how the compliance mechanism performs those functions. *See Function Media*, 708 F.3d at 1318-19 (disclosure of "PGP software" insufficient where no disclosure of how the software performs the function).

In addition, while the specification discloses a number of structural subcomponents that ***could*** be part of the compliance mechanism, it does not disclose which components are necessarily present. JA8. As it did before the district court, MRT argues that not all of the components shown in Figure 3 are necessarily part of the structure of the compliance mechanism. Br.13, 42. The problem with MRT's position, however, as the district court stated, is that "[i]f … the disclosed structure need not include any particular components, as MRT reads its patent, the specification in effect discloses no structure at all." JA8. As this Court noted recently in *Robert Bosch*, "listing of examples of possible structures" that correspond to the claimed function of a means-plus-function claim term is

insufficient because "means-plus-function language that defines a category in functional terms will typically cover examples of structures that fall within it." 2014 U.S. App. LEXIS 19671, *15-16.

Accordingly, the Court should affirm the decision below that "compliance mechanism" is indefinite.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

In view of the foregoing, Capital One asks that the Court affirm the district court's judgment that the claims of the '033 patent are invalid because such claims are patent ineligible under 35 U.S.C. §101 and indefinite under 35 U.S.C. §112(b).

Dated: October 24, 2014                    Respectfully submitted,


                                           /s/ Dabney J. Carr IV


Robert A. Angle                    Douglas D. Salyers
Dabney J. Carr IV                  TROUTMAN SANDERS LLP
George A. Somerville               600 Peachtree Street, NE
Nicholas R. Klaiber                Suite 5200
TROUTMAN SANDERS LLP               Atlanta, GA 30308-2216
1001 Haxall Point                  (404) 885-3000
Richmond, VA 23219
(804) 697-1200


                                   *Counsel for Appellees*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 24th day of October, 2012, I caused this Brief of Appellees to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Courtland L. Reichman
MCKOOL SMITH, P.C.
255 Shoreline Drive, Suite 510
Redwood City, California  94065

Daniel L. Geyser
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201

Robert G. Sterne
Byron L. Pickard
Jonathan M. Strang
Jon Wright
STERNE KESSLER GOLDSTEIN & FOX, PLLC
1100 New York Avenue, NW
Washington, DC  20005

*Counsel for Appellant*

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the Brief of Appellees will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

/s/ Dabney J. Carr IV
*Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*13,966*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[      ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[      ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: October 24, 2014                              /s/ Dabney J. Carr IV
                                                      *Counsel for Appellees*